**No. 23-55054**

UNITED STATES CIRCUIT COURT OF APPEALS
FOR THE NINTH CIRCUIT

LOS PADRES FORESTWATCH, a non-profit organization, CENTER FOR BIOLOGICAL DIVERSITY, a non-profit organization; and EARTH ISLAND INSTITUTE, a non-profit organization,

*Plaintiffs and Appellants*

*vs.*

U.S. FOREST SERVICE, CHRISTOPHER STUBBS, in his official capacity as Supervisor of the Los Padres National Forest, and the U.S. FISH AND WILDLIFE SERVICE,

*Defendants and Appellees,*

*and*

AMERICAN FOREST RESOURCE COUNCIL, a non-profit corporation, CALIFORNIA FORESTRY ASSOCIATION, a nonprofit corporation, and ASSOCIATED CALIFORNIA LOGGERS, a non-profit corporation,

*Defendant-Intervenors and Appellee-Intervenors*

APPEAL FROM DENIAL OF MOTION FOR SUMMARY JUDGMENT

By the United States District Court, Central District of California
Honorable Virginia A. Phillips, U.S. District Judge

**APPELLANTS' EXCERPTS OF RECORD
VOLUME 1 OF 1**

| | |
|---|---|
| Justin Augustine | Brian Segee |
| 1212 Broadway, Suite 800 | 226 W. Ojai Ave., Ste. 101-442 |
| Oakland, CA 94612 | Ojai, CA 93023-3278 |
| (916) 597-6189 | (805) 750-8852 |
| jaugustine@biologicaldiversity.org | bsegee@biologicaldiversity.org |

# INDEX

**Page**

Judgment,
(Docket No. 119) (filed January 3, 2023) ........................................................ ER-4

Summary Judgment Order,
(Docket No. 118) (filed December 5, 2022) ..................................................... ER-5

Tecuya Ridge Project revised Decision Memo,
(AR[1] 011244) (2022) ...................................................................................... ER-23

Tecuya Ridge Project Fire/Fuels Report,
(AR 000177) (2017) .......................................................................................... ER-53

Forest Service, Antimony IRA Analysis,
(AR 004215) (2013) .......................................................................................... ER-64

Forest Service, Environmental Assessment, Frazier Mountain Project,
(AR 008597) (2012) .......................................................................................... ER-73

Mt. Pinos Communities Wildfire Protection Plan Update,
(AR 004731) (2009) .......................................................................................... ER-79

Forest Service Report, Fire Behavior and Effects in Fuel Treatments
and Protected Habitat on the Moonlight Fire,
(AR 009248) (2008) .......................................................................................... ER-80

Los Padres National Forest, Land Management Plan, Part 2,
Los Padres National Forest Strategy,
(AR 005367) (2005) .......................................................................................... ER-82

36 C.F.R. Part 294; Special Areas; Roadless Area Conservation;
Final Rule,
(AR 005587) (2001) .......................................................................................... ER-86

---

[1] "AR" refers to the document's location in the Administrative Record.

Standing Declaration of Bryant Baker,
(Docket No. 108-1) ..................................................................... ER-117

Plaintiffs' Notice of Appeal,
(Docket No. 120) ......................................................................... ER-121

District Court Docket Sheet ......................................................... ER-123

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Los Padres ForestWatch, et al.<br><br>    Plaintiffs,<br><br>                    v.<br><br>United States Forest Service, et al.<br><br>    Defendants<br><br>                    and<br><br>American Forest Resource Council, et al.<br><br>    Defendant-Intervenors. | JS-6<br><br>2:19-cv-05925-VAP-KSx<br><br>**JUDGMENT** |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD**:

Pursuant to the Order Granting Defendant-Intervenors' and Federal Defendants' Cross-Motions for Summary Judgment, IT IS ORDERED AND ADJUDGED that judgment is entered in favor of Defendant-Intervenors and Federal Defendants, and the action, *Los Padres Forestwatch, et al. v. United States Forest Service, et al.*, 2:19-cv-05925-VAP-KSx, is DISMISSED WITH PREJUDICE. The Court orders that such judgment be entered.

**IT IS SO ORDERED.**

Dated:    1/3/23

_____
Virginia A. Phillips
Senior United States District Judge

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

Los Padres ForestWatch, et al.

    Plaintiffs,

           v.

United States Forest Service, et al.

    Defendants

        and

American Forest Resource

Council, et al.

    Defendant-Intervenors.

Case No. 2:19-cv-05925-VAP-KSx

**Order DENYING Plaintiffs'**
**Motion for Summary Judgment**
**(Doc. No. 108)**

Plaintiffs Los Padres Forestwatch, Earth Island Institute and Center for Biological Diversity (collectively, "Plaintiffs") filed a Motion for Summary Judgment ("Plaintiffs' MSJ") on September 23, 2022. (Doc. No. 108). Defendant-Intervenors American Forest Resource Council, California Forestry Association, and Associated California Loggers (collectively, "Defendant-Intervenors") filed a Cross-Motion for Summary Judgment

1

**ER-5**

("Defendant-Intervenors' Cross-MSJ") and opposition to Plaintiffs' MSJ on October 7, 2022. (Doc. No. 110). Federal Defendants United States Forest Service and Christopher Stubbs, Supervisor, Los Padres National Forest (collectively, "Federal Defendants") likewise filed a Cross-Motion for Summary Judgment ("Federal Defendants' Cross-MSJ") and opposition to Plaintiffs' MSJ on October 7, 2022. (Doc. No. 111).

Plaintiffs filed a combined opposition to Defendant-Intervenors' and Federal Defendants' Cross-MSJs ("Plaintiffs' Opp'n") and reply in support of Plaintiffs' MSJ on October 17, 2022. (Doc. No. 112). On October 24, 2022, Federal Defendants and Defendant-Intervenors each filed a reply in support of their respective Cross-MSJs. (Doc. Nos. 116, 115).

After considering all papers filed in support of, and in opposition to, the motions, as well as the arguments advanced at the hearing, the Court **DENIES** Plaintiffs' Motion for Summary Judgment, and **GRANTS** Defendant-Intervenors' and Federal Defendants' Cross-Motions for Summary Judgment.

## I.  BACKGROUND

### A.  PROCEDURAL HISTORY

On September 30, 2019, Plaintiffs initiated this action under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706. (*See* Doc. No. 15). Plaintiffs challenged the United States Forest Service's ("Forest Service") decision approving the Tecuya Ridge Project ("Project") on the grounds that the decision violated the Roadless Area Conservation Rule

2

("Roadless Rule") and the National Environmental Protection Act ("NEPA"). (*Id.*; Doc. No. 102, First Supplemental Amended Complaint ("FAC")). On August 20, 2020, Magistrate Judge Patrick J. Walsh granted summary judgment in favor of Federal Defendants and Defendant-Intervenors. (*See* Doc. No. 61).

On appeal, the Ninth Circuit affirmed the grant of summary judgment on the issue of whether the Forest Service's decision to approve the Tecuya Project violated NEPA. *See Los Padres ForestWatch v. United States Forest Serv.*, 25 F.4th 649, 664 (9th Cir. 2022). The Ninth Circuit concluded, however, that the Forest Service's determination that the Tecuya Project complied with the Roadless Rule was arbitrary and capricious. *Id.* at 659. Accordingly, the Ninth Circuit vacated the district court's order granting summary judgment on that issue and remanded the case to the Forest Service to explain why 21-inch diameter at breast heigh ("DBH") trees qualified as "generally small diameter timber" under the Roadless Rule. *Id.*

Plaintiffs moved to reopen the case and on September 7, 2022, Plaintiffs filed a Supplemental Amended Complaint. (Doc. No. 102). Plaintiffs also filed a Supplemental Administrative Record, attaching Exhibits 1 through 14. (*See* Doc. No. 104, Supplemental Admin. Record ("AR")). On September 23, 2022, Plaintiffs filed their Motion for Summary Judgment. (Doc. No. 108, "Plaintiff's MSJ").

United States District Court
Central District of California

3

On October 7, 2022, Federal Defendants and Defendant-Intervenors each filed a Cross-Motion for Summary Judgment and opposition to Plaintiffs' MSJ.  (*See* Doc. Nos. 111, 112).

On October 17, 2022, Plaintiffs filed a combined opposition to Federal Defendants' and Defendant-Intervenors' Cross-MSJs and reply in support of Plaintiffs' MSJ.  (*See* Doc. No. 112).

On October 24, 2022, Federal Defendants and Defendant-Intervenors each filed a reply in support of their respective Cross-MSJs.  (Doc. Nos. 115, 116).

**B.    TECUYA RIDGE SHADED FUELBREAK PROJECT**

When reviewing an agency action under the APA, a court must generally "limit its review to the administrative record."  *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 992 (9th Cir. 2014); *see, e.g.*, *Karuk Tribe of California v. U.S. Forest Serv.*, 681 F.3d 1006, 1017 (9th Cir. 2012) ("Because this is a record review case, we may direct that summary judgment be granted to either party based upon our review of the administrative record.").  Accordingly, the facts described below are taken from the Supplemental Administrative Record.

The Tecuya Ridge is located in the Los Padres National Forest in Kern County, California.  (AR 11245–11246).  Since 1998, fifteen wildfires have burned within the Tecuya Ridge area and approximately sixty-seven percent of those fires were caused by human-related activities.  (*Id.*

4

at 11244).  The overcrowded stands of trees in Tecuya Ridge are vulnerable to loss by insects, disease, and wildfire.  (*Id.* at 11247).  Much of the area has not burned in over 100 years and "has missed its fire return intervals due to the Forest Service's successful fire suppression efforts[,]" which have led to "unstable conditions in the mixed conifer and pinyon-juniper stands by allowing widespread accumulation of fuels in the form of litter accumulations, coarse woody debris, and understory growth of shrubs and conifer regeneration."  (*Id.* at 11270).

Accordingly, the Forest Service proposed the Tecuya Ridge Shaded Fuelbreak Project ("the Project") in March 2018.  *Los Padres ForestWatch*, 25 F.4th at 653.  The Project authorizes the thinning of 1,626 acres of forest stand and brush fields in the Tecuya Ridge.  (AR 11244).  The July 1, 2022, Revised Decision Memo explains that the Project is needed to "provide safe and effective locations from which to perform fire suppression operations, to slow the spread of wildland fire" by creating "strategic fuelbreak locations, and to reduce the potential for the loss of life, property, and natural resources."  (*Id.* at 11248).  To accomplish these goals, the Project requires thinning existing stand densities to "help increase the forests resilience to insects and disease by lowering the amount of trees that are competing for limited resources such as water."  (*Id.*).

The project area contains mixed conifer and pinyon-juniper dominated stands.  (*Id.* at 11267).  The dominant conifer species within the project area is the Jeffrey pine, which grows to approximately 90-inches DBH.  (*Id.*).  The Forest Service conducted stand exams within the project area and

5

determined that the overall tree diameters ranged from less than 1-inch DBH to 42-inches DBH.  (*Id.*).  Some areas within the Project have up to 480 trees per acre—a stocking level that "exceeds the natural range of variation and is more than double the desired condition[.]"  (*Id.*).  Additionally, stand exams showed that the area is "overgrown with smaller diameter trees."  (*Id.*).

The Revised Decision Memo states that approximately 66-percent of the Project area overlaps with the Antimony Inventoried Roadless Area ("Antimony IRA").  (*Id.* at 11257).  Within this area, the Forest Service will remove only "generally small diameter trees within the 0–14 [inch] diameter class with a small number of trees thinned within the 14–28 [inch] diameter class (up to 21 DBH) . . . ."  (*Id.*).  The majority of the trees (approximately 73%) to be thinned fall within the 0–2 inch size class and nearly all of the trees to be thinned (98.5%) fall within the 0–14 inch non-commercial size class.  (*Id.* at 11267–11268).

The Project proposes thinning a small number of trees up 21-inches DBH to "break up crown fuels enough to help prevent spread of fires if established within the crowns of trees."  (*Id.* at 11271).  Due to the distribution of trees in the Project area, thinning only the lower diameter class trees "will not result in the desired spacing and density levels throughout the project areas."  (*Id.*)  Accordingly, the Project will thin some of the middle and upper diameter class trees that are clustered near each other to reduce the risk of uncharacteristic wildfire effects.  (*Id.*)

6

## II. LEGAL STANDARDS

### A. Administrative Procedure Act

Plaintiffs seek review of the agencies' approval of the Tecuya Project under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706.  The APA directs that a court shall set aside agency action found to be, among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of the procedure required by law."  5 U.S.C. §§ 706(2)(A), (D); *see Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 964 (9th Cir. 2002) (citing 5 U.S.C. § 706*); see also Kisor v. Wilkie*, 139 S. Ct. 2400, 2414 (2019) (generally reaffirming the rule that an agency's reasonable interpretation of its own regulation is controlling unless plainly erroneous or inconsistent with the regulation) (citing *Auer v. Robbins*, 519 U.S. 452, 461–63 (1997) and *Bowles v. Seminole Rock & Sand Co.*, 326 U.S. 410, 414 (1945)).

The district court "is not required to resolve any facts in a review of an administrative proceeding"; rather, "the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Eng'g Co. v. I.N.S.*, 753 F.2d 766, 769 (9th Cir. 1985). Accordingly, summary judgment is an appropriate vehicle for deciding APA cases.  *Id.*

### B. Summary Judgment

A motion for summary judgment or partial summary judgment shall be granted when there is no genuine issue as to any material fact and the

United States District Court
Central District of California

7

moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

"[W]hen parties submit cross-motions for summary judgment, each motion must be considered on its own merits."  *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (internal quotations and citation omitted).  Thus, "[t]he court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard."  *Id.* (quoting 21 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2720, at 335–36 (3d ed. 1998)).  If, however, the cross-motions are before the court at the same time, the court must consider the evidence proffered by both sets of motions before ruling on either one.  *Riverside Two*, 249 F.3d at 1135–36.

Generally, the burden is on the moving party to demonstrate that it is entitled to summary judgment.  *Margolis v. Ryan*, 140 F.3d 850, 852 (9th Cir. 1998).  "The moving party may produce evidence negating an essential element of the nonmoving party's case, or . . . show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial."  *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1106 (9th Cir. 2000) (reconciling *Adickes v. S. H. Kress & Co.*, 398 U.S. 144 (1970) and *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).  The nonmoving party must then "do more than simply show that there is some metaphysical doubt as to the

United States District Court
Central District of California

material facts" but must show specific facts which raise a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248.

In ruling on a motion for summary judgment, a court construes the evidence in the light most favorable to the non-moving party. *Barlow v. Ground*, 943 F.2d 1132, 1135 (9th Cir. 1991). "[T]he judge's function is not [] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

### III.    DISCUSSION

The issue in this case is whether the Tecuya Project's proposed timber cutting violates the Roadless Rule. Plaintiffs seek a court order prohibiting the Tecuya Project until it conforms with the Roadless Rule. (Plaintiff's MSJ at 5).

### A.    Roadless Area Conservation Rule

The 2001 Roadless Area Conservation Rule ("Roadless Rule") was established to "initiate a nationwide plan to protect inventoried and uninventoried roadless areas" within national forests. *Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1105 (9th Cir. 2002). An "Inventoried Roadless Area" ("IRA") is an area that "provide[s] large, relatively undisturbed landscapes that are important to biological diversity and the long-term survival of many at risk species." Special Areas; Roadless Area

Conservation, 66 Fed. Reg. 3244, 3245 (Jan. 12, 2001); *see also* 36 C.F.R. § 294.11.

The Roadless Rule generally prohibits timber cutting, sale, or removal in IRAs because those activities "have the greatest likelihood of altering and fragmenting landscapes resulting in immediate, long-term loss of roadless area values and characteristics."  Special Areas; Roadless Area Conservation, 66 Fed. Reg. at 3244.  The Rule does, however, provide some exceptions.  For example, "timber may be cut, sold or removed" in IRAs if the Responsible Official determines:

> (1) The cutting, sale, or removal of generally small diameter timber is needed for one of the following purposes and will maintain or improve one or more of the roadless area characteristics as defined in § 294.11.
>
>> (i) To improve threatened, endangered, proposed, or sensitive species habitat; or
>>
>> (ii) To maintain or restore the characteristics of ecosystem composition and structure, such as to reduce the risk of uncharacteristic wildfire effects, within the range of variability that would be expected to occur under natural disturbance regimes of the current climatic period[.]

36 C.F.R. § 294.13.

The Roadless Rule defines "roadless area characteristics" as "[r]esources or features that are often present in and characterize" IRAs, including:

United States District Court
Central District of California

(1) High quality or undisturbed soil, water, and air;
(2) Sources of public drinking water;
(3) Diversity of plant and animal communities;
(4) Habitat for threatened, endangered, proposed, candidate, and sensitive species and for those species dependent on large, undisturbed areas of land;
(5) Primitive, semi-primitive non-motorized and semi-primitive motorized classes of dispersed recreation;
(6) Reference landscapes;
(7) Natural appearing landscapes with high scenic quality;
(8) Traditional cultural properties and sacred sites; and
(9) Other locally identified unique characteristics.

36 C.F.R. § 294.11.

1. <u>Roadless Rule Interpretation</u>

Plaintiffs argue that the Court should not defer to the Forest Service's interpretation of the Roadless Rule's exception for logging "generally small diameter timber." (Plaintiffs' MSJ at 10). Instead, Plaintiffs argue that given the Roadless Rule's text, structure, history, and purpose, the regulation "prohibits logging in IRAs with only a narrow exception for 'areas that have become overgrown with smaller diameter trees.'" (*Id.* at 14).

"[T]he possibility of deference can only arise if a regulation is genuinely ambiguous." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2414 (2019). Here, Plaintiffs have not provided any evidence that the regulation is ambiguous or offered any reasons why the Court should not rely on the plain-text reading of the Roadless Rule. Nevertheless, after a careful consideration of the

United States District Court
Central District of California

Roadless Rule, the Court finds that that the regulation is not genuinely ambiguous.  *See id.* at 2415 (explaining to determine whether a regulation is genuinely ambiguous, "a court must 'carefully consider[]' the text, structure, history, and purpose of a regulation, in all the ways it would if it had no agency to fall back on") (alteration in original) (quoting *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 707 (Scalia, J., dissenting)).

Plaintiffs further ask the court to read the word "generally" out of the Roadless Rule and substitute in "only."  (Plaintiffs' MSJ at 14).  Courts must "resist reading words or elements into a statute that do not appear on its face."  *Pac. Coast Fed'n of Fishermen's Associations v. Blank*, 693 F.3d 1084, 1095 (9th Cir. 2012) (quoting *Dean v. United States*, 556 U.S. 568, 572 (2009)).  For these reasons, the Court declines to adopt Plaintiffs' proposed interpretation.

2.    "Generally Small Diameter Timber"

"[W]hether the Forest Service may harvest timber in an inventoried roadless area is a three-step inquiry."  *Los Padres ForestWatch*, 25 F.4th at 656 (quoting *All. for the Wild Rockies v. Krueger*, 950 F. Supp. 2d 1196, 1214 (D. Mont. 2013)).  "First, the timber to be harvested must be 'generally small diameter.'  Second, the harvest must be needed for one of two listed purposes [as defined in 36 C.F.R. § 294.13].  Third, the harvest must maintain or improve one or more of the roadless area characteristics as defined in § 294.11."  *Id.*

United States District Court
Central District of California

The Ninth Circuit concluded that the Forest Service's Decision Memo satisfied the Roadless Rule's second and third requirements to cut timber in the Project's Antimony IRA, but failed to explain why the trees that would be cut qualified as "generally small diameter timber."  *Id.* at 659–660.  The Ninth Circuit held that although the Forest Service substantiated its determination that the Project will "maintain or improve" the Antimony IRA's characteristics, it did not provide a rational explanation of how 21-inch DBH trees would qualify as small diameter timber within the meaning of the Roadless Rule.  *Id.* at 657–660.  The Ninth Circuit pointed out that it "does not require the Forest Service to undertake any particular method of providing a reasoned explanation for its choice to designate trees of up to 21-inches dbh as 'generally small.'"  *Id.* at 659.  Still, the reviewing court must be able to discern how the Forest Service arrived at the 21-inch DBH measure for "generally small diameter timber."  *See id.*

In the preamble to the Roadless Rule, the Forest Service commented that the term "generally small timber" is a relative term "[b]ecause of the great variation in stand characteristics between vegetation types in different areas."  66 Fed. Reg. at 3257.  The Forest Service explained that determinations of what constitutes "generally small diameter timber" are "best made through project specific analysis or land and resource management plan NEPA analyses, as guided by ecological considerations."  *Id.*  Such determinations should consider "how the cutting or removal of various size classes of trees would affect the potential for future development of the stand," and the characteristics and relationships of plant and animal communities associated with the site and overall landscape.  *Id.*

13

United States District Court
Central District of California

Plaintiffs claim that the Forest Service's intention to log trees up to 21-inches DBH in the Antimony IRA exceeds the Roadless Rule's mandate to log only "generally small diameter timber." (Plaintiff's MSJ at 5). First, Plaintiffs contend that average tree diameter is an appropriate measure of whether a tree is "small" because it "demarcates the smaller trees in the stand." (Doc. No. 108 at 13). Due to the overabundance of smaller diameter trees in the Tecuya Project Area, the mean diameter for stands in the area is 7.2-inches DBH. (AR at 11269). Accordingly, Plaintiffs claim that, in the Antimony IRA, "generally small trees" are those with a diameter of approximately 7.2-inches or less and therefore, 21-inch trees cannot be considered "generally small timber." (Doc. No. 108 at 13–14).

Plaintiffs further argue that the Frazier Project provides additional evidence that 21-inch DBH trees are not "generally small." (*Id.* at 13). Data show that the trees on Frazier Mountain have a larger DBH on average than the trees in the Tecuya Project. (*Id.*; Dkt. 112 at 11). The environmental assessment for the Frazier Project defined "larger diameter" trees as those trees with a DBH greater than 10-inches. *Los Padres ForestWatch*, 25 F.4th at 658. The Ninth Circuit held that the Forest Service failed to "justify its determination that 'larger diameter' trees in the Frazier Project area have a dbh greater than ten inches while 'small diameter' trees in the Tecuya Ridge Project have a dbh of up to 21 inches." *Id.*

Here, the Forest Service's Revised Decision Memo explained that the Frazier Project environmental analysis was conducted under different

standards than the Tecuya Project.  (AR at 11272).  The Frazier Project is located outside of any roadless area, so there was no analysis under the Roadless Rule of what constitutes "generally small diameter timber."  (*Id.*). Moreover, years after the Frazier Project was completed, California entered into severe drought conditions and larger trees within the project "began to die off at alarming rates."  (*Id.*).  Analysis showed that thinning the project to a maximum of 10-inches DBH "left the majority of trees at risk to mortality."  (*Id.* at 11273).  The Forest Service took this information into consideration when designing the Tecuya Project, so that the stands "could better withstand the impacts of droughts and maintain or improve the desired roadless area characteristics."  (*Id.*).

In addition, the Forest Service cautioned against using average tree diameter as a measure for evaluating whether a tree is a large or small for a particular tree species or growing area.  (*Id.*).  They explained that"[t]his is because the management or disturbance history of a site often skews a stand's diameter distribution in a manner that undermines the utility of using the existing diameter distribution as an indication of what are 'small,' 'medium,' or 'large' trees."  (*Id.* at 11270).

Instead, the Forest Service states that growth potential is the most appropriate measure of whether a tree is "generally small diameter timber."  (*Id.*).  For example, in the project area, the dominant tree species is the Jeffrey pine, which has a growth potential of up to 60 to 90-inches DBH in the area.  (*Id.*).  The stands in the Tecuya Ridge area were logged in the 1930's and 1960's, so the majority of trees within the project area are

15

**ER-19**

smaller than the trees that once populated the site.  (*Id.*).  As a

consequence of this historical logging, the existing Jeffrey pines within the

project area are small-to-medium in size when considering the species' size

potential.  (*Id.*).  So, even if a 21-inch dbh tree is larger than the average

diameter for stands in the area, such trees are considered "small" when

compared to that species' growth potential.  (*See id.*).

Plaintiffs dispute whether growth potential is an appropriate

benchmark for whether a tree is small or large.  (Plaintiff's MSJ at 15).

Plaintiffs also point out that every tree in the Antimony IRA is arguably small

when compared to the tree's growth potential of 90-inches.  (*Id.*).

The Revised Decision Memo provides that the significant majority of

trees to be thinned are within the 0 to 2-inch DBH size class, which is a

small diameter tree even when compared to the stand's average diameter.

(AR at 11268).  According to the Forest Service, while some larger trees will

be harvested, "the trees to be harvested are generally smaller compared to

the rest of the trees in the treatment area because the average tree

diameter in the stands will increase once the trees are harvested."  *Alliance*

*for the Wild Rockies*, 950 F. Supp. 2d at 1215; *see* AR at 11267.

Accordingly, Federal Defendants and Intervenor-Defendants both argue that

focus of tree removal in the Antimony IRA is on small trees, regardless of

whether average tree diameter or growth potential are used as a measure.

To the extent Plaintiff argues that the Roadless Rule limits the Forest

Service to cutting generally to only those areas that have become

United States District Court
Central District of California

overgrown with smaller diameter trees, the Revised Decision Memo demonstrates the Project area is overgrown with smaller-diameter timber. (*See* AR at 11267–69.  The Project focuses on thinning such smaller-diameter timber within the 0–14 inch DBH class range.  (*Id.* at 11271).  Few middle and upper-diameters trees that are clustered together will be thinned to prevent the spread of wildfires if established within the crowns of the trees and to reduce the risk of uncharacteristic wildfire effects.  (*Id.*).  Such an approach is consistent with the Rule's focus on areas that have become overgrown with smaller diameter trees, which is, in part, to prevent "fuel ladders" from reaching the crown of the dominant overstory trees.  (*Id.*).

The Roadless Rule provides the Forest Service with flexibility when determining what constitutes "generally small timber."  *See The Lands Council v. McNair*, 537 F.3d 981, 993 (9th Cir. 2008), *overruled on other grounds by Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008).  Moreover, agencies are entitled to deference when defining "vague, undefined" terms.  *Id.*  The Forest Service provided the information lacking in its initial Decision Memo to explain its rationale for classifying trees up to 21-inches DBH as "generally small timber."  Accordingly, the Forest Service did not make a "clear error of judgment," *id.*, when it concluded that the timber to be harvested in the Tecuya Ridge Project is "generally small diameter timber."

///

///

///

United States District Court
Central District of California

17

**ER-21**

## IV.    CONCLUSION

For the reasons stated above, the Court **GRANTS** Federal Defendants' and Defendant-Intervenor's Motions for Summary Judgment and **DENIES** Plaintiffs' Motion for Summary Judgment.

**IT IS SO ORDERED.**

Dated:    12/5/22

_____
Virginia A. Phillips
Senior United States District Judge

**ER-22**




# Decision Memo
# Tecuya Ridge Shaded Fuelbreak Project

## USDA Forest Service
## Mt. Pinos Ranger District, Los Padres National Forest
## Kern County, California

This decision replaces the original Decision Memo, by the same name, which was signed on April 9, 2019, and vacated by the United States Court of Appeals for the Ninth Circuit on February 4, 2022. The Decision Memo has been updated, with the addition of Appendix B, to further explain the project's consistency with the Roadless Area Conservation Rule.

## Background

The Tecuya Ridge Shaded Fuelbreak Project consists of approximately 1,626 acres of natural timbered stands and brush fields that were identified by the Mt. Pinos Community Wildfire Protection Plan and the Los Padres National Forest Strategic Fuelbreak Assessment as priority treatment areas. Forest Service specialists identified forested stands within the project area that currently exhibit stand structures that are conducive to stand-replacing wildfire events. Past fire suppression activities have led to unstable conditions in the mixed conifer and pinyon-juniper stands by allowing widespread accumulation of fuels in the form of litter accumulations, coarse woody debris, and understory growth of shrubs and conifer regeneration (Goforth and Minnich 2007). The existing understory, dense crowns, understory fuels ladders, existing fuel loads, and continued periods of drought place the stands at risk from wildfire.

Treatment areas are strategically placed around communities within the wildland-urban intermix: Pine Mountain Club, Pinon Pines Estates, Lake of the Woods and Frazier Park, California. Treatment areas are also in strategic locations that connect to past and future treatment areas on both public and adjacent private lands.

Since 1998, there have been 15 wildfires within the Tecuya treatment areas. Approximately 67 percent of the fire starts were caused by human-related activities. Although fires can start throughout the entire year, the majority of fire starts occur in August and September. While all of these starts were fully suppressed at less than 10 acres, there have been a number of large fires over 1,000 acres within or adjacent to the project area (USGS 2017)[1]. See table 1 for fires over 1,000 acres.

---

[1] References are available at: www.fs.usda.gov/main/lpnf/landmanagement/planning or are on file at the Mt. Pinos Ranger District in Frazier Park, California.




**Table 1. Fires over 1,000 acres within or adjacent to the project area**

| Fire Name | Year | Acres |
|-----------|------|-------|
| Gorman | 2005 | 2,439 |
| Ridge | 2006 | 2,486 |
| Post | 2010 | 1,454 |
| Grand | 2013 | 4,527 |

On the Mount Pinos Ranger District we have been working with local individuals and groups via efforts such as the Mt. Pinos Communities Wildfire Protection Plan to establish priorities, cooperate on activities, and increase public awareness of and participation in site-specific projects such as the Tecuya Ridge Shaded Fuelbreak Project.

## Location

The project is located on the Mount Pinos Ranger District. The project runs along Tecuya Mountain, which overlooks the communities of Lebec, Frazier Park, Lake of the Woods, Pine Mountain Club and Pinon Pine Estates. The western boundary is along the private property line near San Emidgio Canyon, and the eastern boundary is at the Forest boundary just above the community of Lebec near the major transmission lines. The legal description for the project is T9N, R19W, Sections 18, 28, 29, 30, 31, 32, 33 SBM; T9N, R20W, Sections 18, 19, 20, 21, 22, 23, 24, 25, 27, 28, 29 SBM; T9N, R21W, Sections 13, 14, 15, 23, 24 SBM; Kern County, California.

 

**Figure 1. Tecuya Ridge Shaded Fuelbreak Project Vicinity Map**






# Purpose and Need

Purpose and need for action is generated by identifying the departure of the existing condition from the desired condition.

## Existing Condition

Stands in the project area were determined to be overstocked and therefore at risk of loss to insects and disease. Stand exams taken in the project area, coupled with walk-throughs by Forest professionals and data from other sources, confirm that existing stand density and structure put the area at risk from insects and disease, as well as from wildfire. Stand exams show that the project area average mixed conifer stand has up to 480 trees per acre, greater than one-inch diameter at breast height. High stocking levels, overlapping crown canopies, and a dense understory, contribute to resource competition, leaving trees in the project area at risk to more insect attack.

The project area contains approximately 1,541 acres of mixed conifer and pinyon-juniper dominated stands. These stands are experiencing elevated levels of bark beetle activity, pinyon ips (*Ips confusus*) and California fivespined ips (*Ips paraconfusus*), and associated increasing tree mortality that has been exacerbated by the ongoing drought. The project area was identified in the National Insect and Disease Forest Risk Assessment of 2012 (NIDFRA) as being at risk from both of these beetles. According to the risk rating models used by the Risk Assessment, the areas proposed for treatment in this project are categorized as high risk for pests that could destroy over 25 percent of basal area due to current forest conditions. This mortality combined with stand structure and drought is increasing the risk of a stand-replacing wildfire.

In addition, modelling of insect and disease risk for the proposed treatment units using the Forest Vegetation Simulator shows a moderate to high risk of mortality from beetle infestation. According to Oliver (1995), Jeffrey and pinyon pine trees, in stands where basal areas are over 120 square feet per acre, are at imminent risk of bark beetle-associated mortality. The average existing basal area in the pine and mixed conifer stands is slightly over 120 square feet per acre with many stands well in excess of that threshold. Treatments that reduce stocking or densities below this threshold significantly reduces risk and potentially high mortality if bark beetles invade treated stands. Prevention is not guaranteed, but improves the chances that bark beetles would bypass treated stands in search for more preferable conditions.

Within the project area there are approximately 85 acres of sagebrush-scrub. The extreme drought in recent years has increased the risk to the project area and some drought-related mortality in the sagebrush-scrub areas is evident. This drought mortality adds dead fuels to the landscape. The sagebrush-scrub vegetation type has a natural historic fire return interval of 35 to 100 years. However, due to extensive public use, infrastructure, and commuter pass-through, the project area burns more frequently than this. The results of these frequent fires are an inability to support the ecological health of sagebrush-scrub, and an increase of risk to fast-moving wildland fires.

## Desired Conditions

In the long-term, the desired condition for the national forest land would be to: (1) create forests more resistant to the effects of drought, insect and disease outbreaks and stand killing crown fires; (2) encourage tree recruitment that contain a species mix more like pre-settlement composition, (*i.e.,* with a higher representation of shade-intolerant species such as ponderosa pine that have

 

declined during the period of fire suppression); (3) recreate stand densities more like those of the pre-suppression era; and (4) encourage a stand structure that emphasizes large-diameter trees.

The intent of the Mt. Pinos Community Wildfire Protection Plan is to make communities safer from wildfire. The plan highlights the overall threat and risks of wildfire and provides the basis for pre-suppression strategies to reduce the impacts of a wildfire. The plan identifies zones within the wildland-urban interface. The area where structures are located is called the "defense zone" (area buffered 500 feet from structures). If a fire occurs or burns into this zone, structure loss is likely without quick aggressive structure protection. The "threat zone" is adjacent to the "defense zone" (area buffered by 0.25-mile buffer around the defense zone). This zone needs specific and intense management and treatments. The plan recommends establishing and maintaining fuelbreaks and prescribed burning within this zone to reduce the threat to the defense zone (Walsh 2006).

The goals of the 2006 Mt. Pinos Community Wildfire Protection Plan fuel reduction strategies are:

- Design fuel modification to provide a buffer between developed areas and wildlands.

- Design and distribute treatments to increase the efficiency of firefighting efforts and reduce risks to firefighters, the public, facilities, structures, and natural resources.

- Utilize planned prescribed burns at strategically placed area treatments.

## Purpose of the Project

The purpose of the project is to provide safe and effective locations from which to perform fire suppression operations, to slow the spread of a wildland fire at these strategic fuelbreak locations, and to reduce the potential for the loss of life, property, and natural resources. Additionally, this project would undertake timber stand improvement activities such as thinning to help reduce the existing stand densities. Thinning would help increase the forest's resilience to insects and diseases by lowering the amount of trees that are competing for limited resources such as water.

## Need for Action

The need for the project is based on the high likelihood of wildland fire and a corresponding threat to communities and infrastructure that could occur adjacent to the area where the fuelbreak would be created and maintained under this proposed action. By managing for this need we would also be managing for the health of the forest by reducing competition and returning the stands to a state to where they are less likely to be lost by a stand replacing fire.

- There is a need to reduce surface and ladder fuels, reduce fire intensities and to make the stands more resilient to wildfire. Surface-fuel-loading levels, trees that are dead and dying due to insect and disease, and natural forest succession make stand-replacing fire an ongoing risk to the landscape. Removing standing and down fuels reduces fuel loading and fuel continuity, and increases our ability to directly suppress fire in a safe and efficient manner.




- There is a need to reduce the stocking levels and competing vegetation to more closely resemble historic levels to improve resilience of these stands to insect and drought-related mortality.

- There is a need to strategically place fuel breaks that are cost effective and complement planned and completed treatments on adjacent private lands.

- There is a need to maintain or improve resilient forest conditions so the area can return to prior conditions and function after disturbance (USDA Forest Service 2011). Resilient forests are those that not only accommodate gradual changes related to climate, but tend to return toward a prior condition after disturbance, either naturally or with management assistance (Millar et al. 2007).

- There is a need to maintain fuelbreaks along watershed boundaries to minimize fire size and the number of communities threatened by both fire and flood.

## Proposed Action

Reduction in stand density, competing vegetation, and fuels are proposed on an estimated 1,626 acres of National Forest System lands within Mt. Pinos Place Management Area. The project area has been identified within the Mt. Pinos Communities Wildfire Protection Plan and within the Los Padres National Forest Strategic Fuelbreak Assessment as strategic for future wildfire and prescribed fire management.

The proposed action would create a variable-width, shaded fuelbreak, along Tecuya Ridge in order to alter existing stand structure, reduce fuel loading, and protect local communities and provide for firefighter safety. To achieve this, various types of vegetation treatments are proposed. Table 2 displays treatment acres by various stand types:

**Table 2. Treatment by stand type**

| Stand Type | Treatment | Acres |
|---|---|---|
| Mixed Conifer | Hand Cut/Hand Pile | 467 |
| | Mechanical Treatment | 828 |
| Pinyon Juniper | Hand Cut/Hand Pile | 54 |
| | Mechanical Treatment | 192 |
| Sagebrush-scrub | Mechanical Treatment | 85 |

Treatments would include a combination of mechanical thinning, mastication of brush/smaller trees, and hand treatments such as hand thinning, brush cutting, pruning, and piling of material. Pile burning and jackpot burning will be used to reduce fuel loads after thinning or mastication activities.

Mixed conifer and pinyon juniper stands would be thinned to a range of 40 to 80 square feet basal area per acre. The reduction to this level would promote forest health, and create an effective shaded fuel break to assist in fire suppression. Trees would be removed throughout all diameter



classes and would include the removal of commercial trees. Residual trees would be selected for vigor; however, larger Jeffrey pine would be retained per Los Padres National Forest Land Management Plan (Forest Plan) direction unless they pose a hazard or are infected with dwarf mistletoe. All black oak would be left unless they pose a hazard. Early seral species[2] would be a priority to leave when selecting residual trees. Timbered stands with slopes generally greater than 35 percent would be mostly hand thinned. Activity fuels will be either lopped or scattered or hand piled depending on conditions such as slope. Hand piles would be burned.

Areas of sagebrush-scrub would be treated by a combination of mastication and hand treatments such as brush cutting, pruning and piling of material. Slopes generally greater than 35 percent would be hand treated and any piles created would be burned. Up to 85 to 95 percent of this area would be treated as determined by the project manager.

The most cost efficient and effective treatments within each stand or brush field would be chosen based on timing, equipment availability, and post treatment results, but would generally be implemented as follows:

- Stands less than 35 percent slope, with viable amounts of accessible commercial-sized material, would be mechanically harvested using feller bunchers and rubber-tired or track-mounted log skidders to remove whole trees to landings.

- Stands less than 35 percent slope, and that do not have a viable amount of commercial-sized timber, or are not accessible, would be treated by mastication.

- Stands less than 35 percent slope that consist primarily of an over-abundance of smaller trees and shrubs would be masticated.

- Existing and operations-generated slash, small trees, and shrubs would be tractor piled or masticated with a track-mounted masticator. Mastication or tractor piling would occur shortly after thinning is completed. Post-harvest machine piling and burning of piles would occur as necessary to reduce surface fuels to less than 10 tons per acre. Mastication may be substituted for tractor piling where surface fuels can be more effectively treated by this method and where maintaining or increasing soil cover is a higher priority.

- Timbered stands and sage scrub fields with slopes generally greater than 35 percent slope would be cut and either scattered, or hand piled depending on conditions such as slope. Hand piles would be burned.

- Sagebrush-scrub areas less than 35 percent slope would be treated using a masticator. Areas where slopes generally exceed 35 percent slope would be hand treated, piled, and burned.

- The removal of hazard trees (live and dead) of all sizes would occur along utility lines, roads, trails and landings to provide for safety of woods workers and public throughout project implementation, except where restrictions for removal apply.

- A part of the project is within the Antimony Inventoried Roadless Area (IRA). Consistent with the 2001 Roadless Area Conservation Rule, generally only smaller trees (21 inches

---

[2] Jeffrey and pinyon pine.




diameter breast height or less) would be cut or removed within the IRA. Larger trees may be cut or removed within the IRA for safety or operability reasons. No new road construction or re-construction is proposed under this project.

## Design Features

Project design features are elements of the project that are applied in treatment areas. These features are developed based on Forest Plan direction and site specific evaluations in order to reduce or avoid negative impacts of the proposed action. Project design features associated with this project are in Appendix A.

# Decision

It is my decision to proceed with the Tecuya Ridge Shaded Fuelbreak Project as described in the Proposed Action and associated design features. My decision will maintain or improve resilient forest conditions within the shaded fuelbreaks which are located near the local communities/infrastructure by reducing overstocking, reducing surface/ladder fuels, decreasing fire intensities and making the stands more resilient to disturbance (i.e. bark beetle, drought, and wildfire).

I recognize and acknowledge there are concerns from the public about impacts to wildlife, the Antimony IRA, and the commercial sale of timber and other wood products. In arriving at my decision, I carefully assessed the potential impacts to wildlife from the project on pages 8-12 of this Decision Memo. To reduce or avoid impacts to wildlife, such as the California condor, I have included project design features that will be applied during implementation. A concurrence letter was received by the U.S. Fish and Wildlife Service on October 4, 2018 stating that the proposed actions are not likely to adversely affect the California condor. As a result, I am confident that improving the health and resiliency of forest vegetation within the project area will not imperil species of concern.

Potential impacts to the Antimony IRA are disclosed on pages 13-14 of this Decision Memo. An Amendment to the Forest Plan was signed by the Forest Supervisor in October 2014. As part of this Amendment the Forest re-evaluated the Antimony IRA to decide if any changes to the IRA zoning needed to occur. It was decided not to change the land use zoning to recommended wilderness specifically since "recommending wilderness adjacent to the communities and within wildland urban interface could limit the possibilities for vegetation management activities and the establishment and management of fuel breaks for community protection". On October 12, 2018, the Deputy Regional Forester signed a Decision Memorandum concurring that the Tecuya Ridge Shaded Fuelbreak projects fits within 36 CFR 294.13(b)(1)(ii) and is consistent with the 2001 Roadless Rule.

My decision also provides the opportunity to utilize commercial means to efficiently and cost effectively meet project objectives where it can be applied. The sale of timber and other wood by-product is not part of the purpose and need for the project, and would not change the treatment outcome. Rather, it's another tool available for utilization within a portion of the project to help move that area toward forest health desired conditions. Though the value of the timber may be considerably less than the cost of the treatments, any cost offset would be beneficial to the public by reducing the overall cost of the project.




This action is categorically excluded from documentation in an environmental impact statement (EIS) or an environmental assessment (EA). The applicable category of actions is identified in agency procedures as 36 CFR 220.6(e)(6) "Timber stand and/or wildlife habitat improvement activities that do not include the use of herbicides or do not require more than 1 mile of low standard road construction."

As stated in 36 CFR 220.6(b), *the mere presence of one or more of the resource conditions does not preclude use of a categorical exclusion (CE). It is the existence of a cause-effect relationship between a proposed action and the potential effect on these resource conditions and if such a relationship exists, the degree of the potential effect of a proposed action on these resource conditions that determine whether extraordinary circumstances exist.* This category is applicable because the evidence presented in the project record and briefly described in each resource condition below, demonstrates that the actions in this decision and the degree of the effects on the resource conditions result in no extraordinary circumstances, therefore it does not warrant further analysis and documentation in an EA or EIS.

## Federally listed threatened or endangered species or designated critical habitat, species proposed for Federal listing or proposed critical habitat, or Forest Service sensitive species

Federally listed threatened or endangered species or designated critical habitat, species proposed for Federal listing or proposed critical habitat, and Forest Service sensitive species were reviewed.

### Terrestrial Wildlife

A biological assessment and biological evaluation was completed for wildlife (Malengo, 2018). An official species list for this project (Consultation Code 08ESMF00-2018-SLI-1969) was generated on April 26, 2018. No critical habitat for any terrestrial wildlife species, including the California condor, has been identified for the Tecuya Ridge Shaded Fuelbreak Project (Project Record, Wildlife BA. Table 1). One federally listed terrestrial species, California condor, is within range of the project area and possibly contains occupied habitat.

From the Regional Forester's list of Sensitive Species for Region 5 (USDA 2104), six wildlife species (Project Record, Wildlife BE. Table 1) have been identified in the project area. They are: California spotted owl, Northern goshawk, Fringe-myotis bat, Mt. Pinos lodgepole chipmunk, Yellow-blotched ensatina salamander, and Monarch butterfly. The Monarch butterfly has a determination of *no impact* because the project area contains low suitability of breeding habitat. This species will not be discussed further.

No extraordinary circumstances exist with respect to threatened and endangered species listed above and it was determined that the project *may affect, but is not likely to adversely affect* the California condor based on the following rationale:

- The project area does not contain optimal nesting or foraging habitat. In general condors are active in the project area flying over it fairly often and roosting nearby occasionally. The closest previous nests (both were active in 2017) are about 20 miles away near Bitter Creek National Wildlife Refuge and the Tehachapi Mountains.




- Individual condors might roost relatively infrequently in the action area and there are no communal or commonly-used nests (J. Brandt, pers. comm.). The project area is within the Bitter Creek/El Cajon flyway(s) and the Fish and Wildlife Service is relatively unconcerned about thinning projects in this area because the potential for effect on condors would be relatively minor.

- Noise and smoke associated with thinning, burning, and mastication have only minor potential to alter normal flight or roosting patterns of condors within or adjacent to the project area.

- Since all known roosting/nesting sites are approximately 20 miles away, and condors are mobile, high-flying, and able to move away from any incidental smoke, extensive dispersal of the small amount of smoke expected from pile burning would have minor effects. In the unlikely event condors do use the project area for nesting or roosting prior to implementation or ongoing maintenance of the fuelbreak, disturbance to these individuals would be avoided or minimized by prohibiting or restricting management activities and human uses within 1.5 miles of active California condor nest sites and within 0.5 miles of active roosts (Forest Plan Standard 28). In addition, activities would cease if California condors were observed in the project area during implementation or maintenance and the U.S. Fish and Wildlife Service would be notified.

- Large snags would be retained (Forest Plan Standards 14, 15, 17), however, safety at the discretion of the operator, may limit retention of snags. Although there are currently no known condor roosting sites within the action area, snag removal could reduce roosting structures. However, larger Jeffrey pine would be retained per Forest Plan direction unless they pose a hazard or are infected with dwarf mistletoe as well as all black oak.

- The project would benefit California condors by treating fuels to help prevent large, high intensity stand replacement wildland fire that could eliminate roosting habitat over a larger area. The proposed action might improve condor foraging habitat by creating a more open area that facilitates finding and catching prey by birds like condors that are dependent upon sight for locating food.

- Forest Plan Standards, as stated in the project design features, Appendix A, numbers 11-14, 16-19, 22-25 are designed to mitigate effects to the California condor.

No extraordinary circumstances exist with respect to sensitive species listed above and it was determined that the project *may affect individuals but is not likely to result in a loss of species viability in the planning area, nor cause a trend toward federal listing for the species*, for California spotted owl, Northern goshawk, Fringe-myotis bat, Mt. Pinos lodgepole chipmunk, Yellow-blotched ensatina salamander based on the following rationale:

**California Spotted owl (CSO)**
- Although protected activity centers (PACs) haven't been formally designated, the Los Padres National Forest performed a California spotted owl habitat analysis within and adjacent to the project area boundary (WL BE, Figure 1) using California Wildlife Habitat Relationships (Zeiner et al. 1990). Using this mapped suitable habitat, nest stands

 

and the best available habitat in a contiguous and compact arrangements over 300-acres (0.39-mile radius) are outside of the project area boundary.

- The majority of CSO suitable habitat falls outside the project area, there is some overlap between suitable habitat and the project area boundary along the upper north-facing slopes (WL BE, Figure 2). Currently, within the project area there are no known spotted owl nests or spotted owl territories identified in the Statewide California Department of Fish and Game database. There are also no recorded sightings of spotted owl presence within the project area.

- Although limited reproductive habitat is present in the proposed project area, noise and smoke generating activities that occur within or adjacent to suitable spotted owl habitat have the potential to disturb spotted owls, especially nesting individuals. Breeding season surveys for nesting activity are recommended prior to implementation to determine if spotted owls are nesting within the project area.

- In the event a spotted owl nest is found, a limited operating period prohibiting activities within approximately 0.25 miles of the nest site, or activity center where a nest site is unknown, would be maintained during the February 1 through August 15 breeding season. This limited operating period would be applied annually thereafter, as necessary, unless surveys confirm that the owls are not nesting.

- Reducing tree density and removing hazardous fuels would improve forest health and reduce risk from wildfire, thus protecting adjacent high-quality spotted owl habitat against high-intensity stand-replacing fire in the long run. While fire promotes heterogeneous forest landscapes shown to be favored by owls, high severity fire may create large canopy gaps that can fragment the closed-canopy habitat preferred by spotted owls. (Eyes et al. 2017). Forest Plan Standards listed in the design features for wildlife are designed to maintain or enhance habitat conditions.

**Northern Goshawk**
- The northern goshawk is extremely rare and apparently irregular as a breeding species in southern California. The project will generally benefit northern goshawk by treating fuels to help prevent large, high intensity stand replacement wildland fire. The big tree (old growth) appearance of Jeffrey pine would be maintained with vegetative treatments that reduce stand density problems. Goshawk foraging habitat in the project area would likely benefit from implementing the proposed action by creating a more open understory that facilitates finding and catching prey.

- Although limited reproductive habitat is present in the proposed project area, noise and smoke generating activities that occur within or adjacent to suitable goshawk habitat have the potential to disturb goshawks, especially nesting individuals.

- As stated in design feature number 26, active goshawk nest stands (30 acres) would be avoided during project implementation. The limited operating period for goshawk within post-fledgling family area (PFA) is March 1- September 30. Treatments would only occur during the non-breeding season of October 1 through February 28 if goshawks are found and determined to be nesting within the project area.

 

- Forest structure within the project area would change and is expected to be maintained at or converted to goshawk foraging habitat over time. While the potential exists for individual goshawks to be affected, implementing the proposed treatments would not affect goshawk population persistence on the Los Padres National Forest.

**Fringed myotis**

- Suitable habitat for fringed myotis is present in the pinyon pine forest of the project area. There are no documented caves or mines in the project area and rocky outcrops would be avoided by mechanical treatments. Therefore, the project would be unlikely to directly impact maternity colonies or hibernacula.

- Individuals that might be roosting under bark or in tree snags could be disturbed by smoke, noise, or human presence during operations, or injured or killed during pinyon pine and snag removal. In addition, modification of the forest structure has the potential to displace bats, including from important roosts, because changes in vegetation composition or structure can alter the abundance and diversity of their insect prey base (Kenaith 2004).

- Project activities would manage fuel loads to avoid catastrophic stand replacement fires and could prevent loss of tree roosts adjacent to the project area which would benefit bat species. It would also create a mosaic of age classes and densities in vegetation types, improving the amount of forest edge that may improve foraging conditions.

- For the fringed myotis, Pinyon pine is common across the Mt. Pinos Ranger District, and large amounts of habitat would remain across the landscape. The cumulative impact of this project, when considered with similar projects, may lead to an overall beneficial effect by creating a mosaic of age classes and forest edge when considered at the landscape level.

**Pinos lodgepole chipmunk**

- Suitable habitat for the Mount Pinos lodgepole chipmunk is present in the project area, but towards the lower end of its elevational range and outside of the two known locations on Mt. Able and Mt. Frazier.

- Nests located under rocks or within rocky crevasses would be avoided by mechanical treatments and would be unlikely to be impacted by the project.

- Individuals might be disturbed from regular feeding or mating opportunities by noise, smoke, or human presence associated with thinning, burning, and mastication during implementation or fuelbreak maintenance. Individuals are readily mobile and may be displaced by elimination of trees and snags and vegetation containing food sources, rather than injured or killed.

**Yellow-blotched ensatina**

- Suitable habitat for this species is present within the project area, but the species has not been documented.

 

- Individuals that might be present downslope of the project area boundary might benefit from the edge created between dense and sparse vegetation as the result of the proposed action. In addition, individuals and habitat adjacent to the project area would benefit from fuels treatment preventing high intensity wildland fire.

- Thinning mixed conifer stands to a range of 40 to 80 square feet basal area per acre has the potential to change yellow-blotched Ensatina microhabitat in the project area by reducing canopy cover that could increase temperatures and decrease moisture.

- Removal of downed logs and woody debris would remove habitat elements that could lead to injury or mortality of individuals if the species is present.

## Botany

A botany report was completed for botanical species (Tufts, 2018).

**Listed or proposed species and critical habitat:**

There are no federally listed species or habitat within the project area, therefore there is no effect to any federally listed threatened, endangered, proposed or candidate species nor proposed or final designated critical habitat.

Surveys conducted throughout the project area in 2017 further confirmed the absence of any federally listed species from within the project area.

**Sensitive Species**

The Regional Forester has identified 96 botanical species from the Los Padres National Forest which are listed as Region 5 Regional Forester Sensitive Species. Systematic surveys to determine the presence or absence of these species within the project area were conducted during the summer of 2017. These surveys revealed two Regional Forester Sensitive Species (Botany Report, Table 3):

- *Eriophyllum lanatum var. hallii* Hall's Woolly Sunflower. Three occurrences which total approximately 0.23 acres within the project area.

- *Monardella linoides ssp. Oblonga* Flaxleaf Monardella. Two occurrences which total approximately 0.02 acres within the project area.

No extraordinary circumstances exist with respect to sensitive species listed above and it was determined that the project *may affect individuals but is not likely to result in a loss of species viability in the planning area* based on the following rationale:

- Known occurrences for the Woolly sunflower are in areas proposed for hand cut and hand pile treatments. This species is a prolific seed producer which spreads readily to any surrounding open ground (Pavek, 2011). Reducing stand density may be beneficial as open areas are created or maintained within the vicinity which provide suitable habitat.

- Known occurrences for the Flaxleaf Monardella are in areas which may be treated as either mechanical treatments or hand cut/hand pile treatments. Reducing stand density may be beneficial as open areas are created or maintained within the vicinity which provide suitable habitat.

 

## Flood plains, wetlands, or municipal watersheds

### Wetlands

Review of the National Wetlands Inventory and GIS dataset and field review indicates that no wetlands, hydric soils, or hydric plants are present within the project area.

### Floodplains

No extraordinary circumstances with respect to floodplains would be created by the project. All stream channels associated with the Tecuya Ridge Shaded Fuelbreak Project are headwater ephemeral or intermittent channels with limited floodplain development. No 100 year Federal Emergency Management Agency floodplains, regional floodplains, or California Department of Water Resources (DWR) Awareness Floodplains occur with the project boundary.

### Municipal watersheds

Municipal watersheds are defined in FSM 2542.05 as "A watershed that serves a public water system as defined in the Safe Drinking Water Act of 1974, as amended (42 U.S.C. §§ 300f, et seq.); or as defined in state safe drinking water statutes or regulations." As per the Forest Plan, none of the watersheds in the project area are considered municipal.

Further, review of the California Environmental Health Tracking Program's Drinking Water Systems Geographic Reporting Tool (http://www.cehtp.org/water/) shows that there are no public drinking water sources within the project area or immediately downstream. Therefore, there are anticipated to be no effects to public drinking water sources within or immediately downstream of the project.

## Congressionally designated areas such as wilderness, wilderness study areas, or national recreation areas

The project will have no effect on congressionally designated wilderness, or wilderness study areas because there are none within the project area. No extraordinary circumstances exist for this resource condition.

## Inventoried roadless areas or potential wilderness areas

- 66 percent of the project area overlaps with the Antimony Inventoried Roadless Area (IRA). The 2001 Roadless Rule allows for the limited removal of timber under 36 CFR 294.13(b)(1) (2001) to maintain or improve roadless area characteristics and maintain or restore wildlife habitat or ecosystem structure and function. In this project, vegetation management activities within the IRA will remove generally small diameter trees within the 0-14" diameter class with a small number of trees thinned within the 14-28" diameter class (up to 21" DBH) to restore the characteristics of ecosystem composition and structure and reduce the risk of uncharacteristic wildfire effects (see Appendix B). No new road construction or re-construction is proposed under this project.

- As described in the Los Padres Forest Plan Final Environmental Impact Statement (FEIS) (Vol. 1, 3–76), areas that have become overgrown with shrubs and smaller diameter trees creating a fuel profile that acts as a "fire ladder" to the crowns of the dominant overstory trees may benefit ecologically from thinning treatments that cut and remove such




vegetation. The risk of uncharacteristic fire intensity and spread may thus be reduced, provided the excess ladder fuels and unutilized coarse and fine fuels created by logging are removed from the site (FEIS Vol. 1, 3–91). Also, in some situations, cutting or removal of generally small diameter timber may be needed for recovery or conservation of threatened, endangered, proposed or sensitive species to improve stand structure or reduce encroachment into meadows or other natural openings.

- In October of 2014 the Forest Supervisor signed an Amendment to the Los Padres National Forest Land Management Plan. As part of this Amendment to the Los Padres National Forest Land Management Plan the Forest re-evaluated the Antimony IRA to decide if any changes to the IRA zoning needed to occur. It was decided not to change the land use zoning to recommended wilderness specifically since "recommending wilderness adjacent to the communities and within wildland urban interface could limit the possibilities for vegetation management activities and the establishment and management of fuel breaks for community protection."

- As stated on page 19 in the Amendment to the Los Padres National Forest Land Management Plan, there are limited opportunities for wilderness challenge as the natural integrity and opportunity for solitude has been compromised by numerous Off Highway Vehicle (OHV) trails and mining. The linear shape of this unit (24 miles long by 3 miles wide), which is adjacent to major roadways and has multiple roads and motorized trails, indicates that wilderness management could be difficult.

- There are six primitive campgrounds and three active grazing allotments within the Antimony IRA along with a reforestation unit and a number of old roads from previous mining and timber harvesting operations. It is adjacent to the privately managed Wind Wolves Reserve to the north. Adjacent to the south and eastern boundary are the Pine Mountain Club, Cuddy Valley, Lake of the Woods, Frazier Park, and Lebec communities.

- On October 12, 2018, the Deputy Regional Forester signed a Decision Memorandum concurring that the Tecuya Ridge Shaded Fuelbreak projects fits within 36 CFR 294.13(b)(1)(ii) and is consistent with the 2001 Roadless Rule.

For these reasons, no extraordinary circumstances exist for this resource condition.

## Research natural areas

The project will have no effect to these areas because there are none within the project area. No extraordinary circumstances exist for this resource condition.

## American Indians and Alaska Native religious or cultural sites

There are no American Indians and Alaska Native religious or cultural sites within the project area, therefore no consultation with the State Historic Preservation Office, or Indian tribes is necessary.

## Archaeological sites, or historic properties or areas

Cultural resource surveys were conducted throughout the Tecuya Ridge project area in the fall of 2017 and within the Area of Potential Effect (APE). One historic site consisting of concrete floors




of structural remains was found. This site is unevaluated for the National Register of Historic Places. There would be no adverse or negative effects if design features, as outlined in Appendix A, are followed. The reduction of fuels that otherwise could result in fire damage to cultural resources and increased erosion of archaeological sites would have a positive effect.

# Public Involvement

This action has been listed as a proposal on the Los Padres National Forest Schedule of Proposed Actions since March, 2018 and updated periodically during the analysis. In addition to providing a description of the proposed action on the Los Padres National Forest webpage, a letter seeking public comments was sent via regular mail or email to interested individuals, Tribes and organizations.

The Forest received over 600 letters during the public scoping comment period. Thirteen unique letters were submitted. The remaining comments were form letters requesting not to conduct any logging or vegetation clearing. Comments were submitted by mail, email or phone and to the forest's website. These comments were evaluated for significance and considered as part of the analysis. These comments and their disposition are included in the project record.

# Findings Required by Other Laws and Regulations

## National Forest Management Act

The National Forest Management Act (NFMA) requires the development of long-range land and resource management plans. The Forest Plan was approved in 2005 as required by this act. The Forest Plan provides guidance for all natural resource management activities. This decision is consistent with NFMA and the Forestwide goals, objectives, and standards in the Forest Plan.

## Endangered Species Act

The Forest Service has met the requirements of Section 7 of the Endangered Species Act by preparing the appropriate documents. There are no listed threatened, endangered, proposed, or candidate botanical species within the vicinity of project activities, no consultation with the U.S. Fish and Wildlife Service is necessary. For terrestrial wildlife species, the Project *is not likely to adversely affect* the California condor because condors are known to fly over and roost nearby the project area and implementation may affect condors or cause them to avoid the area. However, project design features are expected to be effective at minimizing or avoiding effects to California condors. A concurrence letter was received by the U.S. Fish and Wildlife Service on October 4, 2018 stating that the proposed actions are not likely to adversely affect the California condor.

## National Historic Preservation Act

This project complies with Forest Plan standards and guidelines for cultural resources. Forest Service Policy (FSM 2361.3) requires that projects with the potential to affect cultural resources, including lands which will leave Federal agency control through sale or exchange, be surveyed for cultural resources in order to comply with 36 CFR §800 – Protection of Historic Properties, Section 106 of the National Historic Preservation Act (NHPA) of 1966, as amended; the Archaeological Resources Protection Act (ARPA) of 1979, the National Environmental Policy Act (NEPA), the Native American Graves Protection and Repatriation Act, and the American Indian Religious Freedom Act of 1978.

 

## Clean Water Act (Public Law 92–500)

The 2005 Los Padres National Forest Land Management Plan directs water quality to be maintained and improved through the use of state certified and Environmental Protection Agency (EPA) approved Best Management Practices (BMPs). Project design features, and Forest Plan standards and guidelines, were incorporated into the development of this project to ensure compliance with Section 208 of the Clean Water Act, and the guidelines established by the Central Valley Regional Water Quality Control Board.

## Clean Air Act (Public Law 101-549)

Proposed activities comply with the Federal Clean Air Act. Design feature number 10, states that all prescribed fire activities will occur with approvals from the San Joaquin Valley Air pollution and under conditions established in an approved prescribed fire burn plan. Smoke would not be allowed to affect highway visibility on public highways. In addition, prior to burning, the Forest Service prescribed fire manager would ensure that a required burn plan, vicinity map, and project map are mailed with a completed copy of a CB-3 to California Air Resources Board (CARB) so that CARB is familiar with the burn area for 48/72 hour forecasts.

## Invasive Species - Executive Order 13112

The proposed actions, including prudent design features to mitigate risks associated with the introduction and spread of non-native invasive species, are consistent with Forest Plan goals and objectives, and standards and guidelines, by addressing non-native invasive species inventoried from the area. A determination has been reached through analysis of the potential for introduction and/or spread of non-native invasive species for consideration by the deciding official and is consistent with Executive Orders 13112 and 13751, the National Forest Management Act, and the Federal Noxious Weeds Act.

## Migratory Bird Treaty Act – Executive Order 13186

Because forest lands provide a substantial portion of breeding habitat, land management activities within the Los Padres National Forest could have an impact on local populations.

A 2016 Programmatic Migratory Birds Report for Fuels Treatment Projects (Report) on the Los Padres National Forest list high priority migratory species which may be impacted by fuels treatment projects. In this Report, it is acknowledged that there are some risks to avian species from these types of projects, however the use of avoidance measures can alleviate and minimize these risks. These avoidance measures are displayed in the Report and the Tecuya Ridge Shaded Fuelbreak Project would adhere to these measures, therefore this project is consistent with this Executive Order.

## Administrative Review (Appeal) Opportunities

This decision is not subject to administrative review or appeal (36 CFR §218.23(a)). Section 431 of the Consolidated Appropriations Act of 2014 (Pub. L. No. 113-76, 128 Stat. 5 (2014)) directs that the 1993 and 2012 legislation establishing the 36 CFR Part 215 (post-decisional appeals) and 36 CFR Part 218 (pre-decisional administrative review and objection) processes "shall not apply to any project or activity implementing a land and resource management plan…that is categorically excluded…under the National Environmental Policy Act [NEPA]."





## Implementation Date

This decision may be implemented immediately upon the issuance of this decision memo.

## Contact

For additional information concerning this decision, contact: Greg Thompson, Forester, Los Padres National Forest, 34580 Lockwood Valley Road, Frazier Park, CA 93225, 661-245-3731.

CHRISTOPHER STUBBS
Digitally signed by CHRISTOPHER STUBBS
Date: 2022.07.01 08:55:48 -07'00'

July 1, 2022

CHRISTOPHER J. STUBBS
Forest Supervisor
Los Padres National Forest

Date

In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.

Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible Agency or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English.

To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD-3027, found online at http://www.ascr.usda.gov/complaint_filing_cust.html and at any USDA office or write a letter addressed to USDA and provide in the letter all of the information requested in the form. To request a copy of the complaint form, call (866) 632-9992. Submit your completed form or letter to USDA by: (1) mail: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, SW, Washington, D.C. 20250-9410; (2) fax: (202) 690-7442; or (3) email: program.intake@usda.gov.

USDA is an equal opportunity provider, employer and lender.





# Appendix A – Design Features

## Fuels

1. Maintain the existing system of roadside fuelbreaks and fuelbreaks along watershed boundaries to minimize fire size and the number of communities threatened by both fires and floods. When feasible construct new fuelbreaks on land outside of wilderness or other special designations.

2. Consider an opportunistic approach to fuels management. Take advantage of wildland fire occurrence and wherever possible connect wildland fires to forest health and wildlife habitat improvement projects, as well as fuelbreaks to maintain multiple lines of community defense and to minimize future wildland fire patch size.

3. Thinning to reduce canopy cover is generally recommended to minimize crown fire hazard (J. H. Scott and Reinhardt 2001). The reduction in crown fire potential provides for the increased success of fire suppression. This reduces the risk to firefighters and the public in a suppression action. The decrease in crown fire potential also allows fire managers to use more tools in suppression efforts.

4. The reduction in the potential for crown fire reduces the likelihood of reduced forest health. The risk of losing forest structure and continuity is high in large severe burning fires that produce crown fire. Forest diversity is also lost in large landscape fires that burn at high intensity.

5. Lowering flame lengths decreases the likelihood that there would be crown fire initiation. Lowering flame lengths increases the ability to actively suppress fires effectively during a severe fire season. Using hand crews is the most effective way to attack wildfires; hand crews are generally not effective with flame lengths over 4 feet in height. The activities proposed reduce the flame lengths in treatment units, so hand crews can be utilized.

6. To reduce the threat of spotting distance from firebrands (spotting potential), fuels would need to be reduced both near and at some distance from the wildland urban interface. Implementation of vegetation treatments would result in decreasing the behavior of a wildland fire and would increase the likelihood that fire suppression efforts would be successful in containing fires at a small size.

7. Create fuelbreaks wide enough to allow fire operations to effectively mitigate the high to extreme fire behavior characteristics in those areas that have medium to high fuel load shrub species.

8. Dead and down material left after treatment should be less than 10 tons per acre in the forested treatment areas where available.

9. Brush species would be reduced by up to 85 to 95 percent and may include feathering of treatment for visual concerns. Feather the edges of the fuelbreak by selectively removing random brush species along the edge to create a mixed vegetative area or zone to soften harsh edges.

10. All prescribed fire activities will occur with approvals from the San Joaquin Valley Air pollution and under conditions established in an approved Prescribed Fire Burn Plan.

 

## Botany and Wildlife

11. LMP- S11: When occupied or suitable habitat for a threatened, endangered, proposed, candidate or sensitive (TEPCS) species is present on an ongoing or proposed project site, consider species guidance documents (see LMP, Part 3, Appendix H) to develop project-specific or activity-specific design criteria. This guidance is intended to provide a range of possible conservation measures that may be selectively applied during site-specific planning to avoid, minimize or mitigate negative long-term effects on threatened, endangered, proposed, candidate or sensitive species and habitat. Involve appropriate resource specialists in the identification of relevant design criteria. Include review of species guidance documents in fire suppression or other emergency actions when and to the extent practicable.

12. LMP- S12: When implementing new projects in areas that provide for threatened, endangered, proposed, and candidate species, use design criteria and conservation practices (see Appendix H) so that discretionary uses and facilities promote the conservation and recovery of these species and their habitats. Accept short-term impacts where long-term effects would provide a net benefit for the species and its habitat where needed to achieve multiple-use objectives.

13. LMP-S24: Mitigate impacts of on-going uses and management activities on threatened, endangered, proposed, and candidate species.

14. LMP-S32: When surveys for species presence/absence are done for threatened, endangered, and proposed species, use established survey protocols, where such protocols exist.

## Botany

15. Sensitive plant surveys/monitoring would occur prior to project activities.

## Wildlife

16. LMP- S14: Where available and within the capability of the site retain a minimum of six downed logs per acre (minimum 12 inches diameter and 120 total linear feet) and 10 to 15 hard snags per five acres (minimum 16 inches diameter at breast height and 40 feet tall, or next largest available). Exception allowed in Wildland/Urban Interface Defense Zones, fuelbreaks, and where they pose a safety hazard.

17. LMP - S15: Within riparian conservation areas retain snags and downed logs unless they are identified as a threat to life, property, or sustainability of the riparian conservation area.

18. LMP - S17: In areas outside of Wildland/Urban Interface Defense Zones and fuelbreaks, retain soft snags and acorn storage trees unless they are a safety hazard, fire threat, or impediment operability.

19. LMP - S18: Protect known active and inactive raptor nest areas. Extent of protection will be based on proposed management activities, human activities existing at the onset of nesting initiation, species, topography, vegetative cover, and other factors. When appropriate, a no-disturbance buffer around active nest sites will be required from nest-site selection to fledging.

 

20. LMP- S19: Protect all spotted owl territories identified in the Statewide California Department of Fish and Game database (numbered owl sites) and new sites that meet the state criteria by maintaining or enhancing habitat conditions over the long-term to the greatest extent practicable while protecting life and property. Use management guidelines in the species conservation strategy (or subsequent species guidance document; see Appendix H) to further evaluate protection needs for projects, uses and activities.

21. LMP- S20: Maintain a limited operating period (LOP) prohibiting activities within approximately 0.25 miles of a California spotted owl nest site, or activity center where nest site is unknown, during the breeding season (February 1 through August 15), unless surveys confirm that the owls are not nesting. Follow the USDA Forest Service (1993, 1994 or subsequent) protocol to determine whether owls are nesting. The LOP does not apply to existing road and trail use and maintenance, use of existing developed recreation sites, or existing special-uses, such as recreation residence tracts. When evaluating the need to implement a limited operating period, site- and project-specific factors need to be considered (use species management strategy or subsequent guidance; see Appendix H).

22. LMP- S28: Avoid or minimize disturbance to breeding and roosting California condors by prohibiting or restricting management activities and human uses within 1.5 miles of active California condor nest sites and within 0.5 miles of active roosts. Refer to California condor species account (or subsequent species guidance document; see Appendix H) for additional guidance.

23. Avoid rocky outcrops with mechanical treatments.

24. Trash associated with this project will be removed and properly disposed of. A forest wildlife biologist or designee will brief all personnel involved in implementing the project on the importance of not leaving hazardous materials exposed and daily removal of all garbage fragments to maintain condor health. Garbage removal will be stipulated in mechanical brush treatment contracts.

25. Workers will undergo "hazing" training pursuant to the September 3, 2014 California Condor Recovery Program memo. If any California condors are attracted to work sites, the hazing measures will be implemented to avoid the possibility that the birds will become habituated to human activities, which poses a risk to their well-being.

26. Active goshawk nest stands (30 acres) would be avoided during project implementation. The limited operating period for goshawk within post-fledgling family area (PFA) is March 1 - September 30. Treatments would only occur during the non-breeding season of October 1 through February 28 if goshawks are found and determined to be nesting within the project area.

## Silviculture

27. In all treatments, all live and dead trees posing a safety hazard to management activities or to the public will be removed within the treated areas.

28. In all units, as soon as possible, and no longer than 24 hours after tree cutting, all activity-created fir and pine tree stumps greater or equal to 16-inches in diameter would be treated with a borax compound to inhibit the spread of annosus root disease.

 

29. All black oak will be left unless they are deemed a hazard tree or if removal is needed for operations.

## Recreation

30. Where there is a safety concern for recreationists, implement temporary closures in the project area. Ensure that sufficient public and internal notice is provided prior to those closures.

31. Throughout the duration of the project, communicate with the recreational staff to coordinate closures and/or consultation for privacy screening or potential OHV trespass during implementation.

## Heritage

32. Post-implementation survey of areas with heavy brush cover will occur.

33. All know sites will be flagged with a 30 meter buffer and avoided prior to implementation, and the project manager will be notified of their location for protection measures.

34. No pile burning would occur within site boundaries.

35. Trees near the boundary of cultural resources would be felled away from sites, so sensitive features and artifacts are not damaged by falling trees or the activity required in removing them.

36. If unanticipated resources are discovered during project implementation, all work will stop in the vicinity until cleared by a professional cultural resources manager.

## Soils and Watershed

37. Designate season of use to avoid or restrict road use during periods when use would likely damage the roadway surface or road drainage features. (National BMP Road-4. Road Operations and Maintenance)

38. Use suitable measures to avoid or minimize adverse effects to soil and watershed resources when proposed operations involve use of roads by traffic and during periods for which the road was not designed. (National BMP Road-4. Road Operations and Maintenance)

39. Refueling of equipment and storage of fuel and other hazardous materials will not occur within riparian conservation areas (perennial and seasonal streams, seeps, springs, and meadows). When landings are located within riparian conservation areas, refueling will occur outside riparian conservation areas in an approved refueling area. Storage of any quantity of fuel greater than 100 gallons will require a California Engineer Spill Plan (National BMP Road-10. Equipment Refueling and Servicing)

40. Landing locations should be located outside of riparian conservation areas where possible, unless infeasible due to topography. Landings within riparian conservation areas may occur where there is existing disturbance (instead of constructing a new one); such landings will require special protective measures as specified by an earth scientist or biologist. (National BMP Veg-2. Erosion Prevention and Control)





41. Do not permit use of mechanical equipment on slopes greater than 35 percent or on steeper slopes with short pitches (National BMP Veg-2. Erosion Prevention and Control).

42. Operate equipment when soil compaction, displacement, erosion, and sediment runoff would be minimized. (National BMP Veg-2. Erosion Prevention and Control)

43. Avoid ground equipment operations on unstable, wet, or easily compacted soils unless operation can be conducted without causing excessive rutting, soil puddling, or runoff of sediments directly into waterbodies.

44. Riparian conservation areas will be 100 meters (328 feet) on perennial streams, or 30 meters (98 feet) on intermittent streams, measured as the slope distance from either bank of the channel. Other special aquatic features, such as wetlands, seeps and springs, also have 100-meter riparian conservation areas (National BMP Veg-3. Aquatic Management Zones).

45. No self-propelled ground-skidding equipment is allowed within the riparian conservation areas (exceptions would require input by an earth scientist and/or biologist as described in standard S47 and Appendix E of the Forest Plan).

46. There will be no removal of riparian plant species.

47. Within riparian conservation areas, retain snags and downed logs to the extent possible. Exceptions would be made if snags and logs are identified as a threat to life, property, or sustainability of riparian conservation areas (S15, LMP Part 3, p. 6) (National BMP Veg-3. Aquatic Management Zones).

48. Firelines constructed for project implementation will be rehabilitated following project implementation (prescribed burn). Rehabilitation on the fireline includes: pulling back and spreading out berms, and spreading of bush and ground cover across the fireline. (Fire-2. Use of Prescribed Fire)

49. Water bars or leadout ditches may be constructed in firelines to minimize erosion. Water bars or leadout ditches will be installed according to the following recommended minimum intervals (Fire-2. Use of Prescribed Fire)

**Table 3. Recommended minimum interval guidelines for the installation of waters bars.**

| Fireline Gradient (% slope) | Distance Between Water-Bars (feet) /(chains) | |
|---|---|---|
| 0 to 5 | no water-bars needed | no water-bars needed |
| 6 to 15 | 200 | 3 |
| 16 to 30 | 100 | 1.5 |
| 31 to 49 | 75 | 1 |
| > 50 | 50 | 0.5 |

 

# Appendix B – The project will thin "generally small diameter timber" consistent with the Roadless Rule

The Roadless Area Conservation Rule ("roadless rule," see 36 CFR § 294 (2001)), allows for "generally small diameter timber" to be cut, sold, or removed where it maintains or improves one or more of the roadless area characteristics as defined in § 294.11 and: (1) improves habitat for threatened, endangered, proposed or sensitive species, or (2) maintains or restores the characteristics of ecosystem composition and structure, such as to reduce uncharacteristic wildfire effects, within the range of variability that would be expected to occur under natural disturbance regimes of the current climatic period (see 36 CFR § 294.13). "The intent of the [roadless rule] is to limit the cutting, sale, or removal of timber to those areas that have become overgrown with smaller diameter trees." 66 Fed. Reg. 3257.

The project removes "generally small diameter timber" (36 CFR § 294.13(b)(1))

Due to the great variation in stand characteristics between vegetation types, the definition of "generally small diameter timber" was not specifically included within the roadless rule. *See* 66 Fed. Reg. 3257. Rather, the determination of what constitutes "generally small diameter timber" is made through the project specific NEPA analysis and the Forest's land management plan. The land management plan direction for the Los Padres is to increase the abundance of large diameter trees (those greater than 24" diameter breast height). The intent of the Tecuya Ridge project is to remove smaller diameter trees within the project area, in part, to increase the abundance of large diameter trees.

The project area contains approximately 1,541 acres of mixed conifer and pinyon-juniper dominated stands. Jeffrey pine is the dominant conifer species within the project area and grows to approximately 90" DBH.

Stand exams were conducted within the project area, and overall tree diameters ranged from less than one inch to 42" DBH, with some of the areas having up to 480 trees per acre. This is a high stocking level that exceeds the natural range of variation and is more than double the desired condition; the area is "overgrown with smaller diameter trees." 66 Fed. Reg. 3257. Table 1 shows the average trees per acre by three diameter ranges (0-14", 14-28" and 28-42") using the maximum and minimum tree size collected from the stand data. Based on an analysis of the stand data, the overwhelming majority (98.5%) of the trees to be thinned fall within the mostly non-commercial tree diameter range between 0-14" DBH; only 1.5% of the trees to be thinned fall within the 14-28" diameter range, and within that range, no trees greater than 21" DBH will be thinned. Further, no trees will be thinned within the 28-42" range.

Table 1. Existing Trees Per Acre and Estimate of Trees to be Removed.

| Diameter Classes | 0-14 Inches DBH | 14-28 Inches DBH | 28-42 Inches DBH |
|---|---|---|---|
| Existing Average Trees Per Acre | 318.2 | 19.17 | 1.76 |





|  | 0-14 Inches DBH | 14-28 Inches DBH | 28-42 Inches DBH |
|---|---|---|---|
| Estimated Average Trees Per Acre to be Removed | 193 | 3.03 | 0 |

Figures 1-3 show the number of trees within the stand before and after thinning using 2-inch diameter size classes. The majority of trees (~73%) that will be thinned fall within the 0-2 inch size class. While there is no fixed diameter for a tree that has commercial value, trees less than 12" DBH are typically considered non-commercial.  Here, the vast majority of trees to be thinned (~96%) fall within non-commercial size classes.



Figure 1.  Number of trees per acre within 2" diameter classes before and after thinning across the project area (0-44" diameter range).[3]

---

[3] Due to mechanics of the models from which the numbers above are taken, the post-treatment numbers reflect not only the removal of trees through thinning, but also the projected growth of remaining trees until 2024, and expected mortality. This explains the post-treatment increases relative to pre-treatment in some size classes and the decrease in the 26-28" diameter class. No trees above 21" are proposed for thinning.






Figure 2.  Number of trees per acre within 2" diameter classes before and after thinning for the 0-14" diameter range.



Figure 3.  Number of trees per acre within 2" diameter classes before and after thinning for the 14-28" diameter range.

The quadratic mean diameter for the stand is 7.2" DBH due to the abundance of trees on the lower end of the 0-14" diameter class. After thinning, it is anticipated that the quadratic mean diameter will increase to 10" DBH and continue increasing over time.

The average tree diameter within a stand is generally not a good indicator of what is a small or large diameter tree for a particular tree species or growing area. This is because the management





or disturbance history of a site often skews a stand's diameter distribution in a manner that undermines the utility of using the existing diameter distribution as an indication of what are "small," "medium," and "large" trees.[4] Rather, the most appropriate benchmark for whether a tree is "small" or "large" is the growth potential for a given species in a given area. For example, in the project area, the dominant tree species is the Jeffrey pine and the growing conditions (soil, climate, etc.) are moderately good. It is reasonable to expect Jeffrey Pine to grow up to 60-90" DBH within the project area. Relative to this growth potential, the current mean tree size within the areas proposed for thinning is extremely small.

The stands within the Tecuya Ridge project area were logged in the 1930's and the 1960's, and the old, large-diameter trees that were present prior to logging are now gone. The majority of the trees within the project area are smaller than the large trees that once occupied the site. What exists today are those trees that were left from past logging and post-logging regeneration. So, while Jeffrey pines can grow up to 60-90" DBH under ideal site conditions, not enough time has elapsed for this species within the treatment areas to achieve this size potential. Most of the larger Jeffrey pines within the treatment areas are small-to-medium in size for the species' size potential, and all of the trees to be thinned are relatively small compared to the species' potential on this site. Even if the larger trees to be thinned – such as those 18-21" DBH – were considered "medium" in size (for sake of discussion), the overwhelming majority of trees to be thinned are still "small." As noted above, ~96% of the trees to be removed are small and non-commercial in size. Therefore, even if some of the trees to be thinned were to be considered "medium" in size, the project focuses on the removal of small trees and therefore thins "*generally* small diameter" trees, consistent with roadless rule. *See* 66 Fed. Reg. 3257 (stating that thinning in roadless areas should "*focus* on small diameter trees") (emphasis added); *id*. at 3258 (same).

The proposed timber removal is "needed …: (ii) To maintain or restore the characteristics of ecosystem composition and structure, such as to reduce the risk of uncharacteristic wildfire effects, within the range of variability that would be expected to occur under natural disturbance regimes of the current climatic period." (36 CFR § 294.13(b)(1))

The purpose and need of the project is to restore stand characteristics to pre-suppression-era composition and structure to improve resiliency of the forest to insects and disease, and reduce the risk of uncharacteristic and stand replacing wildfires. This is consistent with 36 CFR § 294.13(b)(1)(ii).

The majority of the Tecuya Ridge project area has not burned in over 100 years and has missed its fire return intervals due to the Forest Service's successful fire suppression efforts. Past fire suppression activities have led to unstable conditions in the mixed conifer and pinyon-juniper stands by allowing widespread accumulation of fuels in the form of litter accumulations, coarse woody debris, and understory growth of shrubs and conifer regeneration (Goforth and Minnich

---

[4] For example, if tree diameters were measured in a stand that had been impacted by a catastrophic fire a few years earlier, all the trees might have diameters between 1"-3", with a mean DBH of 2". It would be incorrect in this situation (especially in the context of a roadless rule evaluation) to conclude that 3" DBH trees were "large" – rather, all the trees would be very small. Similarly, in a plantation stand with a diameter range of trees 12"-16", a 14" DBH tree would still be a small tree, even if it were the mean or median size tree in the stand.

 

2007). The existing understory, dense crowns, understory fuel ladders, existing fuel loads, and continued periods of drought place the stands at risk from stand-replacing wildfire events.

To address these conditions, the project will thin trees within smaller diameter classes. This is consistent with guidance in the preamble of the roadless rule, which states, "Thinning of small diameter trees, for example, that became established as the result of missed fire return intervals due to fire suppression and the condition of which greatly increases the likelihood of uncharacteristic wildfire effects would be permissible." 66 Fed. Reg. 3257.

One of the purposes for thinning within the project area is to reduce the fuel profile, thereby reducing fire potential and the likelihood of uncharacteristic wildfire effects within the stand. This will be accomplished by treating ground and ladder fuels in the understory and limited treatments to the overstory to create spacing and discontinuity. As stated in the preamble of the roadless rule:

The intent of the rule is to limit the cutting, sale, or removal of timber to those areas that have become overgrown with smaller diameter trees. As described in the FEIS (Vol. 1, 3–76), areas that have become overgrown with shrubs and smaller diameter trees creating a fuel profile that acts as a "fire ladder" to the crowns of the dominant overstory trees may benefit ecologically from thinning treatments that cut and remove such vegetation. The risk of uncharacteristic fire intensity and spread may thus be reduced, provided the excess ladder fuels and unutilized coarse and fine fuels created by logging are removed from the site (FEIS Vol. 1, 3–91). 66 Fed. Reg. 3257.

The majority of the thinning for this project will occur within the 0-14" diameter range of trees. The project is also proposing to thin a limited number of trees that fall within the 14-28" diameter class. Treating the 0-14" diameter trees within the stand will accomplish the goal of reducing the ground and ladder fuels but will not limit the impacts of a fire if it reaches the crowns of the trees. Therefore, a small number (1.5%) of trees will be thinned within the 14-28" diameter range.

From the stand exam data and project analysis, it was determined that thinning up to 21" diameter would break up the crown fuels enough to help prevent the spread of fires if established within the crowns of the trees. So, while generally small diameter trees will be removed, some of the middle size class trees[5] need to be thinned to restore the characteristics of ecosystem composition and structure and reduce the risk of uncharacteristic wildfire effects. While this is a small percentage of trees within the project area in this size class, it is still in need of treatments due to the distribution of the trees. For example, some of the middle and upper diameter class trees are clustered near each other to the extent that only thinning the lower diameter class trees will not result in the desired spacing and density levels throughout the project area. It is in these tree clusters that thinning of some 14-28" diameter class trees will occur to meet desired conditions.

---

[5] As explained above, trees within the "middle size class" are not the same as "medium" sized trees for purposes of the roadless rule analysis. The "middle size class" was identified here for analytical purposes based on the existing diameter distribution, whereas the characterization of a tree as "medium" sized is best evaluated by considering the species' and site's growth potential. Most, if not all, of the trees within the "middle size class" are small trees compared to the tree growth potential in the project area.





Another purpose of thinning to a pre-suppression era composition within the project area is to increase the stands' resilience to disturbances (insects, diseases, drought, fire) by reducing the number of trees that are competing for limited resources such as water. Thinning the smaller diameter trees will retain the existing overstory trees and promote the growth of the larger diameter trees to previous levels lost from past management practices. Without action, medium and larger diameter class tree mortality will continue due competition with smaller trees for resources, especially during this current period of drought in California. Reducing the density levels within the stand will help ensure some of these medium and larger trees remain on the landscape consistent with land management plan objectives.

Frazier Mountain Project

In commenting on whether the Tecuya Ridge Project complies with the roadless rule's "generally small diameter timber" requirement, some members of the public have suggested using the diameter limit selected for the Frazier Mountain Project as a benchmark. However, as discussed below, the physical and biological conditions, rationale for selecting a diameter limit, and characterization of what is "small" and "large" diameter timber are unique to each project, such that applying the Frazier Mountain diameter limit here is inappropriate.

The purpose and need of the Frazier Mountain Project is similar to the Tecuya Ridge project insofar as both projects intend to reduce fire hazard risk, maintain the health of mature conifer stands and existing conifer plantations, and protect the communities that are within the wildland urban interface. The Frazier Mountain Project is similarly located on the Mount Pinos Ranger District, but on a distinct mountain top that reaches higher elevations than the Tecuya Ridge project. The Frazier Mountain stands range from plantations to mature conifer stands, and the project area is outside of Inventoried Roadless Areas.

The analysis for the Frazier Mountain Project was conducted utilizing the Healthy Forest Restoration Act environmental analysis process. Under this process, the deciding official is only required to analyze the proposed action and the no action alternative. However, the deciding official may also elect to consider additional alternatives to the proposed action and no-action alternative. Comments were received from the public concerning commercial logging and the deciding official chose to analyze an additional alternative that limited tree thinning to a maximum of 10" DBH. In doing so, the alternative limited thinning to trees with little-to-no commercial value, thereby addressing the concerns expressed in public comment. For the purposes of the project analysis, the project characterized "small" diameter trees as those non-commercial trees 10" DBH and less, and "large" trees as those commercial trees above the 10" threshold. This terminology was not utilized to describe which trees were large or small based on the potential size of the trees, it was not based on an analysis of the site's stand composition, and it was not an analysis of what constitutes "generally small diameter timber" under the roadless rule.

The Decision Notice and Finding of No Significant Impact for the Frazier Mountain Project documents selection of the non-commercial alternative. For this alternative, the project analysis showed that the ground fuels would be reduced and meet some of the fuels management project objectives. However, only one-third of the project stands would be treated to the desired level for





the forest health objectives. The selection of the non-commercial alternative left two-thirds of the project stands at risk to imminent mortality from bark beetle attacks.

A number of years later, when the Tecuya Ridge project was developed, a major shift in weather patterns had occurred. Following completion of the Frazier Mountain Project, the State of California entered into severe drought conditions and experienced exceptional mortality of mass quantities of conifers throughout the state, including on the Los Padres National Forest. The larger trees, which are more susceptible to drought conditions, began to die off at alarming rates, including within the lower elevations of the Frazier Mountain Project. As the analysis showed on the Frazier Mountain Project, thinning to a non-commercial level for the project left the majority of the trees at risk to mortality. This information was factored into the Tecuya Ridge project design, to improve the health of the remaining stands so that it could better withstand the impacts of droughts and maintain or improve the desired roadless area characteristics.

<u>Summary</u>

In summary, a project specific approach has been taken to determine what is "generally small diameter timber" for the Tecuya Ridge project area consistent with the roadless rule. Vegetation management activities within the project area will focus on mostly small diameter trees within the 0-14" diameter class with a small number of trees thinned within the 14-28" diameter class (up to 21" DBH) to restore the characteristics of ecosystem composition and structure and reduce the risk of uncharacteristic wildfire effects.

**Cuddy Valley/Tecuya Stand Improvement Projects**

**Los Padres National Forest**

**Fire/Fuels Report**

*Brad Gillespie*
Brad Gillespie
Fire Management Specialist
Enterprise Team
406-837-7527
12/13/2017
Updated
06/19/18

For:
Mt. Pinos Ranger District

TRSF_B_000177

# Table of Contents

Introduction ............................................................................................................. 3

Data Sources and Methodology ........................................................................... 3

Current Fire/Fuel Conditions and Fire Behavior Outputs ..................................... 4

Wildland Urban Interface (WUI) and Fire Threat .................................................. 7

Cuddy Valley and Tecuya Stand Improvement Hazardous Fuel Treatments.................................. 9

Cuddy Valley and Tecuya Treatment Design Criteria ........................................... 9

Monitoring ........................................................................................................... 10

Bibliography ........................................................................................................ 11

TRSF_B_000178

## Introduction

Fire has always been a natural component in the ecosystems located throughout the Cuddy Valley and Tecuya areas. As a result, fire was historically the primary disturbance agent that burned at different frequencies and severities. Over the last century, fire frequency and severity has departed from historical conditions resulting in changes to the structure and composition of forests and shrub/grasslands. Stands are now more dense because seedlings and saplings are not thinned by periodic low-intensity surface fires (Taylor 2000).

In addition to the physical and ecological role of fire, fire also embodies an array of competing social values, multiple interests, and uncertain outcomes. Coexisting with fire is contentious and complex because there are many diverse people or stakeholders involved with and affected by fire. As a result, wildfire managers need to carefully evaluate and plan how wildland fire will affect the ecosystem, impact air quality, and threaten the safety of human life and property (Kaufmann and others 2009).

One tactic that has proven effective to improve forest stand conditions and reduce wildfire threat is the use of fuelbreaks within Cuddy Valley and Tecuya project area. The Los Padres National Forest Strategic Fuelbreak project analyzed the need to re-establish and maintain fuelbreaks and prioritize them across the Forest. Additionally, the (2006) Mount Pinos Community Wildfire Protection Plan (CWPP) supports the tactical use of fuel modification to create defensible perimeters around communities for wildland fires by strategically constructing and maintaining fuelbreaks at both the county level and on the Los Padres National Forest (Walsh 2006). The concept that fuelbreaks for wildland fire is an important strategical and tactical control measure. The current LMP states that, *"Most of the fuelbreaks are in high hazard chaparral areas and are designed to limit wildland fire size and provide firefighter access and improved firefighter safety"*. The LMP also states that *"most of the planned fuelbreaks are also along roads and ridge tops and are proposed for limiting wildland fire patch size ... Fuelbreaks are sometimes constructed near communities to provide some level of future protection in cases where land ownership patterns or topography limit the applicability of the Wildland/Urban Interface Defense and Threat Zones concept"*(Metzger 2015).

## Data Sources and Methodology

Fire history start data from the Los Padres National Forest GIS layer and Monitoring Trends in Burn Severity (MTBS) for the Cuddy Valley and Tecuya area is from 1998-2017. MTBS is an interagency program whose goal is to consistently map the burn severity and extent of large fires across all lands of the United States from 1984 to present. This includes all fires 1000 acres or greater in the western United States and 500 acres or greater in the eastern Unites States

The existing fuel models and landscape file are from the LANDFIRE Project. The objective of the LANDFIRE Project is to provide the spatial data needed by land and wildland fire managers to accurately identify the amount and locations of lands or communities with hazardous fuel build-up or extreme departure from historical conditions. This data also facilitate the prioritization of ecosystem restoration and hazardous fuel reduction treatments to protect ecosystems, property, and people (Landfire 2014).

Understanding fuel conditions, weather, and corresponding fire behavior is important for fire and fuels management. Monitoring and Design criteria are developed by using fire behavior related inputs and outputs for the proposed treatment areas. Fire behavior modeling was done using FlamMap. FlamMap is a fire behavior mapping and analysis program that computes fire behavior characteristics for a landscape using constant weather and fuels moisture conditions (Finney and McHugh 2016). Outputs

**ER-55**

are crown fire potential and flame length (Finney 2004). In addition, all fire model runs were calculated using the Landfire 2014 dataset provided by Landfire.gov.

Fire Family Plus software was used to analyze and summarizing historical weather observations and compute fire behavior characteristics. The fire danger indices Energy Release Component (ERC) and Spread Component (SC) is used to establish weather and fuel moisture data were for the 90th percentile conditions from the CHUCHUPATE remote automated weather station or very dry conditions (Bradshaw 2014).

The 2006 Community Wildfire Protection Plan developed for the Mt. Pinos Communities. It identifies and prioritizes areas for hazardous fuel reduction treatments and recommends the types and methods of treatment that will protect the communities within the Mt Pinos study area. The California Fire and Resource Assessment Program (FRAP) assesses forest and rangeland vegetation conditions and the threat of wildfire to ecosystem health and community safety.

## Current Fire/Fuel Conditions and Fire Behavior Outputs

### Current Fire History

Since 1998, there were 15 fire starts within the Cuddy Valley and Tecuya treatment areas with 67 percent of the fire starts caused by human related activities. Although fires can start throughout the entire year, the majority of fire starts occur in August and September. While all of these starts were fully suppressed at less than 10 acres, there have been a number of large fires over 1000 acres within or adjacent to the project area (USGS 2017). See table 1 for fires over 1000 acres.

| Fire Name | Year | Acres |
|-----------|------|-------|
| Gorman | 2005 | 2,439 |
| Ridge | 2006 | 2,486 |
| Post | 2010 | 1,454 |
| Grand | 2013 | 4,527 |

Table 1. Fires over 1,000 acres within or adjacent to the project area.

### Hazardous Fuels

The exclusion of fire has allowed biomass to accumulate in those forested and shrubland vegetation types. As a result many changes associated with the current vegetation composition and structure have occurred which also changes the fuel profile and subsequent fire behavior characteristics. The current vegetation consists of grasses and shrubs that transition into pinyon pine and mixed conifer forests. These vegetation types are also represented by the standard fire behavior fuel models. A representative fuel model can be used to quantify fire behavior characteristics and the potential effects on vegetation. Identified in Table 2 and 3 are the current surface fire behavior fuel models and their presence within the Cuddy Valley and Tecuya treatment areas (Landfire 2014) (J.H. Scott and Burgan 2005).

Table 2. Cuddy Valley fuel type, model number, fuel and fire behavior description acres and percent of area

| Fuel Type | Fuel Model Number | Fuel and Fire Behavior Description | Total Acres | Percent of total Area |
|-----------|-------------------|-------------------------------------|-------------|------------------------|
| Non-Burnable (NB) | 91 | Urban Non-Burnable | 76.95 | 6.19% |
| Grass (GR) | 101 | Grass is short naturally, predicted rate of fire spread and flame length is low | 2.58 | 0.21% |
|  | 102 | Primarily grass with some small amounts of fine, dead fuel, any shrubs do not affect fire behavior | 28.33 | 2.28% |

TRSF_B_000180

| Fuel Type | | Fuel and Fire Behavior Description | Total Acres | Percent of total Area |
|---|---|---|---|---|
| Grass/Shrub (GS) | 121 | Shrubs are about 1 foot high, grass load is low, spread rate moderate and flame length is low | 12.07 | 0.97% |
| | 122 | Shrubs are 1-3 feet high, grass load is moderate, spread rate high and flame length is moderate | 387.09 | 31.12% |
| Shrub (SH) | 142 | Woody shrubs and shrub litter, fuelbed depth about 1 foot, no grass, spread rate and flame low | 122.39 | 9.84% |
| | 147 | Woody shrubs and shrub litter, very heavy shrub load, depth 4-6 feet, spread rate and flame length are high | 202.94 | 16.32% |
| Timber Understory (TU) | 165 | Heavy forest litter with shrub or small tree understory, spread rate and flame moderate | 112.5 | 9.05% |
| Timber Litter (TL) | 183 | Moderate load conifer litter, light load of coarse fuels, spread rate and flame low | 272.29 | 21.89% |
| | 186 | Moderate load broadleaf litter, spread rate and flame moderate | 26.54 | 2.13% |

Table 3. Tecuya fuel type, model number, fuel and fire behavior description acres and percent of area

| Fuel Type | Fuel Model Number | Fuel and Fire Behavior Description | Total Acres | Percent of total Area |
|---|---|---|---|---|
| Non-Burnable (NB) | 91 | Urban Areas | 44.84 | 2.77% |
| | 99 | Bare Ground | 5.10 | 0.21% |
| Grass (GR) | 101 | Grass is short naturally, predicted rate of fire spread and flame length is low | 44.65 | 2.76% |
| | 102 | Primarily grass with some small amounts of fine, dead fuel, any shrubs do not affect fire behavior | 118.52 | 7.32% |
| Grass/Shrub (GS) | 121 | Shrubs are about 1 foot high, grass load is low, spread rate moderate and flame length is low | 72.77 | 4.50% |
| | 122 | Shrubs are 1-3 feet high, grass load is moderate, spread rate high and flame length is moderate | 329.87 | 20.38% |
| Shrub (SH) | 141 | Woody shrubs and shrub litter, fuelbed depth about 1 foot, may be some grass, spread rate and flame low | 5.38 | 0.33% |
| | 142 | Woody shrubs and shrub litter, fuelbed depth about 1 foot, no grass, spread rate and flame low | 90.59 | 5.60% |
| | 147 | Woody shrubs and shrub litter, very heavy shrub load, depth 4-6 feet, spread rate and flame length are high | 189.46 | 11.71% |
| Timber Understory (TU) | 165 | Heavy forest litter with shrub or small tree understory, spread rate and flame moderate | 153.12 | 9.46% |
| Timber Litter (TL) | 183 | Moderate load conifer litter, light load of coarse fuels, spread rate and flame low | 522.27 | 32.27% |
| | 186 | Moderate load broadleaf litter, spread rate and flame moderate | 43.34 | 2.68% |
| | 187 | Heavy load forest litter, larger diameter downed logs, spread rate and flame low | 0.24 | 0.01% |

**Fire Behavior Modeling**

Fire behavior modeling is performed to estimate a number of fire behavior characteristics. There are three main categories of inputs to fire behavior modeling; weather, fuels, and topography.

The standard fire behavior fuel models are used to predict fire behavior resulting from weather and topographic inputs. Crown fuel conditions are important for determining crown fire characteristics, such as whether a fire can transition from the ground to the tree crowns.

There are several outputs calculated from fire behavior modeling that are important to fire management decisions that can be used to support the need for vegetation treatments that increase forest health and increase fire suppression effectiveness. The outputs of most concern include flame length and type of fire. Flame length, which corresponds to the fire intensity, is important in determining fire suppression techniques and is used to estimate resistance to control. This is defined as the relative difficulty of constructing and holding a control line as affected by resistance to line construction and by fire behavior. See table 4 for fire behavior characteristics and potential control mechanisms (NWCG 2006).

| Flame Lengths (feet) | Fireline Intensity (BTU/ft/sec) | Possible Methods of Attack | Interpretation |
|---|---|---|---|
| 0-4 | 0-100 | Direct | Hand/ground crews at fire edge. |
| 4-8 | 100-500 | Direct/Indirect | Mechanized equipment supported by hand/ground crews at fire edge. |
| 8-11 | 500-1000 | Indirect | Primarily an indirect attack with line construction away from fire edge using a combination of aerial resources, mechanized equipment and hand/ground crews. |
| >11 | >1000 | Indirect | Indirect attack is only option with line construction away from fire edge using a combination of aerial resources, mechanized equipment and hand/ground crews. |

Table 4. Fire behavior characteristics and potential control mechanisms.

In addition to flame length, the type of fire also defines what suppression resources and tactics are used and the potential resistance of control. In addition, the type of fire can also support the need to thin forested stands to reduce dead down woody debris, reduce ladder fuels, and decrease canopy cover. The two fire types defined for this project are determined by the fuel stratum in which the fire is burning.

**Surface Fire -** A surface fire burns in the surface fuel layer, which lies immediately above the ground fuels, but below the canopy, or aerial fuels. Surface fuels consist of needles, leaves, grass, and dead and down branch wood and logs, shrubs, low brush, and short trees. Surface fire behavior varies widely depending on the nature of the surface fuel complex. Surface fires are generally easier to contain than any type of crown fire.

**Passive -** A passive crown fire, also called torching, or candling, is one in which individual or small groups of trees torch out, but a solid flame is not consistently maintained in the canopy. These can encompass a wide range of fire behavior, from the occasional tree torching out, to a nearly active crown fire. Passive crowning is common in many forest types, especially those with an understory of shade-tolerant conifers.

In order to quantify fire behavior characteristics and the potential mechanisms to control a wildfire, fire behavior modeling was used across the treatment areas. As a result, fire behavior outputs were

TRSF_B_000182

calculated from FlamMap. FlamMap's outputs are widely-accepted by the fire modeling community because it is specifically designed to generate fire behavior characteristics across a large area.

**Fire Behavior Modeling Results**

By using the 90th percentile climatological information and the standard fire behavior fuel models, FlamMap produced fire behavior outputs for flame length and fire type. As described in table 4 above, those fire behavior outputs determine the fire hazard and management actions taken across project area. Under dry conditions, the current vegetation conditions within the project area demonstrate a significant percent of the timber fuel type's displaying passive crown fire and the heavier load shrub fuel types show flame lengths that require indirect fire suppression tactics. See Tables 5 and 6 for flame length and fire type acres and percent for the Cuddy Valley and Tecuya treatment areas.

Table 5. Cuddy Valley flame length classes and fire type acres and percent of area

| Flame Length Classes | Acres | Percent Total Area |
|---|---|---|
| 0 Feet | 639.08 | 51.39% |
| 0 - 4 Feet | 307.16 | 24.70% |
| 4 - 8 Feet | 66.32 | 5.33% |
| 8 - 11 Feet | 28.10 | 2.26% |
| > 11 Feet | 202.93 | 16.32% |
| **Fire Type** | **Acres** | **Percent Total Area** |
| Unburnable | 76.97 | 6.19% |
| Surface Fire | 684.31 | 55.03% |
| Passive Crown Fire (torching) | 482.30 | 38.78% |

Table 6. Tecuya flame length classes and fire type acres and percent of area

| Flame Length Classes | Acres | Percent Total Area |
|---|---|---|
| 0 Feet | 944.91 | 58.38% |
| 0 - 4 Feet | 340.63 | 21.05% |
| 4 - 8 Feet | 98.37 | 6.08% |
| 8 - 11 Feet | 44.64 | 2.76% |
| > 11 Feet | 189.89 | 11.73% |
| **Fire Type** | **Acres** | **Percent Total Area** |
| Unburnable | 52.68 | 3.26% |
| Surface Fire | 1,100.45 | 67.99% |
| Passive Crown Fire (torching) | 465.31 | 28.75% |

**Wildland Urban Interface (WUI) and Fire Threat**

The Mt. Pinos CWPP primary purpose is to make communities safer from wildfire. The plan highlights the overall threat and risks of wildfire and provides the basis for pre-suppression strategies to reduce the impacts of a wildfire. The plan identifies three zones within the WUI. The area where structures

**ER-59**

are located is the Defense Zone (area buffered 500 feet from structures). If a fire occurs or burns into this zone, structure loss is likely without quick aggressive structure protection. The threat zone is adjacent to the Defense Zone (area buffered by one-quarter mile buffer around the Defense Zone). This zone needs specific and intense management and treatments. The CWPP recommends establishing and maintaining fuelbreaks and prescribed burning within this zone to reduce the threat to the Defense Zone (Walsh 2006).

The 2006 CWPP goals of the fuel reduction strategies are simple:

- Design fuel modification to provide a buffer between developed areas and wildlands.
- Design and distribute treatments to increase the efficiency of firefighting efforts and reduce risks to firefighters, the public, facilities, structures, and natural resources.
- Utilize planned prescribed burns as strategically placed area treatments.

**Fire Threat**

Another metric that demonstrates a need to improve stand conditions within the Cuddy Valley and Tecuya treatment areas is categorized by the current fire threat.   Fire threat is an indicator of the potential wildfire related impacts to ecosystem health and values within the WUI. Fire threat levels are also an indicator of fire hazard that includes components for both probability (chance of burning) and the nature of the fire (fire behavior). Taken collectively, these two features assess the basic threat features of periodic wildfires (Calfire 2010).  See figures 7 and 8 for the fire threat level percent within the Cuddy Valley and Tecuya treatment areas.  A significant percent of the treatments areas are within a high or very high fire threat.  Fire threat does not measure fire effects and fire risk values (Calfire 2010).



Figure 7.  Cuddy Valley fire threat level percent within the treatment area.

TRSF_B_000184



Figure 8. Tecuya fire threat level percent within the treatment area.

**Cuddy Valley and Tecuya Stand Improvement Hazardous Fuel Treatments Design Criteria**

Current land management direction on the Los Padres National Forest allows for the construction of new fuelbreaks at a rate of 400 acres annually. The Los Padres Forest Plan strategy for fuel breaks includes the following guidance that provides direct and indirect public protection from wildfires and floods (USDA 2005) based on the following criteria:

- *Maintain the existing system of roadside fuelbreaks and fuelbreaks along watershed boundaries to minimize fire size and the number of communities threatened by both fires and floods. When feasible construct new fuelbreaks on land outside of wilderness or other special designations.*
- *Consider an opportunistic approach to fuels management. Take advantage of wildland fire occurrence and wherever possible connect wildland fires to forest health and wildlife habitat improvement projects, as well as fuelbreaks to maintain multiple lines of community defense and to minimize future wildland fire patch size.*

Additionally, fuel reduction treatments are designed to remove existing hazardous fuels that have accumulated either on the forest floor, ladder fuels, or in the crowns. The treatments proposed are designed to reduce the potential for flame lengths and crown fires. Therefore increasing the likelihood of success for fire suppression operations.

- Thinning to reduce canopy cover is generally recommended to minimize crown fire hazard (J. H. Scott and Reinhardt 2001). The reduction in crown fire potential provides for the increased success of fire suppression. This reduces the risk to firefighters and the public in a suppression action. The decrease in crown fire potential also allows fire managers to use more tools in suppression efforts.
- The reduction in the potential for crown fire reduces the likelihood of reduced forest health. The risk of losing forest structure and continuity is high in large severe burning fires that produce crown fire. Forest diversity is also lost in large landscape fires that burn at high intensity.
- Lowering flame lengths decreases the likelihood that there would be crown fire initiation. Lowering flame lengths increases the ability to actively suppress fires effectively during a severe

TRSF_B_000185

fire season.  Using hand crews is the most effective way to attack wildfires; hand crews are generally not effective with flame lengths over 4 feet in height.  The activities proposed reduce the flame lengths in treatment units, so hand crews can be utilized.

- To reduce the threat of spotting distance from firebrands (spotting potential), fuels would need to be reduced both near and at some distance from the WUI.  Implementation of vegetation treatments would result in decreasing the behavior of a wildland fire and would increase the likelihood that fire suppression efforts would be successful in containing fires at a small size.
- Create fuelbreaks wide enough to allow fire operations to effectively mitigate the high to extreme fire behavior characteristics in those areas that have medium to high fuel load shrub species.

Specific hazardous fuels design criteria from prescribed fire (pile or jackpot burning) or mastication should include the following:

- Dead and down material left after treatment should be less than 10 tons per acre in the forested treatment areas where available.
- Brush species would be reduced by up to 85 percent and may include feathering of treatment for visual concerns.  Feather the edges of the fuelbreak by selectively removing random brush species along the edge to create a mixed vegetative area or zone to soften harsh edges.
- All prescribed fire activities will occur with approvals from the San Joaquin Valley Air pollution and under conditions established in an approved Prescribed Fire Burn Plan.

**Monitoring**

All treatment units throughout the project area will be monitored and documented within the site specific burn plan and unit folders prior to and after implementation. Monitoring could include pre and post treatment photos, pre and post ocular estimation of fuel loading to determine if resource objectives have been met activity with regard to course woody debris, and overall change in surface fuel modification.

TRSF_B_000186

## Bibliography

**Bradshaw, L. 2014.** Fire Family Plus 4.1. Fort Collins, Colorado: USDA Forest Service, Rocky Mountain Research Station. http://www.firelab.org/project/firefamilyplus. (5 May, 2015).

**Calfire. 2010.** California's Forest and Rangelands: 2010 and 2015 Assessment. http://frap.fire.ca.gov/assessment/2015/assessment2015. (Accessed: 12/15/17).

**Finney , M.A. 2004.** FARSITE: Fire Area Simulator-model development and evaluation.  RMRS-RP-4,. USDA, Forest Service, Rocky Mountain Research Station,  Ogden, UT. 47  pp.

**Finney , M.A.; McHugh, C.W. 2016.** FlamMap. https://www.firelab.org/project/flammap. (Accessed: 01-26-2017).

**Kaufmann, M.R.; Shlisky, A.; Brooks, J.J.; Kent, B. 2009.** Coexisting With Fire: Ecosystems, People, and Collaboration.   Gen. Tech. Rep. RMRS-GTR-227. Rocky Mountain Research Station, Fort Collins, CO. 20  pp.

**Landfire. 2014.** Vegetation, Fire , and Fuels related data obtained for analysis purposes. U.S. Department of Agriculture and U.S. Department of the Interior. http://www.landfire.gov/fuel.php.

**Metzger, T. 2015.** Los Padres National Forest Strategic Community Fuelbreak Improvement Project Fire/Fuels Report. Unpublished paper.pp.

**NWCG. 2006.** Appendix B. Fire Line Handbook.  Boise, ID. 124  pp.

**Scott, J.H.; Burgan, R.E. 2005.** Standard fire behavior fuel models:  A comprehensive set for use with Rothermel's surface fire spread model.   General Technical Report RMRS-GTR-153. USDA Forest Service, Rocky Mountain Research Station,  Fort Collins, CO. 72  pp.

**Scott, J.H.; Reinhardt, E.D. 2001.** Assessing Crown Fire Potential by Linking Models of Surface and Crown Fire Behavior.   Res. Pap. RMRS-RP-29. Rocky Mountain Research Station,  Fort Collins, CO. 59  pp.

**Taylor, A.H. 2000.** Fire regimes and forest changes in mid and upper montane forests of the southern Cascades, Lassen Volcanic National Park, California, USA. Journal of Biogeography  27: 87-104.

**USDA, F.S. 2005.** Land Management Plan, Part 2 Los Padres National Forest Strategy.  R5-MB-078. Forest Service,  Goleta, CA 155  pp.

**USGS. 2017.** National Monitoring Trends in Burn Severity (MTBS) Burned Area Boundaries Dataset. https://www.mtbs.gov/. (Accessed: 12/15/17).

**Walsh, T. 2006.** The Mt. Pinos Communities Wildfire Protection Plan. HangFire Environmental-Copyright Mt. Pinos Communities Fire Safe Council-2006,  California. 181  pp.

TRSF_B_000187

# Los Padres National Forest

## Antimony Inventoried Roadless Area

Mount Pinos Ranger District

### Overview

Location and vicinity, including access by type of road or trail: The 40,513 acre Antimony Inventoried Roadless Area (IRA) is located within the Mount Pinos Ranger District of the Los Padres National Forest. The area is adjacent to the small communities of Frazier Park, Lake of the Woods, Pinyon Pines Estates and Pine Mountain Club; all approximately two hours north of Los Angeles. Most of the area lies north of or adjacent to the San Andreas Rift Zone. The area is split by a deep drainage known as San Emigdio Creek. Other drainages include Pleito, Salt and Cherry Creeks and Black Bob, Deadman, Cloudburst and Santiago Canyons. A strip of private land, part of the 95,000 acre Wildlands Conservancy Wind Wolves Preserve, bisects the area along San Emigdio Canyon. In addition, major paved roads and residential developments along the periphery impact the serenity of the area along the southern boundary. Centrally located on the southern edge is the Pine Mountain Club subdivision. Further to the eastern boundary are the communities of Cuddy Valley, Lake of the Woods and Frazier Park. Extensive private lands are found on the northern border. These lands are along Black Bob Canyon, Salt Creek, Pleito Creek, Devil's Kitchen and others. Private landowners do not provide access through these lands.

Geography, topography and vegetation (including the ecosystem type(s): The area consists of folded and faulted non-marine sedimentary rock formations south of the fault and a mixture of intensified fractured and faulted granite, gneiss and schist north of it. Numerous small peaks and drainages that primarily flow into the San Joaquin Valley characterize the topography. Elevations range from 3,250 feet up to 7,495 feet atop San Emigdio Peak.

Approximately 48% of the total area of Antimony is pinyon woodlands (*Pinus monophylla*), Great Basin sagebrush (7%) and other conifers like (big-cone Douglas-fir (*Pseudotsuga macrocarpa*). 'Eastside' pine (5%) is present and a minor amount of mixed conifer forest occupies the highest elevations. Annual grasslands comprise approximately 1,300 acres and are not very prevalent. There is a minor component of coastal sage scrub with buckwheat (*Eriogonum* spp.) and rabbitbrush (*Chrysothamnus nauseosus*) as the dominant cover. There are also 26 acres of valley oak (*Quercus lobata*) and 3,100 acres of canyon live oak (*Quercus chrysolepis*).

Current uses of the area: Recreation use in Antimony is generally light except for a few holiday weekends and a couple of popular destinations within the areas. Portions of the area receive intensive, seasonal use by hunters and year-round use by off highway vehicle (OHV) enthusiasts and mountain bikers. The area is used for wood gathering, recreational target shooting and pinyon nut collection.

The unit is bisected in the middle by the Wind Wolves Preserve, a north-south private land corridor in San Emigdio Canyon connecting to the Pine Mountain Club community. Private land extends into the unit but it is 'cherry-stemmed' from inclusion. Only one private land in-holding (120 acres in size) is located in Black Bob Canyon (Township 9 North, Range 20 West, Sections 15 and 22).

There are six primitive campgrounds (Valle Vista, Caballo, Marian, Pleito Creek, Salt Creek and Cherry Creek). Each contains picnic tables, fire rings and rustic toilets. These campgrounds are accessed by roads outside the boundary of Antimony or by 14.4 miles of motorized trails (19W01, 20W01, 20W14, 20W17, 21W01, 22W12, 21W06) within Antimony.

There is a wildlife viewing area west of Valle Vista Camp. A portion of the Bitter Creek National Wildlife Refuge is adjacent to the western portion of the unit. The Wind Wolves Preserve is adjacent to the northern portion of the unit.

There are three active and one vacant livestock grazing allotment. There are several permitted roads associated with these allotments.

There are uranium, antimony, gold, and silver mines in the area that are no longer in operation. Evidence of mining operations and associated access roads can still be seen on the landscape but are not current uses.

There is one shaded fuel break in the conceptual planning phase on Tecuya Ridge from San Emigdio on the Forest boundary, east on Tecuya Ridge to Tecuya Mountain and to the Forest boundary. There are fuel breaks, planned prescribed burns and roads that are maintained around the communities near Antimony (Unit D of the Pine Mountain Club Project for example). There is one water source and seven helispots in the area identified for potential use during fire management operations.

Snow play occurs along a half-mile section of State Highway 95 (Potrero Highway) at the eastern section of this unit between Forest Road 9N21 and the private land boundary. Visitors park along the side of this highway and play in the snow on the hillside.

There are two ozone-monitoring plots where vegetation sampling occurs.

Appearance and surroundings (such as the characteristics of contiguous areas): The area is about 24 miles long and three miles wide. Its linear configuration affords few locations where one can get away from the impacts of humans, particularly along the south facing slopes from Apache Saddle (at the fire station) to the eastern boundary of the area. About half of the vegetation is coniferous forest and one quarter is shrubland.

The area serves as a scenic backdrop to the rural mountain communities of Frazier Park, Pinyon Pines Estates, Lake of the Woods and Pine Mountain Club. The forested mountains with perennial streams provide an attractive landscape. Recreation trails, OHV routes and campgrounds provide access to this area. The level of development here is consistent with the surrounding private land.

Approximately 1% (497 acres) of Antimony illustrates scenic attractiveness characteristics that are distinctive (Scenic Attractiveness Class A). These characteristics are based upon the perceptions of landform, vegetation patterns, water characteristics, and cultural features that combine to provide unusual, unique, or outstanding landscapes. These landscapes have strong positive attributes of variety, unity, vividness, mystery, intactness, order, harmony, uniqueness, pattern and balance.

Key attractions, if any, such as sensitive wildlife and scenic landmarks: There are excellent vistas of the southern San Joaquin Valley from the ridge tops of Antimony. Special attractions to the area include the San Andreas Rift Zone and formations near the fault that moved here from their

original location near the Salton Sea. There are opportunities to view the California condor (*Gymnogyps californianus*) and California spotted owl (*Strix occidentalis*). There is a wildlife viewing area west of Valle Vista Camp. A portion of the Bitter Creek National Wildlife Refuge is adjacent to the western portion of the Antimony unit and the Wind Wolves Preserve to the north.

## Capability

The areas potential for wilderness is described using characteristics that make the area appropriate and valuable for wilderness, regardless of the area's availability or need. The principal wilderness characteristics that follow are generally, but not necessarily, listed in order of importance or desirability.

Naturalness of the area: There are no perennial streams that run through Antimony. All streams are intermittent or ephemeral as this area is in the desert montane landscape on the rain shadowed inland, or Cuyama Valley side, of the coastal ranges. Santiago Canyon runs for about five miles through this unit but is intermittent, flowing during the winter and spring, but not enough to establish willows or other non-herbaceous riparian vegetation. It does not support any riparian or aquatic wildlife species. There are no impoundments along that portion of Santiago Creek within the unit or within the Forest itself.

In general the health of the plant community is vigorous, with mature pinyon pine and juniper and some mature conifer that has not been burned frequently. The smaller patches of high elevation conifer here and throughout the Forest are at risk from excessive fire frequency.

About 59% of Antimony is managed to maintain a High Scenic Integrity Objective (SIO) in which the landscape appears unaltered to the casual observer. Another 41% of the unit is managed to maintain the integrity of a Moderate SIO in which management activities may appear slightly altered but never dominate the appearance of the landscape. All National Forest System lands within the unit meet or exceed these objectives although there are several roads and some mining activities that have left scars in the landscape and therefore do not meet these objectives. But these scars are small and not significant within the scope of this evaluation and they would not jeopardize the character of the entire roadless area.

Antimony is primarily composed of six Hydrologic Unit Code (HUC) 6 watersheds that drain northward to the Cuyama River. These watersheds are Santiago Creek, Los Lobos Creek, San Emigdio Creek, Pleito Creek, and Tecuya Creek running west to east. They are uniformly Class 1 properly functioning, watersheds on National Forest System lands. Although the unit on National Forest System lands is fully functional from a watershed perspective, limitations on access would not enhance nor preserve water quality because of downstream influences.

Some non-native invasive grasses (*Bromus* spp.) occur but do not dominate the vegetation.

This area has, to some extent, long fire-free intervals because of wildfire suppression efforts. But there have been more than 100 fire starts recorded within Antimony's borders from 1911 to 2009. This area has experienced few sizeable wildfires but a significant number of small fire starts, predominantly lightning-caused, have occurred. The 2010 Post Fire was the most recent event and it burned approximately two percent of the unit. There is a high uniform distribution of live and dead fuels found in these coniferous vegetation types. The management of the conifer

stands in Antimony is designed to increase them to Condition Class 1 (Forest Land Management Plan, Part 3, Table 3.3).

Most of the unit is in Kern County (with 2,400 acres in Ventura County). It is designated non-attainment for ozone and particulates for current air quality.

<u>Undeveloped:</u> The appearance of the landscape remains relatively natural. Most roads here are narrow jeep ways. A road scar is visible as a result of Antimony Mine activity. There are six campgrounds that are accessed by roads outside the boundary of the unit or by 14.4 miles of motorized trails within the unit. There are a number of old, unclassified roads from previous mining and timber harvesting activities. The most obvious are a road down Bradley Ridge, the road accessing the patented mining claim on Antimony Peak and the road from the northern Forest boundary into Black Bob Canyon that accesses Black Bob Mine. There is also an old rock quarry near the top of San Emigdio Mountain with a visible scar on the hillside.

There are uranium, antimony, gold and silver mines in the area but they are no longer in operation. Management emphasis is on protecting communities from fire and vegetative treatments to preserve the forested areas.

There are 3.9 miles of Forest system road, 1.1 miles of county roads and approximately 1.5 miles of Forest permitted roads in the unit.

There are 14.4 miles of motorized OHV trails.

<u>Opportunities:</u> The natural integrity of the area and opportunity for solitude has been compromised by numerous roads, OHV trails and mining. Approximately 87% of Antimony is managed to meet the Semi-Primitive Non-Motorized Recreation Opportunity Spectrum (ROS) objective. Lands are managed to assure that the natural character of the landscape remains dominant and motorized activities are not part of the recreation opportunities provided. Approximately 8% of the unit is managed to meet the Semi-Primitive Motorized ROS objective with lands that are managed to assure that the natural character of the landscape remains dominant. Facilities are provided for recreation in order to protect the natural integrity of the landscape rather than for the convenience of the forest visitor. The remaining 5% of the unit is managed to meet the Roaded Natural ROS objective with lands that allow for recreation development that blends with the natural environment and provides for some level of user convenience.

Opportunities for wilderness challenge are limited because of the linear shape of this area and the proximity of urban development. There is limited to moderate opportunity to experience isolation from sights, sounds, and the presence of others from the developments and evidence of humans. The relatively large (40,513 acres) size of this area does not provide isolation from human impacts and intrusions like roads and agency and public development. Similarly, developed roads and trails provide motorized and non-motorized access to this area. Expansive vistas afforded from peaks accessed by roads and trails are located in this area.

Major recreational opportunities include hiking, mountain biking, OHV trails and roads, horseback riding, camping (developed and primitive), nature viewing and hunting.

<u>Special features and values:</u> Floristic surveys have not been conducted throughout the entire IRA. At this time, no threatened or endangered plant species are known to occur. A small

Case: 23-55054, 04/24/2023, ID: 12701327, DktEntry: 12, Page 68 of 140

Southern California National Forests      Final Supplemental
Land Management Plan Amendment            Environmental Impact Statement      Appendix 2

population of pale-yellow layia (*Layia heterotricha*), a Forest Service Region 5 sensitive species, is present in Antimony.

The California condor (*Gymnogyps californianus*) uses Antimony extensively for travel and roosting as they soar on uplifted winds along the southern boundary of the San Joaquin Valley. This is an important part of the historic range of the condor. There is a condor release facility at Bitter Creek National Wildlife Refuge to the west of the unit. Condors occasionally roost on Brush and San Emigdio Peaks. There has also been California spotted owls (*Strix occidentalis*) detected in the older conifers within this unit and undocumented reports of northern goshawks (*Accipiter gentilis*). Sooty grouse (*Dendragapus fuliginosus*) were observed prior to about 1980. A portion of Antimony is included in the San Emigdio Mountains Globally Important Bird Area as recognized by the National Audubon Society.

The cultural and historic values within the Antimony Inventoried Roadless Area are comprised of significant cultural and heritage resources with listings on the National Register of Historic Places. The most significant are the traditional cultural properties (TCP) comprised of pictographs (rock art) and milling features. There are archaeological sites within Antimony. Several of the sites are highly significant. One consists of both pictographs (rock art) and petroglyphs (carvings in stone). Another site is a large monument in honor of Juan Jose Fustero, last of the Tataviam, who died in 1921 at Piru Lake.

Description of size and shape: The linear shape of this unit, which is also adjacent to major roadways and having multiple roads, indicates that management as a wilderness could be difficult. It is separated from the Chumash Wilderness by a corridor with major private land holdings so it could be difficult to effectively manage Antimony with that unit. Motorized activities on the roadways into the area (not part of the unit) could influence management.

Summary of the boundary conditions, needs, and management requirements: The area is bordered on the north by Wind Wolves Preserve, a conservation area operated by the Wildlands Conservancy and by Mil Potrero Highway from Pine Mountain Club to the western extremity.

Other than the portion of the northern boundary that abuts Wind Wolves Preserve this area could be difficult to manage as wilderness. If recommended as wilderness, it would be desirable to adjust the boundary of the unit so as to exclude the area east of San Emigdio Canyon, thereby eliminating considerable conflict with existing developed uses. The remaining western portion of the unit could also benefit from some boundary modification. If the boundary were moved to the north of the main ridgeline from San Emigdio Canyon to San Emigdio Mountain the western portion of the area could be more reasonably manageable as recommended wilderness.

**Availability**

The availability of potential wilderness areas is described using other resource potential. Pertinent quantitative and qualitative information including current use, outputs, trends, and potential future use and/or outputs for the applicable resources is summarized in this section.

Forest Plan Land Use Zone (40,848 acres): Backcountry (BC) - 2,943 acres, Backcountry Motorized Use Restricted (BCMUR) - 37,156 acres, and Developed Area Interface (DAI) - 749 acres.

Recreation, including tourism: Cross-country hiking could offer a challenge to the experienced hiker and rock climbing in the canyons within the area could provide some challenge and

excitement. There are opportunities for hiking on the Blue Ridge Trail 23W28. Additional hiking and horseback riding opportunities are available on unclassified trails. Snow play and sledding occurs along Mil Potrero Highway in various locations. Hunting and viewing scenery occur in this area. Santiago Canyon provides some opportunities for rock climbing. There are 3.8 miles of hiking trails, 14.4 miles of motorcycle trails, and six small primitive campgrounds (Cherry Creek, Salt Creek, Marian, Caballo, Valle Vista and Pleito Creek). No specific recreation visitation figures are available for Antimony.

Wildlife species, populations, and management needs: Part of the area includes historic roost sites of the California condor. The area contains big game species as mule deer, mountain lion and black bear as well as historic range for Tule elk and pronghorn. Small game species here include fox, quail, band-tailed pigeon, coyote, bobcat and rabbit. Many species of the rodent family live in the area. The area serves as winter deer range. California condors, pronghorn and Tule elk are all species that require large tracts of land in order to maintain viable populations. All three species occupy areas that are part roadless and part roaded. Current monitoring data does not indicate that the presence of roaded areas is precluding or reducing the use of these areas by this wildlife. The recovery plan for the California condor does not recommend the designation of additional wilderness as a means of promoting the recovery of the species. The area provides opportunities for big game hunting (primarily deer) as well as bird hunting (primarily quail and pigeon). California condor, pronghorn and Tule elk have had their historic ranges substantially reduced due to increased human populations and developments. All three species have been re-introduced into areas of their historic range in and adjacent to the Antimony roadless area. Current and projected human uses and developments on National Forest System lands in Antimony are not substantially affecting the habitats of these species. A portion of the area is included in the San Emigdio Mountains Globally Important Bird Area.

Water availability and use: Antimony provides the headwaters for a series of seven watersheds that extend northward onto extensively grazed private land from which surface disturbance and reduction of plant cover reduces the value of the water runoff to the Middle Kern-Upper Tehachapi-Grapevine basin. Private lands account for approximately 67% of the total watershed area. The unit does provide a small quantity of water to a system that eventually reaches the Santa Maria River and is used as a municipal and agricultural water source at numerous locations along the way. Water quality, while good at the upper reaches on public land, will continue to be degraded by downstream development offering little opportunity for improvement by limiting access to the public portions of the watersheds.

Livestock operations: There are three active and one vacant livestock grazing allotment within the unit. These allotments include 13 spring developments and 5.4 miles of fence. The improvements could remain should the area be recommended as wilderness. The Cold Springs allotment has 0.02 acres in this IRA and is not included in the table. The following table displays allotment information for this IRA.

TRSF_C_004220

| Allotment Name and Status (active/vacant) | Sum of Allotment acres w/in IRA | % of IRA with Allotment Acres |
|---|---|---|
| Cowhead-Active | 5 | 0.10 |
| Johnson Canyon-Vacant | 702 | 1.72 |
| San Emigdio-Vacant | 25,276 | 61.78 |
| Santiago-Active | 7,847 | 19.18 |
| Total | 33,830 | 82.68 |

.

Timber: No lands are identified for commercial timber sale production in Antimony (as per Forest Land Management Plan, Part 3, Standard 1). Vegetation management projects may be conducted for wildlife, fuels, watershed or other needs which could result in wood and special forest products such as mulch. The collection of personal use fuelwood from dead and downed woody material is not permitted in designated wilderness or recommended wilderness land use zones.

There are approximately 40 acres of reforestation from the 2006 Scott Fire on Tecuya Ridge near Frazier Park within the area that require maintenance.

Minerals: A high potential for saleable products such as gravel and building stone exists and there is also a high potential for non-strategic and strategic minerals. There is low potential for phosphate production and geothermal resources. There is moderate to low potential for oil and gas leasing in the area.

There are a number of old, undetermined roads from previous mining and timber harvesting activities. The most obvious are a road down Bradley Ridge, the road accessing the patented mining claim on Antimony Peak and the road from the northern Forest boundary into Black Bob Canyon that accesses Black Bob Mine. There is an old rock quarry near the top of San Emigdio Mountain with a visible scar on the hillside. There are uranium, antimony, gold, and silver mines in the area that are no longer in operation. Black Bob Mine has been reclaimed as part of the Forest Service abandoned mine lands program.

Cultural Resources: Only portions of Antimony have been assessed for heritage and cultural resources with archaeological assessments conducted only for specific projects. The portions surveyed have several significant archaeological resources documented and recorded (a description of these resources can be found under Special Features and Values section of this report).

Authorized and potential land uses: There are no special use authorizations other than the grazing permits described above. Grazing and recreational uses are the highest potential uses in the unit.

Management considerations including fire, insects and diseases, and presence of non-federal land: There is a need for the limited use of mechanical equipment to manage vegetation for ecosystem health and fuel reduction in Pine Mountain Club and alongside roads and intersections of roads with planned fuel breaks.

Approximately 749 acres of this unit are zoned as Developed Area Interface (DAI) indicating a concerted effort to manage vegetation within these acres to protect property adjacent to the unit.

Heavy vegetation modifications are required to meet the objectives to protect life and property and to lower the risk of the structures acting as fuel sources within adjacent communities. The potential resistance to fire control is rated moderate. Recommendation of wilderness adjacent to the private land in Pine Mountain Club, Cuddy Valley, Lake of the Woods, Frazier Park, and Lebec could limit the possibilities for vegetation management activities and the establishment and management of fuel breaks adjacent to this growing urban interface. A shaded fuel break across Tecuya Ridge is in the conceptual planning phase following the objectives of the Forest Land Management Plan Vegetation Management Standard S4.

As necessary, treatment of noxious weed infestations with motorized vehicles/mechanized equipment and/or pesticides would be managed using laws, policies and direction for recommended wilderness.

The area includes infestations of dwarf mistletoe and bark beetle. The infestations have led to higher incidences of tree mortality in some areas of the IRA than in others. The continued impact of the infestations on tree stand health and the potential for spread is of concern. There are approximately 40 acres of reforestation from the 2006 Scott Fire on Tecuya Ridge near Frazier Park within the area.

**Need**

The following factors were considered in the process used in assessing the need for each potential wilderness area.

Location, size, and type of other existing wildernesses in the general vicinity and their distance from the proposed area: Within a 20 mile radius of Antimony is the San Rafael Wilderness (197,380 acres), Dick Smith Wilderness (67,800 acres), Chumash Wilderness (38,150 acres) and Sespe Wilderness (219,700 acres).

Present visitor pressure on other existing wildernesses, the trends in use, changing patterns of use, population expansion factors, and trends and changes in transportation: Visitation to the nearby Chumash Wilderness is light to moderate. Population growth and urbanization are increasing on the Interstate 5 corridor and wilderness use is expected to increase. Snow play, OHV and hunting pressure are also expected to continue to increase as the population expands towards the area from the Los Angeles Basin.

There were an estimated 63,700 recreation visits to all Los Padres National Forest wilderness areas in FY 2009 (this and the following demographics are from the FY 2009 Forest National Visitor Use Monitoring Report – NVUM). Demographics are 57% male, 43% female; 86% white race/ethnicity; 29% ages 50 – 59 and 9.4% under the age of 20. On a scale of 1 to 10, with 1 being 'hardly anyone there', most (34%) visitors rated their stay in the wilderness as a '4'. About 10.6 % reported a '5' or above towards overcrowding. Most people reported being satisfied with the performance of the Forest Service during their wilderness visit. The average duration of a visit to a designated Forest wilderness was 9.3 hours; median visit duration was 2.6 hours. This indicates mostly day use.

Most of the use in the Los Padres National Forest is short-term day visits. The average Forest visit lasts less than eight hours; over half of the visits last less than four hours. There are a modest number of frequent visitors: almost 11 percent of the visits are made by people who visit at most five times per year (NVUM). Use patterns are usually concentrated in the first few miles of wilderness trails.

<u>The extent to which non-wilderness lands on the NFS unit or other federal lands are likely to provide opportunities for unconfined outdoor recreation experiences:</u> Much of the Mt. Pinos area non-wilderness lands encompass similar landscapes or land areas with a comparable level of development for recreation opportunities. Increasing use from expanding area populations are expected to increase pressures on these areas.

<u>The need to provide a refuge for those species that have demonstrated an inability to survive in less than primitive surroundings or the need for a protected area for other unique scientific values or phenomena</u>: Of particular importance in the Antimony unit are the high density of California condors and their regular flights from east to west along the north facing slopes of this mountain range. Reliable strong winds are crucial to condor movements and the winds blowing southward from the San Joaquin Valley that are lifted up by the San Emigdio Mountains provide excellent soaring conditions for the condor and are the reason this is an important historic condor area. Wilderness recommendation here could preclude wind energy development and its potential impacts to condors. In addition to the value of Antimony as condor habitat, the Forest Land Management Plan identifies the unit as a habitat corridor connecting to the Bitter Creek National Wildlife Refuge to the north.

<u>An area's ability to provide for preservation of identifiable landform types and ecosystems:</u> The higher elevation coniferous forest of the Antimony area and the surrounding mountainous areas of the Mt Pinos Ranger District are unique to the Los Padres National Forest. These higher elevations provide cooler summer temperatures and higher precipitation than the dry coastal chaparral vegetation types typified on by the coastal regions of the Forest.

TRSF_C_004223



United States
Department of
Agriculture

Forest
Service

January 2012



# Environmental Assessment

## Frazier Mountain Project

**Mt. Pinos Ranger District, Los Padres National Forest
Kern and Ventura County, California**



TRSF_I_008597

# II.   ALTERNATIVES, INCLUDING THE PROPOSED ACTION

This section describes and compares the alternatives considered for the Frazier Mt project. This section also presents the alternatives in comparative form, sharply defining the differences between each alternative and providing a clear basis for choice among options by the decision maker and the public.  There are three alternatives studied in detail in this analysis:

- **Alternative 1 -- No Action**
- **Alternative 2 – Proposed Action**
- **Alternative 3 – (10" diameter limit on tree removal, no commercial harvest)**

## Alternative 1 – No Action

No thinning or fuels reduction treatments would occur with the No Action Alternative.  Other ongoing activities would still continue.  No map is presented for the No Action alternative.

## Alternative 2 -- Proposed Action

Thinning and fuels treatments would occur on approximately 2,386 acres of the 2,850 acre project area.  See Table 7 and **Appendix A- Map A-2** for Alternative 2 - Proposed Action treatments.

### *Frazier Mountain Timber Stand Treatments*

High risk timber stands exist on upper Frazier Mountain. These stands would be treated using commercial thinning and/or noncommercial thinning to thin dense conifer stands to reduce tree competition and crown densities, reduce under story green tree and brush competition, decrease ladder and surface fuel loads and reduce existing brush cover.  Commercial thinning would thin smaller diameter trees (thin from below) and would leave the larger diameter fire resilient trees unless they pose a safety hazard to harvest operations or the public. Trees may be cut by machine where feasible, or by hand. Activity fuels from thinning would be treated and existing fuels would be reduced.  Ladder fuels, tops and limbs and excess large fuels would be removed or burned on site.  Machine piling and burning, hand piling and burning, loping-and-scattering, and prescribe burning would be used to treat activity fuels. Approximately 1,040 acres would be commercial thinned. Trees would be removed from most stands using ground-based tractor logging; however, there are three stands (#97B, #104 and #106) from which trees would be removed using a cable/skyline yarding system (47 acres).

See **Appendix A-Table A-1** for a detailed list of proposed CT and NCT units.  Approximately 40 landings would be needed and approximately 2.4 miles of temporary roads would be needed to access units.  All landings would be rehabilitated after treatments are completed.  Temporary roads would be decommissioned and rehabilitated after treatments are completed.  OHV use would be restricted from using these decommissioned temporary roads using barriers or signage and active enforcement.  Commercial harvested trees would be part of a commercial timber sale and log trucks would haul those trees to a regional mill.  Public access may be restricted on Frazier Mt area roads for safety needs for a limited time during commercial log haul operations.

### *Frazier Mountain Tree Plantation Treatments*

Existing tree plantations (lower to mid-Frazier Mountain) that were created after a wildfire in 1946 would be noncommercial thinned.  These plantations are overly dense and are at risk of being lost from insects and wildfire.  Approximately 241 acres of existing plantations would be

treated and activity fuels would be treated by hand or machine pile and burning or jackpot burning.

### Frazier Mountain Fuelbreak and Prescribed Fire Treatments

The objectives of a fuelbreak are to serve as a point of control in the event of wildfire and to be used as an anchor point for prescribed underburning operations. An emergency fireline was constructed on Frazier Mountain during the Day Fire event in 2008. The existing fireline would be incorporated into an improved fuelbreak treatment approximately 7.5 miles long and up to 300 feet wide, treating approximately 220 acres. The Frazier Mountain fuelbreak would be treated using a combination of commercial thinning (when within existing commercial units), noncommercial thinning, mastication of shrubfields, pile burning, jackpot burning and prescribed fire. Areas on the top of Frazier Mountain not treated by commercial thinning, noncommercial thinning and fuelbreak treatments would be treated using prescribed fire to reduce surface fuels, ladder fuels and shrubfields. A total of approximately 823 acres would be treated along the top of Frazier Mountain using prescribed fire and the Frazier Mt fuelbreak treatments.

### Chuchupate Campground, Special Use Residences and Mt Pinos District Ranger Office Fuel Reduction Treatments

Fuel reduction treatments would be implemented around the Chuchupate Campground, three special use residences, lower trailhead access parking areas, and the Mt Pinos Ranger District office and warehouse complex. These treatments would include a combination of methods including mastication or burn (173 acres), handpile/burn (14 acres), and noncommercial thin/handpile/burn (95 acres). Approximately 282 acres total would be treated around these recreation areas, special use residences and Forest Service facilities. Table 7 below summarizes the proposed action treatment activities.

**Table 7. Summary of Alternative 2 - Proposed Action Activities by Treatment Type:**

| Alternative 2 - Proposed Action Activities | Acres / Miles / # |
|---|---|
| Project Area acres (managed by USDA-FS) | 2,850 |
| Private Ownership acres (if intermingled) | 0.0 |
| Total Project Area acres | **2,850** |
| Forested Stand Treatments (on FS acres only) | |
| • Commercial Thin (CT) *(includes NCT and activity fuels treatments on same acres.)* | 1,040 |
| • Noncommercial Thin only (NCT) *(includes activity fuels treatments on same acres)* | 241 |
| *Total CT/NCT and NCT only acres | **1,281** |
| Commercial Harvest Landings / Transportation Activities | |
| • Temporary road construction miles | 2.4 |
| • Timber harvest landings # *(estimated)* | 40 |
| Fuels Treatments (on FS acres only) | |
| • Prescribed Fire Treatments (upper Frazier Mt), also includes Frazier Mt Fuelbreak Treatments | 823 |
| • Fuel Reduction Treatments *(mastication, thin, handpile, burn, – lower project area including Chuchupate Campground, trailheads, special use residences and FS facilities)* | 282 |
| *Total Fuels Only acres | **1,105** |
| Total Project Treated Acres (Fuels-CT-NCT Treatments) | **2,386** |

### Treatment Definitions for Proposed Action Activities

**Ground-based yarding**
Thinned trees would be pulled from the site to landings by the use of ground-based machine such as a rubber-tired skidder, tracked skidder (dozer), or ATV.

**Cable yarding**
Thinned trees would be transported from the site to landings by a cable system. The leading end of trees being removed would be suspended, but in most cases the trees would not be fully suspended and ground contact would occur.

**Hand thinning**
Trees and/or shrubs would be cut or pruned using hand-carried machines (e.g., chainsaws) to the desired spacing.

**Hand pile and burn**
Fuels created by pruning, tree thinning or shrub thinning would be piled by hand and burned during conditions when risk of fire spread is low and when smoke will be adequately dispersed. Handpiles would be up to 6 feet high and 8 feet in diameter and would be placed as far from the canopy drip-line of trees as possible to prevent scorch.

**Machine cut**
Trees would be cut by a ground-based machine such as a track-mounted feller-buncher, but on occasion, hand cutting may be necessary. Mechanical equipment will be limited to 35% (as defined in the LRMP) with some pitches up to 50%. Anything above 35% will be hand felled, piled, and burned.

**Machine pile and burn**
Fuels created by tree thinning would be piled by machine and burned during conditions when risk of fire spread is low and when smoke will be adequately dispersed. Piles would be placed as far from the canopy drip-line of trees as possible to prevent scorch. The operation could be the use of a track-mounted excavator with a grapple or a track-mounted dozer to pile thinning debris. Mechanical equipment will be limited to 35% (as defined in the LRMP) with some pitches up to 50%. Anything above 35% will be hand felled, piled, and burned.

**Mastication**
Brush fields and smaller diameter trees remaining after commercial or noncommercial thinning after thinning would be masticated. The specific type of mastication equipment used is dependent on availability and cost at the time.

**Prescribed fire underburn**
Fuels would be reduced by prescribed burning with a low intensity controlled burn. A range of prescribed burning activities including hand piling, jackpot burning, aerial ignitions, and low intensity burns would be conducted, usually under a forest canopy. Most of the thinning units are nested within larger underburn areas. Fuels treatment would vary depending on the existing and post-thinned conditions.

# Alternative 3 – 10" Diameter Cap - No Commercial Harvest

Noncommercial thinning and fuels treatments would occur on approximately 2,386 acres of the 2,850 acre project area. See Table 8 and **Appendix A-Map A-3** for Alternative 3 treatments.

### *Frazier Mountain Timber Stand Treatments*

High risk timber stands exist on upper Frazier Mountain. These stands would be treated by noncommercial thinning the understory trees up to a 10" diameter. The removal of these trees will help reduce tree competition and crown densities, reduce under story green tree and brush competition, decrease ladder and surface fuel loads, and reduce existing brush cover. This understory thinning would remove smaller diameter trees (thin from below up to 10" diameter dbh) and would leave the larger diameter (>10" diameter) trees unless they pose a safety hazard to thinning operations or the public. Trees may be cut by machine where feasible, or by hand. Activity fuels from thinning would be treated and existing fuels would be reduced. Ladder fuels, tops and limbs and excess large fuels would be removed or burned on site. Machine piling and burning, mastication, chipping, hand piling and burning, loping-and-scattering, and prescribed burning would be used to treat activity fuels. Approximately 1,040 acres would be noncommercial thinned. Trees would be removed from most stands using ground-based tractor thinning; however, there are three stands (#97B, #104 and #106) from which trees would be thinned by hand crews using chainsaws and trees would be cut, piled and burned on site (47 acres).

See **Appendix A-Table A-2** for a detailed list of proposed NCT units. Approximately 10 landings would be needed and approximately 0.8 miles of temporary roads would be needed to access units (no proposed temporary roads would be within any inventoried roadless area). All landings would be rehabilitated after treatments are completed. Temporary roads would be decommissioned and rehabilitated after treatments are completed. OHV use would be restricted from using these decommissioned temporary roads using barriers or signage and active enforcement. The smaller diameter trees may be brought out to the landings and then offered to the public for specialty use products such as poles or firewood.

### *Frazier Mountain Tree Plantation Treatments*

Existing tree plantations (lower to mid-Frazier Mountain) that were created after a wildfire in 1946 would be noncommercial thinned. These plantations are overly dense and are at risk of being lost from insects and wildfire. Approximately 241 acres of existing plantations would be treated and activity fuels would be treated by hand or machine pile and burning or jackpot burning.

### *Frazier Mountain Fuelbreak and Prescribed Fire Treatments*

The objectives of a fuelbreak are to serve as a point of control in the event of wildfire and to be used as an anchor point for prescribed underburning operations. An emergency fireline was constructed on Frazier Mountain during the Day Fire event in 2008. The existing fireline would be incorporated into an improved fuelbreak treatment approximately 7.5 miles long and up to 300 feet wide, treating approximately 220 acres. The Frazier Mountain fuelbreak would be treated using a combination of noncommercial thinning, mastication of shrubfields, pile burning, jackpot burning and prescribed fire.

Areas on the top of Frazier Mountain not treated by noncommercial thinning and fuelbreak treatments would be treated using prescribed fire to reduce surface fuels, ladder fuels and

TRSF_I_008634

## Appendix B – Existing Condition - Stand Summary Data

| StandID | Tpa | BA | SMSDI2IN | QMD |
|---------|-----|-----|----------|-----|
| 3 | 239 | 226 | 372 | 13 |
| 4 | 388 | 126 | 256 | 8 |
| 19 | 227 | 115 | 214 | 10 |
| 29 | 308 | 123 | 239 | 9 |
| 73 | 181 | 193 | 310 | 14 |
| 75 | 96 | 148 | 221 | 17 |
| 80 | 136 | 138 | 224 | 14 |
| 83 | 194 | 178 | 294 | 13 |
| 84 | 295 | 186 | 331 | 11 |
| 85 | 337 | 224 | 395 | 11 |
| 90 | 393 | 192 | 360 | 9 |
| 92 | 179 | 195 | 312 | 14 |
| 97 | 347 | 203 | 367 | 10 |
| 98 | 179 | 201 | 319 | 14 |
| 99 | 214 | 190 | 317 | 13 |
| 104 | 402 | 197 | 369 | 9 |
| 106 | 229 | 244 | 393 | 14 |
| 116 | 215 | 212 | 346 | 13 |
| 130 | 148 | 200 | 307 | 16 |
| 134 | 82 | 133 | 197 | 17 |
| 241 | 121 | 142 | 224 | 15 |
| 242 | 302 | 230 | 395 | 12 |
| 243 | 181 | 177 | 289 | 13 |

*TPA – Trees per acre*
*BA – Basal area in square feet per acre*
*SDI – Stand density index*
*QMD – Quadratic mean diameter*

TRSF_I_008778

## Frazier Park Vegetation Management Plan

| Project Name | Project Number | Location & Size | Type of Treatment | Agency | Priority Level | Structure Protected | Implementation Date |
|---|---|---|---|---|---|---|---|
| Frazier Park Community fuel break | FP-1 | Community Fuel break around the North and South sides of the community | Hand cut and chip/ Pile Burning | KRN/ FSC/ USFS | H | Yes | Project was started in 2004 and was completed in 2006 |
| Teycua Ridge Fuel Break | FP-2 | Ridgeline fuel break that follows the ridgeline above Frazier Park-Pine Mountain  300 ft wide for 12 miles      unknown | Mastication (ASV) Dozer crush pile and burn /Hand cut and chip/ Pile Burning | KRN/ FSC/ USFS | H | Yes | Outyear should be established in 5 years |
| | | | | | | | |

KRN- Kern County Fire

FP- Frazier Park

FSC- Fire Safe Council
ASV- All Surface Vehicle
FS-Forest Service

1



# Fire Behavior
### and Effects
in
# Fuel Treatments
## and
## Protected Habitat
on the
## Moonlight Fire

**Prepared by**

## The Fire Behavior Assessment Team

Scott Dailey[A], JoAnn Fites[A], Alicia Reiner[A], Sylvia Mori[B]

[A]USDA Forest Service, Adaptive Management Service Enterprise Team
[B]USDA Forest Service, Pacific Southwest Research Station



**June • 2008**

# III POST FIRE SURVEY OF FIRE BEHAVIOR EVIDENCE AND EFFECTS

## Table 1 – Treatment Type Definitions

| Treatment | Treatment Definition. |
|---|---|
| Salvage and Masticate | Salvage of trees which are dead or dying due to fire, insect infestation, or disease. Trees removed in salvage operations are generally larger (10" dbh and greater). Mastication treatments can vary by prescription and equipment used, but generally it involves reducing small trees (up to 10" dbh ) and brush to small chunks (soda can-sized and smaller). |
| Old Harvest | Silvicultural treatments that occurred between 1983 and 1990 were assigned to the "old harvest" group. It was decided to separate these treatment types from more current treatments as the prescriptions prior to the early 90s were generally focused on removal of even-aged overstory trees larger than 10". In the early 90s the focus changed to removal of more intermediate sized trees. The market for biomass material which began in the early 90s allowed for the removal of sub-merchantable trees. |
| Thin and Burn | Understory thinning focused on removal of ladder fuels and reducing crown bulk density such that crown fire progression is unlikely under all but the most extreme weather conditions. Thinning is followed by a broadcast prescribed burn to consume surface fuels. |
| Commercial Thin | Generally, a mechanical thinning prescription for removal of larger trees (10" dbh and greater). This is different than pre-commercial thinning which is generally a hand-thinning prescription to remove material under 6 to 8" dbh. |

The emphasis of the post-fire survey of the Moonlight Fire was on quantitative evidence of fire behavior and effects. Two complementary post-fire evidence data sets on fire behavior and effects were compiled from: 1) field plots, and 2) satellite imagery.

Data layers of treatment history, fire history, and Habitat Conservation Areas—sites protected[5] for the California spotted owl and goshawk—were compiled to allow a comparison of treated, untreated, and protected areas. Data analysis included both descriptive analysis with summary data in graphs, as well as formal statistical analysis using General Linear Models.

The emphasis of this assessment was on fire behavior and effects on National Forest lands. Therefore, private lands burned in the fire were not included.

For each data set, two different questions were addressed:

1. How did evidence of fire behavior and effects differ between broad categories of land status (including owl and goshawk habitat), recent wildfires, treated areas, and untreated areas?

2. How did evidence of fire behavior and effects differ between specific types of treatment, including: salvage and masticate, old harvest (1980-1990), thin and burn, and commercial thin. (See Table 1 above for treatment details.)

---

[5] The term "protected habitat" is used in this report for both Protected Activity Centers (nest stands that are not allowed any treatment activities in Herger-Feinstein Quincy Library Group national forests) and core habitat—where limited treatments are allowed.



United States Department
of Agriculture

**Forest Service**

Pacific Southwest Region

R5-MB-078

September 2005



# Land Management Plan

## Part 2 Los Padres National Forest Strategy



**ER-82**

TRSF_H_005367

## Mt. Pinos

**Theme:** A big tree (old growth), high country environment offering opportunities for year-round recreation. The Mt. Pinos Place is the center of the Chumash Indian Universe.



**Setting:** The Mt. Pinos Place serves as the primary outdoor recreation gateway on the eastern side of the Los Padres National Forest where the Tehachapi Mountains, Transverse Ranges and the San Joaquin Valley converge. Elevations range from 4,000 feet to 8,831 feet at the peak of Mount Pinos (the national forest's highest point and center of the Chumash Indian Universe). The San Andreas Fault bisects the area in an east-west direction. Mt. Pinos Place is readily accessible from Interstate 5 and is within an hour's drive of downtown Los Angeles to the south or of Bakersfield to the north.

Singleleaf pinyon-California juniper (*Juniperus californica*) woodlands and forests dominate low elevation landscapes. Montane conifer forests (composed almost entirely of Jeffrey pine) cover the higher elevations. Small patches of limber pine (*Pinus flexilis*) and subalpine vegetation occupy the mountain summits. The area has the largest stand of unmanaged Jeffrey pine stands in southern California. Dalmatian toadflax (*Linaria dalmatica* - an invasive plant) has taken hold in the Place north of Frazier Park. Also, there are infestations of spotted knapweed (*Centaurea biebersteinii*) and Russian knapweed (*Acroptilon repens*) on private land near national forest lands.

The Place is a frequently occupied area within the California condor's distributional range. Mt. Pinos provides a critical wildlife linkage between the national forest and the adjacent Wind Wolves Preserve, the Bitter Creek Wildlife Refuge and Carrizo Plains Monument. Together these four areas comprise a large, interconnected block of wildland habitat for many species. The Place provides habitat for the California spotted owl and northern goshawk (Accipter gentilis).



Mt. Pinos.  Photo by Mike Foster

The area also provides habitat for the Fort Tejon woolly sunflower (Eriophyllum lanatum hallii), one of only three known locations in the world. There is one established research natural area (RNA), the San Emigdio Mesa RNA that supports pinyon-juniper woodland, and one candidate RNA, Sawmill Mountain. Two special interest areas are also found in the Place. Mt. Pinos Summit SIA exhibits exemplary botanical values, including limber pine stands that are the national forest's sole example of southern California subalpine forest. The Quatal Canyon SIA boasts unique, eroded badland topography with Miocene vertebrate fossils.

The Place serves as a scenic backdrop to a number of rural mountain communities like Frazier Park and Pine Mountain Club. Views from the area's highest points include expansive vistas of adjacent mountains and valleys. Cerro Noroeste Road offers vistas of the Badlands and San Emigdio Mesa, two prominent geological features of the area. Mt. Pinos is a popular dark-sky star gazing location for amateur astronomers. There are significant paleontological resources in Quatal and the Dry Canyons.

The Place provides year-round motorized and non-motorized recreation. It is a regional destination for winter snowplay activities and cross-country skiing, but facilities and snowplay services are inadequate to accommodate the large volume of winter sports enthusiasts. This results in conflicts between local landowners and businesses resulting in an inferior experience for many recreationists. Challenges within the Place include landownership patterns, which preclude providing loop opportunities for pleasure driving and trails within the Place. Unmanaged recreational target shooting behind the County Fire Station has resulted in a problem area in terms of inappropriate target litter, as well as illegal dumping. User-constructed trails are increasing adjacent to local communities.

Mt. Pinos Place accommodates special-uses including communication sites. There are also several organization camps that offer facilities for a number of groups. The area contains seven occupied grazing allotments. The area's natural setting and its close proximity to Los Angeles make it a very popular 'site' location for the film industry.

Existing Wilderness:

- Chumash Wilderness 37,248 acres

Recommended Wilderness:

- Chumash - Toad Springs (Chumash Wilderness) 560 acres

Special Interest Areas:

- Chumash Toad Springs 453 acres
- Quatal Canyon 469 acres

Existing Research Natural Areas:

- San Emigdio Mesa 1,239 acres

Recommended Research Natural Areas:

- Sawmill Mountain 3,451 acres

Total national forest acres--Mt. Pinos Place: 153,454

TRSF_H_005441

### FH 1 - Vegetation Restoration

Restore vegetation through reforestation or other appropriate methods after stand replacing fires, drought, or other events or activities that degrade or cause a loss of plant communities. Where needed implement reforestation using native tree species grown from local seed sources. In such plantings consider long-term sustainability of the forest vegetation by taking into account factors, such as fire regime and regional climate. Consider small nursery operations to facilitate reforestation and to improve restoration success where direct seeding is ineffective. Use noxious-weed-free seed in all plantings.

| **Linked to National Strategic Plan** |
| --- |
| Goal 5 - Improve watershed condition, objective 3. |

### FH 3 - Restoration of Forest Health

Protect natural resource values at risk from wildland fire loss that are outside the desired range of variability, or where needed for wildlife habitat improvement:

- Implement vegetation management activities to reduce tree densities and fuel loading in yellow pine and mixed conifer forests to levels similar to those that characterized forests of the pre-suppression and early suppression eras (ca. 1880-1930). Restore species composition comparable to forests of the same era with an emphasis on increasing the relative abundance of large-diameter (greater than 24 inches diameter breast height), shade-intolerant conifer species.

- Implement vegetation treatments that improve the health of Coulter pine forests and woodlands growing in chaparral. Focus treatments on stands greater than 35 years, except where it is necessary to protect life and property. In the latter case, treatments may occur in stands greater than 20 years so long as seed (cone) banks are adequate to perpetuate the stands.

- Remove ladder fuels and forest floor fuel accumulations to protect stands of bigcone Douglas-fir from stand replacing crown fires. Reduce fuel loading in chaparral adjacent to fir stands so that future wildland fires are less likely to initiate crown fires from surrounding shrublands.

- Treat fuel loading in montane chaparral to reduce the likelihood that fires originating in this type will generate crown fires in adjacent forested stands.

- Manage chaparral in selected locations to protect the life and property of human inhabitants (e.g., the urban interface), to improve wildlife forage, and to protect watersheds from the adverse impacts of large, destructive, high intensity fires. In selected watersheds, manage for even-aged patch sizes of less than 5,000 acres.

| **Linked to National Strategic Plan** |
| --- |
| Goal 1- Reduce the risk from catastrophic wildland fire, objective 1. |



**Friday,**
**January 12, 2001**

**Part VI**

# Department of Agriculture

**Forest Service**

**36 CFR Part 294**
**Special Areas; Roadless Area**
**Conservation; Final Rule**

TRSF_H_005587

**3244** **Federal Register** / Vol. 66, No. 9 / Friday, January 12, 2001 / Rules and Regulations

**DEPARTMENT OF AGRICULTURE**

**Forest Service**

**36 CFR Part 294**

**RIN 0596–AB77**

**Special Areas; Roadless Area Conservation**

**AGENCY:** Forest Service, USDA.

**ACTION:** Final rule and record of decision.

**SUMMARY:** The Department of Agriculture is adopting this final rule to establish prohibitions on road construction, road reconstruction, and timber harvesting in inventoried roadless areas on National Forest System lands. The intent of this final rule is to provide lasting protection for inventoried roadless areas within the National Forest System in the context of multiple-use management.

**EFFECTIVE DATE:** This rule is effective March 13, 2001.

**ADDRESSES:** For additional information, refer to the Roadless Area Conservation website (*roadless.fs.fed.us*). Written inquiries may be directed to USDA Forest Service, National Forest System Roadless Project, P.O. Box 96090, Washington, DC 20090–6090.

**FOR FURTHER INFORMATION CONTACT:** Scott Conroy, Project Director, Forest Service (703) 605–5299 or (800) 384–7623.

**SUPPLEMENTARY INFORMATION:** The following outline displays the contents of the preamble for this regulation.

Introduction

Purpose and Need for the Roadless Area Conservation Rule

Roadless Area Values and Characteristics
Fiscal Considerations
National Direction vs. Local Decisionmaking
Importance of Watershed Protection
Improving Ecosystem Health
Need for Action

Public Comments on the Proposed Rule

How Was Public Involvement Used in the Rulemaking Process?
What General Issues Were Identified Regarding the Proposed Rule and Draft Environmental Impact Statement?
Overview Issues Raised by Those Opposed to Prohibitions
Issues Raised by Those Who Favor Prohibitions
Issues Raised by Federal, Tribal, State, and Local Public Officials
What Specific Issues Were Raised on the Proposed Rule and What Changes Did the Agency Make From Proposed to Final Rules?
Proposed § 294.10. Purpose
Proposed § 294.11. Definitions
Proposed § 294.12. Prohibition on road construction and reconstruction in inventoried roadless areas
Final § 294.13. Prohibition on timber cutting, sale, or removal in inventoried roadless areas
Proposed § 294.13. Consideration of roadless area conservation during forest plan revision
Proposed § 294.14. Scope and applicability
What Other Issues Were Considered in the Final Environmental Impact Statement?
Environmental Effects
Forest Dependent Communities
Local Decisionmaking

The Final Rule and Alternatives Considered

What Alternatives and Mitigation Measures Were Considered by the Agency?
Prohibition Alternatives
Exceptions and Mitigation Measures
Tongass National Forest Alternatives
What is the Environmentally Preferred Alternative?
What is the Final Rule and What Are the Reasons for Selecting that Alternative?
Prohibition Alternatives
Exceptions
Tongass National Forest Alternatives
Decision Summary

Regulatory Certifications

Regulatory Impacts
Summary of the Results of the Regulatory Impact Analysis
Summary of the Results of the Final Regulatory Flexibility Analysis
Environmental Impact
The Endangered Species Act of 1973, as Amended
Other Required Disclosures
Controlling Paperwork Burdens on The Public
Unfunded Mandates Reform
No Takings Implications
Civil Justice Reform Act
Federalism and Consultation with Tribal Governments

**Introduction**

The Department of Agriculture is adopting this final rule to protect and conserve inventoried roadless areas on National Forest System lands. This preamble states the basis and purpose of the rule, includes responses to comments received on the proposed rule, and serves as the record of decision for this rulemaking. Preparation of the record of decision is required by the Council on Environmental Quality regulations (40 CFR 1505.2) implementing the National Environmental Policy Act (NEPA) (42 U.S.C. 4321). This document sets forth the reasons supporting the decision to adopt the final rule; the major policy issues that were raised in public comment; responses to public comment and changes adopted in response to comments; and the reasons this final rule was selected from among the alternatives considered to meet the agency's purpose and need, as described in the four volume final environmental impact statement (FEIS) and project record, which are incorporated by reference. Agency responses to comments on the draft environmental impact statement (DEIS) are contained in Volume 3 of the Forest Service Roadless Area Conservation FEIS (November 2000). Responses in Volume 3 relevant to the final rule are summarized in this document. Throughout this preamble and record of decision, citations to chapters and pages of the FEIS are provided for further information regarding the alternatives and effects analysis; for example, (FEIS Vol. 1, 3–237) refers to volume 1, chapter 3, page 237.

This final rule is available on the Forest Service website (*roadless.fs.fed.us*), along with the FEIS and much of the record supporting the decision for this final rule.

**Purpose and Need for the Roadless Area Conservation Rule**

The Department of Agriculture is responsible for managing National Forest System resources to sustain the health, diversity, and productivity of the nation's forests and grasslands to meet the needs of present and future generations. As noted in the USDA Forest Service Strategic Plan (2000 Revision) (*www.fs.fed.us/plan*, October 2000), demands for, and supplies of, renewable resources change over time in response to social values, new technology, and new information. In the future, expanding urban areas and increased fragmentation of private lands make it likely that the largest and most extensive tracts of undeveloped land will be those in public ownership.

This final rule prohibits road construction, reconstruction, and timber harvest in inventoried roadless areas because they have the greatest likelihood of altering and fragmenting landscapes, resulting in immediate, long-term loss of roadless area values and characteristics. Although other activities may also compromise roadless area values, they resist analysis at the national level and are best reviewed through local land management planning. Additionally, the size of the existing forest road system and attendant budget constraints prevent the agency from managing its road system to the safety and environmental standards to which it was built. Finally, national concern over roadless area management continues to generate controversy, including costly and time-consuming appeals and litigation (FEIS Vol. 1, 1–16 to 1–17). This final rule addresses these needs in the context of a national rulemaking.

TRSF_H_005588

**Roadless Area Values and Characteristics**

Inventoried roadless areas considered in this rule constitute roughly one-third of all National Forest System lands, or approximately 58.5 million acres. Although the inventoried roadless areas comprise only 2% of the land base in the continental United States, they are found within 661 of the over 2,000 major watersheds in the nation (FEIS Vol. 1, 3–50) and provide many social and ecological benefits.

As urban areas grow, undeveloped private lands continue to be converted to urban and developed areas, and rural infrastructure (such as roads, airports, and railways). An average of 3.2 million acres per year of forest, wetland, farmland, and open space were converted to more urban uses between 1992 and 1997. In comparison, 1.4 million acres per year were developed between 1982 and 1992. The rate of land development and urbanization between 1992 and 1997 was more than twice that of the previous decade, while the population growth rate remained fairly constant (FEIS Vol. 1, 3–12). In an increasingly developed landscape, large unfragmented tracts of land become more important. For example, from 1978 to 1994, the proportion of private forest ownerships of less than 50 acres nearly doubled (Birch, T.W. 1996. Private forest-land owners of the United States, 1994. Resource Bulletin NE–134. Radnor, PA: USDA Forest Service, Northeastern Experiment Station. 183 p). Subdivision and other diminishment of tract size of these lands can discourage long-term stewardship and conservation.

Inventoried roadless areas provide clean drinking water and function as biological strongholds for populations of threatened and endangered species. They provide large, relatively undisturbed landscapes that are important to biological diversity and the long-term survival of many at risk species. Inventoried roadless areas provide opportunities for dispersed outdoor recreation, opportunities that diminish as open space and natural settings are developed elsewhere. They also serve as bulwarks against the spread of non-native invasive plant species and provide reference areas for study and research (FEIS Vol. 1, 1–1 to 1–4).

The following values or features often characterize inventoried roadless areas (FEIS Vol. 1, 3–3 to 3–7):

*High quality or undisturbed soil, water, and air.* These three key resources are the foundation upon which other resource values and outputs depend. Healthy watersheds catch, store, and safely release water over time, protecting downstream communities from flooding; providing clean water for domestic, agricultural, and industrial uses; helping maintain abundant and healthy fish and wildlife populations; and are the basis for many forms of outdoor recreation.

*Sources of public drinking water.* National Forest System lands contain watersheds that are important sources of public drinking water. Roadless areas within the National Forest System contain all or portions of 354 municipal watersheds contributing drinking water to millions of citizens. Maintaining these areas in a relatively undisturbed condition saves downstream communities millions of dollars in water filtration costs. Careful management of these watersheds is crucial in maintaining the flow and affordability of clean water to a growing population.

*Diversity of plant and animal communities.* Roadless areas are more likely than roaded areas to support greater ecosystem health, including the diversity of native and desired nonnative plant and animal communities due to the absence of disturbances caused by roads and accompanying activities. Inventoried roadless areas also conserve native biodiversity by serving as a bulwark against the spread of nonnative invasive species.

*Habitat for threatened, endangered, proposed, candidate, and sensitive species and for those species dependent on large, undisturbed areas of land.* Roadless areas function as biological strongholds and refuges for many species. Of the nation's species currently listed as threatened, endangered, or proposed for listing under the Endangered Species Act, approximately 25% of animal species and 13% of plant species are likely to have habitat within inventoried roadless areas on National Forest System lands. Roadless areas support a diversity of aquatic habitats and communities, providing or affecting habitat for more than 280 threatened, endangered, proposed, and sensitive species. More than 65% of all Forest Service sensitive species are directly or indirectly affected by inventoried roadless areas. This percentage is composed of birds (82%), amphibians (84%), mammals (81%), plants (72%), fish (56%), reptiles (49%), and invertebrates (36%).

*Primitive, Semi-Primitive Non-Motorized, and Semi-Primitive Motorized classes of dispersed recreation.* Roadless areas often provide outstanding dispersed recreation opportunities such as hiking, camping, picnicking, wildlife viewing, hunting, fishing, cross-country skiing, and canoeing. While they may have many Wilderness-like attributes, unlike Wilderness the use of mountain bikes, and other mechanized means of travel is often allowed. These areas can also take pressure off heavily used wilderness areas by providing solitude and quiet, and dispersed recreation opportunities.

*Reference landscapes.* The body of knowledge about the effects of management activities over long periods of time and on large landscapes is very limited. Reference landscapes of relatively undisturbed areas serve as a barometer to measure the effects of development on other parts of the landscape.

*Natural appearing landscapes with high scenic quality.* High quality scenery, especially scenery with natural-appearing landscapes, is a primary reason that people choose to recreate. In addition, quality scenery contributes directly to real estate values in nearby communities and residential areas.

*Traditional cultural properties and sacred sites.* Traditional cultural properties are places, sites, structures, art, or objects that have played an important role in the cultural history of a group. Sacred sites are places that have special religious significance to a group. Traditional cultural properties and sacred sites may be eligible for protection under the National Historic Preservation Act. However, many of them have not yet been inventoried, especially those that occur in inventoried roadless areas.

*Other locally identified unique characteristics.* Inventoried roadless areas may offer other locally identified unique characteristics and values. Examples include uncommon geological formations, which are valued for their scientific and scenic qualities, or unique wetland complexes. Unique social, cultural, or historical characteristics may also depend on the roadless character of the landscape. Examples include ceremonial sites, places for local events, areas prized for collection of non-timber forest products, or exceptional hunting and fishing opportunities.

**Fiscal Considerations**

The Department is also concerned about building new roads in inventoried roadless areas, when there presently exists a backlog of about $8.4 billion in deferred maintenance and reconstruction on the more than 386,000 miles of roads in the Forest Transportation System. The agency

TRSF_H_005589

estimates that at least 60,000 miles of additional unauthorized roads exist across National Forest System lands.

The agency receives less than 20% of the funds needed annually to maintain the existing road infrastructure. As funding needs remain unmet, the cost of fixing deteriorating roads increases exponentially every year. Failure to maintain existing roads can also lead to erosion and water quality degradation and other environmental problems and potential threats to human safety. It makes little fiscal or environmental sense to build additional roads in inventoried roadless areas that have irretrievable values at risk when the agency is struggling to maintain its existing extensive road system (FEIS Vol. 1, 1–5 and 3–22). The National Forest System was founded more than 100 years ago to protect drinking water supplies and furnish a sustainable supply of timber. Neither objective is fully achievable given the present condition of the existing road system. The risks inherent in building new roads in presently roadless areas threaten environmental, social, and economic values.

Development activities in inventoried roadless areas often cost more to plan and implement than on other National Forest System lands. Some planned timber sales in inventoried roadless areas are likely to cost more to prepare and sell than they realize in revenues received. Because of the level of public controversy and analytical complexity, projects in roadless areas often require development of costly environmental impact statements for most resource development activities, including timber harvesting, in inventoried roadless areas. In some cases, road construction costs are higher due to rugged terrain or sensitive ecological factors. Many development projects in inventoried roadless areas are appealed or litigated. These factors contribute to generally higher costs for the agency to plan and implement development activities in inventoried roadless areas.

### National Direction vs. Local Decisionmaking

At the national level, Forest Service officials have the responsibility to consider the "whole picture" regarding the management of the National Forest System, including inventoried roadless areas. Local land management planning efforts may not always recognize the national significance of inventoried roadless areas and the values they represent in an increasingly developed landscape. If management decisions for these areas were made on a case-by-case basis at a forest or regional level,

inventoried roadless areas and their ecological characteristics and social values could be incrementally reduced through road construction and certain forms of timber harvest. Added together, the nation-wide results of these reductions could be a substantial loss of quality and quantity of roadless area values and characteristics over time.

In 1972, the Forest Service initiated a review of National Forest System roadless areas generally larger than 5,000 acres to determine their suitability for inclusion in the National Wilderness Preservation System. A second review process completed in 1979, known as Roadless Area Review and Evaluation II (RARE II), resulted in another nationwide inventory of roadless areas. In the more than 20 years since the completion of RARE II, Congress has designated some of these areas as Wilderness. Additional reviews have been conducted through the land management planning process and other large-scale assessments. The 58.5 million acres of inventoried roadless areas used as the basis for this analysis were identified from the most recent analysis for each national forest or grassland, including RARE II, land and resource management planning, or other large-scale assessments such as the Southern Appalachian Assessment.

Of the 58.5 million acres of inventoried roadless areas considered in the FEIS, approximately 34.3 million acres have prescriptions that allow road construction and reconstruction. The remaining 24.2 million acres are currently allocated to management prescriptions that prohibit road construction; however, protections in these existing plans may change after future forest plan amendments or revisions.

Over the past 20 years, roads have been constructed in an estimated 2.8 million of those 34.3 million acres of inventoried roadless areas. The agency anticipates that the trend of building roads in inventoried roadless areas will gradually decrease in the future even without this rule due to economic and ecological factors already discussed, changes in agency policy, increasing controversy and litigation, and potential listings under the Endangered Species Act. While these anticipated changes may reduce some of the impact to inventoried roadless areas, they would not eliminate the future threat to roadless area values (FEIS Vol. 1, 1–14 to 1–15).

On many national forests and grasslands, roadless area management has been a major point of conflict in land management planning. The controversy continues today,

particularly on most proposals to harvest timber, build roads, or otherwise develop inventoried roadless areas. The large number of appeals and lawsuits, and the extensive amount of congressional debate over the last 20 years, illustrates the need for national direction and resolution and the importance many Americans attach to the remaining inventoried roadless areas on National Forest System lands (FEIS Vol. 1, 1–16). These disputes are costly in terms of both fiscal resources and agency relationships with communities of place and communities of interest. Based on these factors, the agency decided that the best means to reduce this conflict is through a national level rule.

### Importance of Watershed Protection

Watershed protection is one of the primary reasons Congress reserved or authorized the purchase of National Forest System lands. Watershed health and restoration is also one of four emphasis areas in the agency's Natural Resource Agenda. Protecting the remaining healthy components of a watershed provides multiple benefits and a strong base to anchor future restoration in unprotected portions of these watersheds. Rivers, streams, lakes, and wetlands within a watershed are the circulatory system of ecosystems, and water is the vital fluid for inhabitants of these ecosystems, including people (FEIS Vol. 1, 1–1).

Inventoried roadless areas comprise a small fraction of the national landscape, representing less than 2% of the land base of the continental United States. They are, however, disproportionately important to the small percentage of the land base they occupy. Overall, National Forest System watersheds provide about 14% of the total water flow of the nation, about 33% of water in the West (FEIS Vol. 1, 3–46). Of the watersheds on National Forest System land, 661 contain inventoried roadless areas and 354 of those watersheds serve as source areas of drinking water used by millions of people across the nation. Therefore, the health of these watersheds is important to people's health throughout the United States.

Roads have long been recognized as one of the primary human-caused sources of soil and water disturbances in forested environments (FEIS Vol. 1, 3–44). For example, while landslides are a natural process, extensive research and other investigations in the West have closely associated land management activities, particularly roading and timber harvest, with accelerated incidence of landslides by several orders of magnitude (FEIS Vol.

TRSF_H_005590

1, 3–58). A joint study by the Forest Service and Bureau of Land Management in Oregon and Washington found that of 1,290 landslides reviewed in 41 sub-watersheds, 52% were related to roads, 31% to timber harvest, and 17% occurred in undisturbed forest (FEIS Vol. 1, 3–59). Another evaluation of landslides initiated by the Siuslaw National Forest found that roads were the source of 41% of landslides, harvest units less than 20 years old were the source of 36%, while natural forest processes accounted for the remaining 23%. Without the disturbance caused by roads and associated activities, stream channels are more likely to function naturally (FEIS Vol. 1, 3–54). Current road construction and timber harvest practices reduce the potential for damage associated with the use of earlier and less sophisticated techniques. However, even with today's improved design standards for road construction and timber harvest, these activities can still result in adverse effects to watersheds. These effects include pollution, changes to water temperatures and nutrient cycles, and increased sediment from storm or runoff events that exceed road design standards (FEIS Vol. 1, 3–45 to 3–50).

### Improving Ecosystem Health

Inventoried roadless areas provide large, relatively undisturbed blocks of important habitat for a variety of terrestrial and aquatic wildlife and plants, including hundreds of threatened, endangered, and sensitive species. In addition to their ecological contributions to healthy watersheds, many inventoried roadless areas function as biological strongholds and refuges for a number of species and play a key role in maintaining native plant and animal communities and biological diversity (FEIS Vol. 1, 3–123 to 3–124). For example, about 60% of unroaded or very low road density sub watersheds within the Interior Columbia Basin Ecosystem Management Project (ICBEMP) assessment area are aquatic strongholds for salmonid populations (FEIS Vol. 1, 3–161). Inventoried roadless areas are key to recovery of salmon and steelhead stocks in decline, providing habitat to protect species until longer-term solutions can be developed for migration, passage, hatchery, and harvest problems associated with the decline of anadromous fish.

Species richness and native biodiversity are more likely to be effectively conserved in larger undisturbed landscapes, such as inventoried roadless areas (FEIS Vol. 1, 3–142). For example, inventoried

roadless areas cover approximately 21% of the centers of biodiversity for animals and 10% for plants identified in ICBEMP (FEIS Vol. 1, 3–144 and 3–173). Inventoried roadless areas also provide reference landscapes that managers can use to gauge the health and condition of other land areas.

Road construction, reconstruction, and timber harvesting activities can result in fragmentation of ecosystems, the introduction of non-native invasive species, and other adverse consequences to the health and integrity of inventoried roadless areas (FEIS Vol. 1, 3–128 to 3–136). As human-caused fragmentation increases, the amount of core wildlife habitat decreases. This fragmentation results in decreased connectivity of wildlife habitat and wildlife movement, isolating some species and increasing the risk of local extirpations or extinctions (FEIS Vol. 1, 3–133). The value of inventoried roadless areas as habitat for threatened, endangered, and sensitive species and as biological strongholds can also be diminished due to these activities. For example, 220 species that are listed as threatened, endangered, or proposed for listing under the Endangered Species Act and 1,930 agency-identified sensitive species rely on habitat within inventoried roadless areas (FEIS Vol. 1, 3–180). The Department of Agriculture believes that the risks associated with certain development activities in inventoried roadless areas should be minimized and that these areas should be conserved for present and future generations.

### Need for Action

Promulgating this rule is necessary to protect the social and ecological values and characteristics of inventoried roadless areas from road construction and reconstruction and certain timber harvesting activities. Without immediate action, these development activities may adversely affect watershed values and ecosystem health in the short and long term, expand the road maintenance backlog which would increase the financial burden associated with road maintenance, and perpetuate public controversy and debate over the management of these areas. The new planning rules provide for review of other activities and allow for additional protection of roadless areas, if warranted. Adoption of this final rule ensures that inventoried roadless areas will be managed in a manner that sustains their values now and for future generations.

### Public Comments on the Proposed Rule

*How Was Public Involvement Used in the Rulemaking Process?*

In January 1998, Forest Service Chief Mike Dombeck proposed to temporarily suspend road construction and reconstruction in most inventoried roadless areas and other adjacent unroaded areas, and provided advance notice of revisions to the regulations governing the management of the Forest Transportation System. After analyzing public comments on the proposal, the Agency issued an interim rule at 36 CFR part 212, Administration of the Forest Development Transportation System: Temporary Suspension of Road Construction and Reconstruction in Unroaded Areas (February 12, 1999; 64 FR 7290). This Interim Roads Rule suspended road construction and reconstruction in certain inventoried roadless areas for 18 months (March 1999 through August 2000), while a long-term forest transportation policy was developed. During the public comment period for the Interim Roads Rule, the Agency received approximately 119,000 public comments, many of which mentioned the need for "permanent protection" of inventoried roadless areas.

On October 13, 1999, President William J. Clinton directed the Forest Service to develop and propose for public comment regulations that would provide appropriate long-term protection for currently inventoried roadless areas. The public, and all interested parties, were to have the opportunity to review and comment on the proposed regulations.

To comply with this presidential directive, the agency published a notice of intent to prepare a DEIS in the **Federal Register** (64 FR 56306) on October 19, 1999, and announced the initiation of the public rulemaking process to propose the protection of certain roadless areas within the National Forest System. Section 553(a) of the Administrative Procedures Act exempts public property rules from the public involvement requirements set forth in section 553. In 1971, the United States Department of Agriculture published a voluntary waiver of the exemption from the notice and comments requirements of 5 U.S.C. 553(b) and (c) (36 FR 13804). Accordingly, the Forest Service published a proposed rulemaking in the **Federal Register** and provided opportunity for public participation during the development of the proposed and final rules. (*See Rodway* v. *USDA, 514 F.2d 809 (D.C. Cir. 1975)*).

TRSF_H_005591

On May 10, 2000, the Forest Service issued a proposed rule in the **Federal Register** (65 FR 30276). The notice of availability of the DEIS was published in the **Federal Register** on May 19, 2000 (65 FR 31898). The public comment period on the proposed rule and DEIS closed on July 17, 2000. The notice of availability of the FEIS was published in the **Federal Register** on November 17, 2000 (65 FR 69513).

The agency's notice of intent to prepare an environmental impact statement drew about 16,000 people to 187 public meetings and elicited more than 517,000 responses. Although the purpose of the notice of intent was merely to solicit issues that the public thought should be addressed in the development of a DEIS, the Forest Service provided maps and other information to address public concerns and questions. On March 15, 2000, two months before release of the proposed rule and DEIS, news releases and letters were sent to news media, other Federal, State, and local government agencies, libraries, and Forest Service units to explain how to obtain the proposed rule and DEIS in a variety of electronic and hardcopy formats. The proposed action and other alternatives, background information, and a schedule of public meetings were posted on the agency's Roadless Area Conservation website (*roadless.fs.fed.us*).

The Forest Service hosted two cycles of meetings during the comment period on the DEIS and proposed rule—one for information sharing and discussion and the other to collect oral comments. Written comments were collected at both meetings. About 430 public meetings were held—about 230 for information sharing and written comments and about 200 for collecting oral and written comments. Every national forest and grassland hosted at least two meetings. These meetings drew over 23,000 people nationwide.

The Forest Service also received comments by postal and electronic mail and by telefax. By the close of the comment period, the agency received over 1 million postcards or other form letters; 60,000 original letters; 90,000 electronic mail messages; and several thousand telefaxes (FEIS Vol. 1, 1–7). The Forest Service's Content Analysis Enterprise Team in Salt Lake City, Utah, organized and analyzed the comments on the proposal. Some respondents focused their remarks on provisions of the proposed rule, others concentrated on the alternatives and analyses contained in the DEIS, and many comments applied to both documents.

Information from the formal public meetings, letters, emails, telefaxes, and other sources were all included in the FEIS analysis. The Forest Service reviewed, analyzed, and responded to those comments. Responses to comments directly related to the proposed rule are included in this preamble. An explanation of the comment analysis process and how the comments were used to clarify text, modify alternatives or analysis, or augment technical information is included in Volume 3 of the FEIS.

One of the major process concerns expressed was that the agency did not give the public and governmental entities, such as Tribes, States, and counties adequate notice or time to comment on the proposed action. The agency recognizes that many groups would have preferred additional time for review and comment. However, the time period was adequate to allow for more than 1.6 million comments to be received throughout the process. Throughout the process, the agency's website has provided up-to-date information for interested parties to learn about the proposed action. The straightforward nature of the proposed rule and the sheer volume of comments received are compelling evidence that there was an adequate opportunity for the public to be heard, and sufficient information for officials to make a reasoned and informed decision.

Since the publication of the FEIS, the agency has received comments on the FEIS and the preferred alternative. Generally, these comments mirror comments received on the NOI and DEIS. The majority of these respondents asked for the prohibitions to immediately take effect on the Tongass National Forest, and for additional prohibitions on off-highway vehicle use, grazing, and mining activities. Some respondents provided additional information on potential environmental and economic effects, which the agency has reviewed and determined fall within the range of effects disclosed in the FEIS. These comments were considered by the agency in the development of the final rule and are in the project record.

*What General Issues Were Identified Regarding the Proposed Rule and Draft Environmental Impact Statement?*

*Overview.* Comments on the notice of intent, the proposed rule, and the DEIS illustrated strongly held individual values and beliefs and a wide range of views on how to manage inventoried roadless areas. These comments can be divided into two basic and very different perspectives (FEIS Vol. 1, 1–8 to 1–9). One perspective is that decisions concerning management of inventoried roadless areas should be left to the local responsible official, without national intervention. The other perspective is that national prohibitions on road construction, reconstruction, and timber harvest in inventoried roadless areas, along with a stop to other activities, must occur from a national level, as local decisionmaking does not always reflect the national significance of the issues involved. The agency considered and attempted to balance both perspectives throughout this rulemaking.

These two viewpoints focused on six major categories of issues in the DEIS as follows: public access, identification of other unroaded areas, exemptions and exceptions, environmental effects, local involvement (decisionmaking), and the effect on forest dependent communities (FEIS Vol. 1, 1–9 to 1–14).

After reviewing and analyzing the public comments received during the comment period for the proposed rule and DEIS, the agency found that these major issue categories were still valid. Public comment within these categories is incorporated in the discussions of specific issues and comments related to each section of the proposed rule. These issues also have been used for the following purposes in the rulemaking process: to determine the scope of the proposal (type of decision to be made); to develop a range of alternatives; to identify possible mitigation measures; to direct the analysis of potential environmental, social, and economic effects; and to ensure that the agency is operating within its legal authorities.

*Issues Raised by Those Opposed to Prohibitions.* This group indicated that inventoried roadless areas should remain available for road construction and reconstruction to obtain resources, to provide increased motorized recreation opportunities, and for other uses. These individuals expressed the viewpoint that roadless areas, with active and prudent management, could support both intrinsic benefits and commodity uses, and that local responsible officials should make management decisions on inventoried roadless areas. This group also indicated that environmental concerns should not take precedence over human needs and desired uses, and that maintaining a healthy environment should not preclude resource production, motorized access, and developed recreation opportunities.

Many members of this group also stated that conservation requires active management, such as providing roads for: thinning forest vegetation, insect and disease treatment, commodity resource production, hazardous fuels

reductions, and the development of recreation facilities. They stressed that the failure to actively manage forests and grasslands could result in insect infestations and uncharacteristic wildfire effects, and asserted that prudent management would benefit people and wildlife. They expressed concern for the impact this rule would have on future generations that would not be able to participate in a lifestyle that is dependent on resource use and production. They said that if future generations would not be able to access the land, they would not value the land.

*Issues Raised by Those Who Favor Prohibitions.* These respondents indicated that they viewed forestlands as whole ecosystems and that they thought roadless areas should be conserved for their intrinsic values and for esthetic benefits to humans. In their view, roadless areas should be allowed to evolve naturally through their own dynamic processes, although some proponents agreed with the need for limited stewardship activity. This second group stressed that human desire for commodity production should take second place to needs for a healthy environment (both locally and globally), for quiet natural places, for spiritual and psychological regeneration, and to meet the needs of other living things. They indicated that the social and economic needs of forest-dependent users could be met through job retraining, through development of alternative materials, and by designating already developed areas for motorized recreation and other ground-disturbing activities.

Most of the respondents in this second group maintained that the proposed rule did not prohibit enough development activities. They stated that the final rule should immediately ban timber harvest, other commodity production, and motorized recreation from roadless areas 1,000 acres or larger, and that the agency should not defer conservation of roadless areas to future land management planning processes. They also stressed that the Tongass National Forest should be included in this conservation effort, an issue that the agency specifically requested comment on in the DEIS. Many respondents in this group expressed a desire that future generations receive the benefits of clean air and water, habitat adequate to assure species diversity, and other social and ecological values provided by inventoried roadless areas.

*Issues Raised by Federal, Tribal, State and Local Public Officials.* The agency received many comments from Federal, Tribal, State and local public officials and agencies across the country. Letters received from these sources during the comment period on the DEIS are published in Volume 4 of the FEIS. These comments reflect a cross-section of the comments received from the public at large.

Many public officials from States and counties concerned about access to and across National Forest System lands and concerned about forest dependent communities expressed strong opposition to the proposed rule, citing negative economic impacts to these communities and commodity production industries, as well as negative impacts to rural lifestyles. Access to State-owned lands and impacts to statutory rights-of-way across public lands were major concerns as well. In general, those Western States with the greatest roadless acreage (for example, Idaho, Montana, Nevada, Utah, and Wyoming) tended to generate the greatest number of negative comments from Governors, agencies, and officials. Public officials from areas with larger urban populations generally supported the proposed rule because of their expressed desire for recreation opportunities, protection of water quality, and undisturbed landscapes.

The following examples illustrate these different views. In the State of Washington, some of the officials and agencies writing in support of the proposed rule included the Governor, King and Spokane Counties, and the Seattle City Council, while Stevens County, the City of Forks, and the City of Port Angeles were opposed (FEIS Vol. 4, 573, 579, 583 to 588). In Missouri, the Dent County Commission was opposed to the proposal while the State's Department of Natural Resources was supportive (FEIS Vol. 4, 250 to 252).

Comments from agencies also varied according to the anticipated effects to their management programs. For example, the Florida Fish and Wildlife Conservation Commission saw the proposed rule as resulting in positive benefits for native wildlife and plant communities, while the Virginia Department of Game and Inland Fisheries saw the proposal as harmful to wildlife and the management of wildlife (FEIS Vol. 4, 79 to 81, 571). Most responding Department of Transportation offices were concerned over access and maintenance issues.

Letters from Tribal officials provided mixed comments and concerns. Some Tribes were generally supportive of the proposed rule, with the provision that traditional uses of the land and access to cultural and sacred sites be allowed to continue. Other Tribes expressed concern about how the proposal might affect economic opportunities. Still others believed that the rule should further restrict certain activities in inventoried roadless areas that may affect adjacent Tribal lands.

*What Specific Issues Were Raised on the Proposed Rule and What Changes Did the Agency Make From Proposed To Final Rules?*

The following is a section-by-section discussion of issues raised and comments received on the proposed rule, the agency's response, and a description of changes made to the rule.

*Proposed § 294.10—Purpose.* This proposed section identified the agency's goal of providing lasting protection for inventoried roadless areas and other unroaded areas of the National Forest System in the context of multiple-use management.

*Comment on Multiple-Use.* Some respondents commented that the proposed rule did not provide for multiple-use of inventoried roadless areas, since resources cannot always be accessed and developed without roads and, therefore, for example, forest health issues could not be addressed.

*Response.* The Multiple-Use Sustained-Yield Act of 1960 (MUSYA) provides the Forest Service authority to manage national forest and grasslands "for outdoor recreation, range, timber, watershed, and wildlife and fish purposes." The NFMA reaffirmed multiple-use and sustained-yield as the guiding principles for land management planning of National Forest System lands (16 U.S.C. 1600, 1604).

In defining "multiple use," the MUSYA, as amended, clearly provides that under multiple-use management some land will be used for less than all of the possible resource uses of the national forests and grasslands. The act also provides that even the establishment of wilderness areas is consistent with the purposes and provisions of the act. The Roadless Area Conservation rule, unlike the establishment of wilderness areas, will allow a multitude of activities including motorized uses, grazing, and oil and gas development that does not require new roads to continue in inventoried roadless areas.

Currently, a wide range of multiple uses is permitted in inventoried roadless areas subject to the management direction in forest plans. A wide range of multiple uses will still be allowable under the provisions of this rule. The National Forest System contains an extensive system of roads measuring approximately 386,000 miles. This final rule will not close or otherwise block access to any of those roads; the final rule merely prohibits the construction of new roads and the

TRSF_H_005593

**3250** **Federal Register** / Vol. 66, No. 9 / Friday, January 12, 2001 / Rules and Regulations

reconstruction of existing roads in inventoried roadless areas.

Under this final rule, management actions that do not require the construction of new roads will still be allowed, including activities such as timber harvesting for clearly defined, limited purposes, development of valid claims of locatable minerals, grazing of livestock, and off-highway vehicle use where specifically permitted. Existing classified roads in inventoried roadless areas may be maintained and used for these and other activities as well. Forest health treatments for the purposes of improving threatened, endangered, proposed, or sensitive species habitat or maintaining or restoring the characteristics of ecosystem composition and structure, such as reducing the risk of uncharacteristic wildfire effects, will be allowed where access can be gained through existing roads or by equipment not requiring roads. Also, see the response to proposed § 294.12 for further discussion of the MUSYA.

*Comment on Forest Plan Amendments.* Many respondents asserted that the rule would supersede forest plans, the National Forest Management Act, and land management planning regulations, and thus exceed existing statutory authority. Others contended that the rule would require an amendment to forest plans.

*Response.* The preamble to the recent NFMA planning regulations identify that "[p]lanning will be conducted at the appropriate level depending on the scope and scale of the issues." The Department went on to note that "[f]undamental to this rule is the notion that there is a hierarchy of scale to be considered when addressing resource management issues, and that it is the nature of the issue that guides the selection of the appropriate scale and level of the organization to address it" (65 FR 67523). The use of rulemaking to address the conservation of inventoried roadless areas is both appropriate and consistent with the NFMA implementing regulations.

Just as development and approval of forest plans must conform to existing laws and regulations, new laws or regulations, including this rule, can supersede existing forest plan management direction. This rulemaking process does not require amendments or revisions to forest plans. However, a Forest or Grassland Supervisor may consider whether an amendment or revision is appropriate given overall circumstances for a particular administrative unit.

*Comment on Roadless Areas in Forest Planning.* A few respondents stated that

the purposed section should require the incorporation of roadless area protection into forest plans.

*Response.* The recently revised regulations at 36 CFR part 219 guiding the development of forest plans (November 9, 2000; 65 FR 67571) contain a requirement at § 219.9(b)(8) that provides additional protection for unroaded and inventoried roadless areas. During the plan revision process, or at other times as deemed appropriate, the responsible official must identify and evaluate inventoried roadless areas and unroaded areas and then determine which, if any, of those areas warrant additional protection and the level of protection to be afforded. For this reason, there is no need to add the suggested language to the purpose section of the final rule. In fact, inclusion of these procedures in the new planning regulations is why the procedures proposed at § 294.13 have been removed from this rule.

*Summary of Changes in Section 294.10 of the Final Rule.* Having considered the comments received, the agency has retained the purpose section with two changes: (1) The sentence has been reorganized to emphasize that the goal of providing lasting protection of roadless areas must occur within the context of multiple-use management; and (2) the agency has removed the reference to "other unroaded areas" in this section, since, as already noted, the new land and resource management planning regulations at 36 CFR part 219 provide for evaluation of these areas at the time of land and resource management plan revision (FEIS Vol. 1, 1–16).

*Proposed Section 294.11 Definitions.* This section set out the terms and definitions used in the proposed rule. The proposed rule contained definitions for the following terms: "inventoried roadless areas, responsible official, road, classified road, unclassified road, road construction, road maintenance, road reconstruction, (road) realignment, (road) improvement, (road) rebuilding, unroaded area, unroaded portion of an inventoried roadless area."

*Comment on "Inventoried Roadless Area" Definition.* Some respondents requested a modification of the definition for "inventoried roadless area" to include "undeveloped areas of 1,000 acres and larger" rather than "undeveloped areas exceeding 5,000 acres." Others thought that including references to the minimum criteria for wilderness made the definition too restrictive, eliminating otherwise deserving areas from protection. Some expressed confusion over which inventories were used to determine

inventoried roadless areas, and the possibility of error in identifying inventoried roadless areas.

*Response.* The proposed definition of inventoried roadless area was based on a group of roadless areas that were evaluated for wilderness consideration beginning in the 1970's and through subsequent planning efforts. With the publication of the DEIS and now the FEIS, the agency can now define these inventoried roadless areas as those areas identified in the set of maps contained in Volume 2 of the FEIS or subsequent revisions. These maps are maintained at the national headquarters of the Forest Service and are the official maps for the final rule. In the event a modification to correct any clerical, typographical, or other technical error is needed, the change will be made to the national headquarters maps and corrected copies of the maps made available to other administrative units. This definition does not apply to future areas that may be inventoried for wilderness consideration or other purposes. This modification, which removed the historical context for the definition of inventoried roadless area, has been included in the final rule.

*Comment on "Unroaded Area" Definition.* The identification of unroaded areas other than those already inventoried was a major issue. It was unclear to some respondents whether the presence of unclassified roads would be a factor in determining whether an area qualified as an unroaded area. Others thought that the definition of "unroaded area" should not include unclassified roads because such areas could not foster isolation, independence, or an undisturbed setting. Others suggested that these issues are better resolved through local land management planning. The public suggested various criteria and processes for the protection and management of these other unroaded areas.

*Response.* These suggestions were considered under procedural alternatives A through D in the DEIS. Since the comment period on the DEIS closed, the consideration of other unroaded areas has been addressed in the context of the final planning regulations at 36 CFR part 219. The agency agreed with the respondents who believed these types of planning issues were more appropriately addressed in the context of the planning rule and local land management planning. Thus, comments on how to consider and manage these other unroaded areas were considered in the preparation of the planning rule. As explained in the discussion of the agency's response to proposed § 294.13

TRSF_H_005594

**Federal Register** / Vol. 66, No. 9 / Friday, January 12, 2001 / Rules and Regulations     **3251**

later in this preamble, the provisions of the proposed rule relevant to unroaded areas have been removed. Therefore, the term "unroaded area" is no longer needed.

*Comment on "Responsible Official" Definition.* Some respondents wanted to know whether the responsible official for activities within an inventoried roadless area would be a District Ranger, Forest Supervisor, or Regional Forester.

*Response.* The appropriate responsible official, as defined in the proposed rule, depends on the decision under consideration. For example, District Rangers often make decisions regarding trail construction, special use authorizations, and wildlife habitat improvement projects. Forest Supervisors typically make decisions on major developed recreation sites, large timber sales, and ski area developments. This rule does not alter existing delegations of authority for Forest Service responsible officials. Because the scope of a proposed decision determines who will make the decision, the definition of "responsible official" must be broad enough to embrace the various possibilities. Therefore, the final rule retains, without change, the definition in the proposed rule.

*Comment on "Road" Definition.* Respondents expressed concern that the definition of a road was ambiguous and failed to recognize the primitive travelways used by motorized recreationists. Some respondents were concerned that the definition indicated permission for the construction of a travelway over 50 inches wide for off-road vehicles if the road was determined to be a trail. Other respondents thought that the definition of classified roads should include Revised Statute (R.S.) 2477 roads.

*Response.* For agency consistency, this final rule includes the same definitions of "road," "classified road," "unclassified road," and "temporary road" that are contained in the National Forest System Road Management regulations (36 CFR part 212) and policy (Forest Service Manual 7700 and 7710) transmitted on January 4, 2001 for publication in the **Federal Register**. Based on consideration of public comment received on the road management proposal, these definitions were revised for clarity and a definition for "temporary road" was added.

A trail is established for travel by foot, stock, or trail vehicle, and can be over, or under, 50 inches wide. Nothing in this paragraph as proposed was intended to prohibit the authorized construction, reconstruction, or maintenance of motorized or non-motorized trails that are classified and

managed as trails pursuant to existing statutory and regulatory authority and agency direction (FSM 2350). Nor was anything in this paragraph intended to condone or authorize the use of user created or unauthorized roads or trails. These decisions are made subject to existing agency regulations and policy and that intent has been retained in the final rule.

Future claims and existing rights for R.S. 2477 roads would not be affected by this rule. The agency recognizes valid R.S. 2477 rights-of-way. However, the validity of R.S. 2477 assertions must be evaluated on a case-by-case basis. Therefore, there is no need to modify the definition of classified road for this purpose.

*Comment on Road Management Terms.* Some respondents thought the definitions of "road construction," "maintenance," "reconstruction," "realignment," "improvement," and "rebuilding" were confusing. Others wanted clarification on whether the terms applied only to classified roads, or to unclassified roads as well.

*Response.* As previously noted in this preamble, this final rule includes the definitions of road management terms adopted in the final National Forest System Road Management Rule and policy. The definition of "rebuilding" has been removed; the definition of "road" has expanded to include "temporary road;" and the other terms were revised in the final road management policy and are used verbatim in this rule for consistency.

*Comment on "Unroaded Portion of an Inventoried Roadless Area" Definition.* Many respondents considered the term and definition of "unroaded portion of an inventoried roadless area" confusing and remarked that they did not understand how it would be applied. In response to the identified preferred alternative in the FEIS, which would have applied the prohibitions to developed portions of inventoried roadless areas, respondents questioned why the agency would seek to protect roadless area values and characteristics in areas that have already been roaded and had timber harvest, thereby negating the very characteristics this rule seeks to protect.

*Response.* One of the primary objectives of this rulemaking was to resolve the longstanding controversies surrounding management of inventoried roadless areas. Without additional clarification, the definition of "unroaded portion of an inventoried roadless area" could have begun a new round of land management plan inventories and controversy about how to identify the boundary between the

roaded and unroaded portions of these areas. This had the potential to increase rather than reduce the number of appeals and lawsuits surrounding inventoried roadless area management.

The agency agreed that the terminology and definition in the proposed rule were confusing. Therefore, it proposed in the FEIS eliminating this definition and applying the prohibitions to the entire area within an inventoried roadless area boundary.

To resolve the agency's concern about extending the controversy to future land management planning and to address the public concern about precluding timber harvesting in the portions of inventoried roadless areas that no longer possess roadless characteristics, § 294.13(b)(4) has been added. This paragraph allows timber to be cut, sold, or removed in the portions of inventoried roadless areas where roadless values and characteristics have been substantially altered due to road construction and subsequent timber harvest after the area was inventoried. No new road construction would be allowed. Decisions on whether or not an inventoried roadless area's characteristics have been substantially altered would occur during project planning and decisionmaking.

In response to the proposed rule, some respondents questioned why the agency would only exempt those portions developed after an area was inventoried, rather than exempting all developed portions regardless of when the road construction and timber harvest occurred. Some inventoried roadless areas, particularly those in the East, contained roads at the time of their inventory and timber may also have been harvested in these areas. However, the agency assumes that these prior existing developments and activities did not substantially alter the areas' roadless values and characteristics, or they would not have been inventoried for possible wilderness consideration.

For the reasons described, the term "unroaded portion of an inventoried roadless area" is no longer necessary and has been removed from the definitions in the final rule.

*Comment on "Roadless Area Characteristics."* Some respondents wanted additions to the list of roadless area characteristics identified in proposed § 294.13(a), more specific characteristics for each inventoried roadless area, clarification as to their meaning, and to know how they would be used in the evaluation of inventoried roadless areas and unroaded areas during forest plan revision.

TRSF_H_005595

*Response.* Although the term "roadless area characteristics" was not defined in the proposed rule, proposed § 294.13 did include the list of characteristics. While proposed § 294.13 was not retained in the final rule for reasons described in the section of this preamble entitled "Consideration of Roadless Area Conservation During Forest Plan Revision," the roadless area characteristics remain fundamental to the environmental analysis of the alternatives considered in this rulemaking and are critical to evaluating whether trees may be cut, removed, or sold from inventoried roadless areas pursuant to the provisions at § 294.13(b). For these reasons, the list of roadless area characteristics has been reformatted with minor changes for clarification and added to the definitions in § 294.11 of the final rule.

The definition of roadless area characteristics includes "other locally identified unique characteristics" to capture unique characteristics specific to individual inventoried roadless areas identified during local land management planning. Therefore, it is not necessary to identify, in this rule, characteristics for each inventoried roadless area or to add to the list in the definition. A more detailed description of these characteristics is in the section of this preamble entitled "Roadless Area Values and Characteristics."

*Summary of Changes in § 294.11 of the Final Rule.* The definitions section of the final rule reflects the preceding responses to comments received. Revisions have been made in the road management definitions included in § 294.11 to achieve consistency with the final National Forest System Road Management Rule as well as with the provisions of the final National Forest System Land and Resource Management Planning Rule. The terms "unroaded portion of an inventoried roadless area" and "unroaded area" were removed from the definitions. The first sentence was removed from the proposed rule's definition of "inventoried roadless area" because, while the sentence provided historical context, it was not necessary for the definition. The definition of "roadless area characteristics" has been added.

*Proposed Section 294.12. Prohibition on road construction and reconstruction in inventoried roadless areas.* This section of the proposed rule identified the road construction and reconstruction prohibitions, and exemptions and exceptions to the prohibitions. Paragraph (a) of proposed § 294.12 prohibited road construction and reconstruction in the unroaded portions of inventoried roadless areas,

except for the circumstances listed in proposed paragraphs (b)(1) through (b)(4) and paragraph (c).

*Comment on Agency Authority.* The agency received many comments questioning whether the Forest Service had the authority to prohibit road construction through this rulemaking process, and whether the proposed rule was in conflict with existing environmental and land management laws and policies.

*Response.* The Forest Service routinely makes decisions to construct or not construct roads for a variety of purposes. The Secretary has clear authority to promulgate this rule, and this rule does not conflict with existing law and policy. The foundation for any exercise of power by the Federal government is the United States Constitution. The Constitutional provision that provides authority for management of public lands is the Property Clause (Article IV, Section 3). The Property Clause states that Congress has the power to dispose of and make all needful rules and regulations respecting land or other property belonging to the United States. Using this authority, Congress entrusted the Secretary of Agriculture with broad powers to protect and administer the National Forest System by passing laws, such as the Organic Administration Act of 1897 (the Organic Act), the Multiple-Use Sustained-Yield Act of 1960 (MUSYA), and the National Forest Management Act of 1976 (NFMA).

The duties that Congress assigned to the Secretary include regulating the occupancy and use of National Forest System lands and preserving the forests from destruction (16 U.S.C. 551). Through the MUSYA, Congress directed the Secretary to administer the National Forest System for multiple-use and sustained-yield of renewable resources without impairment of the productivity of the land (16 U.S.C. 528–531), thus establishing multiple-use as the foundation for management of national forests and grasslands. These multiple uses include outdoor recreation, range, timber, watershed, and wildlife and fish purposes. The statute defines "multiple use" broadly, calling for management of the various uses in the combination that will best meet the needs of the American people (16 U.S.C. 531). Under this framework, courts have recognized that the MUSYA does not envision that every acre of National Forest System land be managed for every multiple use, and does envision some lands being used for less than all of the resources. As a consequence, the agency has wide discretion to weigh and decide the proper uses within any area (*Wind-River*

*Multiple-use Advocates* v. *Espy*, 835 F. Supp. 1362, 1372 (D.Wyo.1993)).

In passing the MUSYA, Congress also affirmed the application of sustainability to the broad range of resources the Forest Service manages, and did so without limiting the agency's broad discretion in determining the appropriate resource emphasis and mix of uses. Some of the agency's past decisions have been challenged in court, leading to judicial decisions interpreting the extent of Forest Service discretion, or judgment, in managing National Forest System lands. Courts have routinely held that the Forest Service has wide discretion in deciding the proper mix of uses within any area of National Forest System lands. In the words of the Ninth Circuit Court of Appeals, the agency's authority pursuant to the MUSYA "breathes discretion at every pore." (*Perkins* v. *Bergland*, 608 F.2d 803, 806 (9th Cir.1979)).

The NFMA reaffirmed multiple-use and sustained-yield as the guiding principles for land management planning of National Forest System lands (16 U.S.C. 1600, 1604). Together with other applicable laws, the NFMA authorizes the Secretary of Agriculture to promulgate regulations governing the administration and management of the National Forest Transportation System (16 U.S.C. 1608) and other such regulations as the Secretary determines necessary and desirable to carry out the provisions of the NFMA (16 U.S.C. 1613). These laws complement the long-standing authority of the Secretary to regulate the occupancy and use of the National Forest System (16 U.S.C. 551).

*Comment on National Prohibitions* vs. *Local Decisionmaking.* Many respondents supported the proposed national prohibition on new road construction in inventoried roadless areas. Other respondents felt there should not be a national prohibition because this would eliminate the option of making local decisions based on public input. Others felt the decisions regarding construction of roads in inventoried roadless areas should be made when forest plans are revised.

*Response.* The agency has addressed this issue in detail at the outset of this final rule. At the national level, Forest Service officials have the responsibility to consider the "whole picture" regarding the management of the National Forest System, including inventoried roadless areas. Local land management planning efforts may not always recognize the national significance of inventoried roadless areas and the values they represent in an increasingly developed landscape. If

**ER-95**

management decisions for these areas were made on a case-by-case basis at a forest or regional level, inventoried roadless areas and their ecological characteristics and social values could be incrementally reduced through road construction and certain forms of timber harvest. Added together, the nationwide results of these reductions could be a substantial loss of quality and quantity of roadless area values and characteristics over time.

On many national forests and grasslands, roadless area management has been a major point of conflict in land management planning. The controversy continues today, particularly on most proposals to harvest timber, build roads, or otherwise develop inventoried roadless areas. The large number of appeals and lawsuits, and the extensive amount of congressional debate over the last 20 years illustrates the need for national direction and resolution and the importance many Americans attach to the remaining inventoried roadless areas on National Forest System lands (FEIS Vol. 1, 1–16). These disputes are costly in terms of both fiscal resources and agency relationships with communities of place and communities of interest. Based on these factors, the agency decided that the best means to reduce this conflict is through a national level rule.

*Comment on Access.* The agency received many comments questioning how the proposed rule would affect access to lands that the agency does not manage, such as State lands or private inholdings, and access pursuant to the General Mining Law of 1872.

*Response.* This rule does not affect a State's or private landowner's right of access to their land. The proposed rule did not close any roads or off-highway vehicle (OHV) trails. The proposed rule provided for the construction and reconstruction of roads in inventoried roadless areas where needed pursuant to existing or outstanding rights, or as provided for by statute or treaty, including R.S. 2477 rights, access to inholdings under the Alaska National Interest Lands Conservation Act (ANILCA) provisions, or circumstances where a valid right-of-way exists.

The most common right of access to non-federally owned property surrounded by National Forest System lands is a road constructed or reconstructed on those National Forest System lands. The final rule at § 294.12(b)(3) provides for construction or reconstruction of a road in an inventoried roadless area "if the Responsible Official determines that \* \* \* a road is needed pursuant to

reserved or outstanding rights, or as provided for by statute or treaty." For example, the ANILCA provides a landowner a right of access across National Forest System lands in certain circumstances, and this rule does not amend or modify that statute.

Title 36 part 251 of the Code of Federal Regulations implements the ANILCA access provisions and sets forth the procedures by which landowners may apply for access across National Forest System lands; this rule does not amend or modify that regulation. Access to non-Federal land does not have to be a road in all cases, nor does it have to be the most economical, direct, or convenient for the landowner, although the agency tries to be sensitive to the cost in time and money to the inholder. The cost to construct or reconstruct road access to non-Federal lands is usually the responsibility of the inholder, not the Forest Service. During the application process for such access, applicable laws, such as the National Environmental Policy Act and the Endangered Species Act, still must be considered.

Access for the exploration of locatable minerals pursuant to the General Mining Law of 1872 is not prohibited by this rule. Nor is reasonable access for the development of valid claims pursuant to the General Mining Law of 1872 prohibited. In some cases, access other than roads may be adequate for mineral activities. This access may include, but is not limited to, helicopter, road construction or reconstruction, or non-motorized transport. Determination of access requirements for exploration or development of locatable minerals is governed by the provisions of 36 CFR part 228.

*Comments on Effect on Fire Suppression.* Numerous respondents expressed concern with the effect of a road construction prohibition on fire fighter safety and access to suppress wildland fires.

*Response.* Proposed § 294.12(b)(1) allowed road construction and reconstruction in inventoried roadless areas when a road is needed to protect public health and safety in cases of an imminent threat of flood, fire, or other catastrophic event. In addition, using such suppression resources as smokejumpers and fire crews delivered by helicopters, the current fire suppression organization has been effective in suppressing at a small size approximately 98% of wildland fire starts in inventoried roadless areas. The agency also typically prioritizes fighting roadless and wilderness fires lower than fighting fires in more accessible and populated areas. The Agency has a long

history of successfully suppressing fires in inventoried roadless areas and this high level of suppression performance is expected to continue. Furthermore, the agency rarely builds new roads to suppress fires. Building roads into inventoried roadless areas would likely increase the chance of human-caused fires due to the increased presence of people. Fire occurrence data indicates that prohibiting road construction and reconstruction in inventoried roadless areas would not cause an increase in the number of acres burned by wildland fires or in the number of large fires (FEIS Vol. 1, 3–115).

*Comment on Including Other Unroaded Areas.* Some respondents asserted that prohibitions should be applied to all roadless areas, not just inventoried roadless areas.

*Response.* The agency had adequate information to assess the effects of implementing the prohibition of road construction and limited timber harvesting in inventoried roadless areas. There was not sufficient information to make a decision regarding other uninventoried unroaded areas. Furthermore, the agency decided that these uninventoried unroaded areas would be better evaluated in the context of the new planning regulations at 36 CFR part 219.

*Comment on Relationship to Other Rulemakings.* Some respondents have questioned whether the agency has adequately integrated the decision to prohibit road construction and timber harvesting in inventoried roadless areas with other agency rulemaking efforts.

*Response.* The objective of conserving inventoried roadless areas reflects current scientific understanding of the importance of inventoried roadless area ecosystems and changing values of society as evidenced by comments received on this proposal.

This final roadless area conservation rule is entirely consistent with other Forest Service rulemaking and policy efforts, including the agency's final planning rule at 36 CFR part 219 (November 9, 2000; 65 FR 67514) and newly adopted National Forest System Road Management regulations (36 CFR part 212) and policy (Forest Service Manual 7700 and 7710). It is also consistent with the report of Secretaries Babbitt and Glickman to the President, *Managing the Impacts of Wildfire on Communities and the Environment* (September 8, 2000), the agency's *Protecting People and Sustaining Resources in Fire-Adapted Ecosystems: A Cohesive Strategy* (November 9, 2000; 65 FR 67480), and ongoing efforts to reduce the risk of fire to communities and the environment.

The planning rule provides the overall framework for planning and management of the National Forest System. No provisions in the Roadless Area Conservation rule would require land management or project planning, although managers may decide to initiate plan revisions. However, this final rule does complement the key sustainability, science, and spatial decisionmaking issues raised by the planning rule.

The planning rule also requires that during the plan revision process, or at other times as deemed appropriate, the responsible official must identify and evaluate inventoried roadless areas and unroaded areas and then determine which inventoried roadless areas and unroaded areas warrant additional protection and the level of protection to be afforded. This provision is similar to the procedural requirements proposed in May 2000, as part of the proposed Roadless Area Conservation Rule. Given their inclusion in the final planning rule, the procedural provisions have been removed from this final rule. As disclosed in the DEIS, the proposed procedures do not directly result in adverse physical or biological environmental effects, nor do the procedures cause irreversible or irretrievable resource commitments (DEIS Vol. 1, 3–223). The FEIS disclosed the combined effects of the final planning rule and the final roadless rule as being complementary, not additive (FEIS Vol. 1, 3–397; see also 65 FR 67529).

The National Forest System Road Management regulations and policy are designed to make the agency's existing road system more safe, responsive to public needs, environmentally sound, and affordable to manage. Elements of the regulation and policy requiring planning would be completed using the new planning rules. For example, under the road management policy, national forests and grasslands would have to complete an analysis of their existing road system and then incorporate this analysis into their land management plans. Consistent with the planning rule, this would be accomplished by using a science-based analysis procedure and by working cooperatively with other agency partners and the public.

Together, these requirements ensure that roadless areas and their important social and ecological characteristics will be conserved for present and future generations based on the principles of sustainability, sound science, and collaboration. The Forest Service has coordinated development of each of these rulemakings to ensure that the rules are integrated and consistent. In addition, consistency in the definitions and program emphases has been assured. The resulting rulemaking efforts efficiently align priorities and resources to implement the agency's statutory responsibilities (FEIS Vol. 1, 1–18 to 1–20).

*Comment on Application to the Tongass National Forest.* The agency received many comments regarding the Tongass National Forest. Many respondents stated that the Tongass should not be exempt from the provisions of the proposed rule. Others, concerned that local communities had already experienced substantial social and economic effects due to the recent revision of the Tongass Land and Resource Management Plan and other factors, thought that the Tongass should be exempt from the provisions of the proposed rule. Some respondents stated that the Forest Service should defer action on the Tongass National Forest until the next plan revision.

*Response.* In both the DEIS and FEIS, using the best available science and data, the agency has considered the alternatives of exempting and not exempting the Tongass National Forest, as well as deferring a decision as per the proposed rule. Social and economic considerations were key factors in analyzing those alternatives, along with the unique and sensitive ecological character of the Tongass National Forest, the abundance of roadless areas where road construction and reconstruction are limited, and the high degree of ecological health. In developing the proposed action, the agency sought to balance the extraordinary ecological values of the Tongass National Forest against the needs of the local forest dependent communities in Southeast Alaska.

With the recent closure of pulp mills and the ending of long-term timber sale contracts, the timber economy of Southeast Alaska is evolving to a competitive bid process. About two-thirds of the total timber harvest planned on the Tongass National Forest over the next 5 years is projected to come from inventoried roadless areas. If road construction were immediately prohibited in inventoried roadless areas, approximately 95 percent of the timber harvest within those areas would be eliminated (FEIS Vol. 1, 3–202).

The Tongass National Forest is part of the northern Pacific coast ecoregion, an ecoregion that contains one fourth of the world's coastal temperate rainforests. As stated in the FEIS, the forest's high degree of overall ecosystem health is due to its largely undeveloped nature including the quantity and quality of inventoried roadless areas and other special designated areas. Alternatives that would immediately prohibit new road construction and timber harvest in all inventoried roadless areas would most effectively protect those values. Other alternatives that exempt, delay, or limit the application of the prohibitions would offer less protection. The environmental impacts of these alternatives are disclosed in Chapter 3 of the FEIS.

The proposed rule would have deferred a decision on whether or not the prohibitions should be applied to the Tongass National Forest until April 2004. This would have allowed an adjustment period for the timber program in Southeast Alaska to occur under provisions of the 1999 Record of Decision for the Tongass Land and Resource Management Plan Revision, but would not have assured long-term protection of the Forest's unique ecological values and characteristics.

In response to public comments, an optional social and economic mitigation measure was considered under the Tongass Not Exempt alternative that would require implementation of the final rule on the Tongass, but delay this implementation until April 2004, to provide a transition period for local communities to adjust to changes that would occur when the prohibitions take effect.

The final rule applies immediately to the Tongass National Forest but adopts a mitigation measure that both assures long-term protection and a smooth transition for forest dependent communities. The final rule provides that the prohibitions do not apply to road construction, reconstruction, and the cutting, sale or removal of timber from inventoried roadless areas on the Tongass National Forest where a notice of availability for a draft environmental impact statement for such activities has been published in the **Federal Register** prior to the date of publication of this rule in the **Federal Register**. This mitigation measure allows an adjustment period for the timber program in Southeast Alaska, but will also assure more certain long-term protection of the Forest's unique ecological values and characteristics.

Allowing road construction and reconstruction on the Tongass National Forest to continue unabated would risk the loss of important roadless area values. The agency had sufficient information to analyze the environmental, social, and economic effects of prohibiting road construction, reconstruction, and limited timber harvesting on the Tongass National Forest and did not see the value in

TRSF_H_005598

**Federal Register** / Vol. 66, No. 9 / Friday, January 12, 2001 / Rules and Regulations    **3255**

deferring the issue to further study prior to making a decision.

Moreover, this course of action is consistent with the provisions of the Tongass Timber Reform Act (TTRA). While the TTRA urges the Forest Service to "seek to meet market demand" for timber from the Tongass National Forest, the TTRA does not envision an inflexible harvest level, but a balancing of the market, the law, and other uses, including preservation. (*Alaska Wilderness Recreation and Tourism Ass'n* v. *Morrison, 67 F.3d 723, 731 (9th Cir. 1995)).* The record for this rulemaking fully supports the imposition of the prohibitions on the Tongass National Forest. However, in inventoried roadless areas the Tongass National Forest has 261 MMBF of timber under contract and 386 MMBF under a notice of availability for a DEIS, FEIS, or Record of Decision. In addition, the Tongass has 204 MMBF available in roaded areas that is sold, has a Record of Decision, or is currently in the planning process. This total of 851 MMBF is enough timber volume to satisfy about 7 years of estimated market demand.

Based on the analysis contained in the FEIS, a decision to implement the rule on the Tongass National Forest is expected to cause additional adverse economic effects to some forest dependent communities (FEIS Vol. 1, 3–326 to 3–350). During the period of transition, an estimated 114 direct timber jobs and 182 total jobs would be affected. In the longer term, an additional 269 direct timber jobs and 431 total jobs may be lost in Southeast Alaska. However, the Department believes that the long-term ecological benefits to the nation of conserving these inventoried roadless areas outweigh the potential economic loss to those local communities and that a period of transition for affected communities would still provide certain and long term protection of these lands.

The special provision at § 294.14(d) of the final rule allowing road construction, reconstruction, and the cutting, sale, or removal of timber from inventoried roadless areas on the Tongass National Forest where a notice of availability of a draft environmental impact statement for such activities has been published in the **Federal Register** prior to the date of publication of this rule in the **Federal Register** is considered necessary because of the unique social and economic conditions where a disproportionate share of the impacts are experienced throughout the entire Southeast Alaska region and concentrated most heavily in a few communities.

*Comment on Exceptions and Conflict with Purpose of the Rule.* Another major issue was whether there should be exemptions or exceptions from the prohibitions. A few respondents stated that the exceptions and exemptions to the prohibitions set out in proposed § 294.12 conflicted with the stated purpose of the rule. A summary of the major comments on this issue and the agency's responses follow.

*Response.* The exceptions to the prohibitions on road construction in inventoried roadless areas found at proposed § 294.12 responded to specific circumstances where the prohibitions might conflict with legal responsibilities to provide for public health and safety or environmental protection (FEIS Vol. 1, 2–13 to 2–14). In some cases, the exceptions could result in effects contrary to the purpose stated in the proposed rule, but the agency determined that they were necessary to honor existing law or address social or economic concerns. While the exceptions and exemptions place limited restrictions on the application of the prohibition, the stated purpose of the rule remains valid. These exceptions were only relevant to FEIS action Alternatives 2 through 4, as Alternative 1 (no action) did not prohibit any activities.

The public health and safety exception at paragraph (b)(1) in the final rule applies only when needed to protect public health and safety in cases of an imminent threat of a catastrophic event that might result in the loss of life or property. It does not constitute permission to engage in routine forest health activities, such as temporary road construction for thinning to reduce mortality due to insect and disease infestation.

The exception in paragraph (b)(2) permits entry for activities undertaken pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) and other identified statutes. An example of an allowable CERCLA activity is mitigating the leaching of toxic chemicals from an abandoned mine.

Paragraph (b)(3) permits the construction and reconstruction of a road pursuant to rights granted in statute or treaty, or pursuant to reserved or outstanding rights. These include, but are not limited to, rights of access provided in ANILCA, highway rights-of-way granted under R.S. 2477, and rights granted under the General Mining Law of 1872, as amended. Rights of reasonable access for mineral exploration and development of valid claims would be governed by the General Mining Law under any of the alternatives considered in the FEIS. These rights of access may or may not include new road construction as discussed elsewhere in this preamble. Therefore, rights of access to locatable mineral exploration and development of valid claims would not be affected by the final rule or any of the alternatives analyzed in the FEIS (FEIS Vol. 1, 3–254).

Paragraph (b)(4) in the final rule permits realignment of an existing classified road when it is found to cause irrepairable resource damage because of its design, location, use, or deterioration. The road must be essential for public or private access, natural resource management, or public health and safety. For the realignment exception to apply, the original road must have caused the resource damage and the resource damage cannot be corrected or mitigated by maintenance alone. Following realignment, treatment of the old roadway may include a variety of methods, such as decommissioning or by converting it to another use. An example of a situation where realignment may be appropriate is the presence of a classified road contributing sediment to a stream that is important spawning or rearing habitat for an endangered species of fish, and the sediment is having an adverse impact on the fish or its habitat. Realignment of the classified road and decommissioning the old roadway to eliminate the sediment caused by the old roadway is appropriate.

After considering the public comment on the proposed rule and conducting further analysis, three other exceptions were added to the final rule at § 294.12(b). New paragraph (5) is an exception to the prohibition to allow for reconstruction of a classified road if needed for safety based on accident experience or accident potential on that road. This exception allows for realignment or improvement in situations where road location or design is a threat to health or safety, and reconstruction would reduce that threat. New paragraph (6) was added to mitigate potential social and economic impacts in response to comments on the effects this rule might have on some State highway projects proposed as part of the National Highway System. These exceptions were not a major consideration in evaluating differences among the FEIS action alternatives because they apply to all of the prohibition alternatives. The agency considered other exemptions and exceptions, but eliminated them from detailed study (FEIS Vol. 1, 2–21 to 2–22).

An additional optional exception was considered in detail in the FEIS as a social and economic mitigation measure and was available for selection with any alternative. This exception would have allowed road construction or reconstruction where a road is needed for prospective mineral leasing activities in inventoried roadless areas (FEIS Vol. 1, 2–9). If road construction and reconstruction were allowed for all future mineral leasing, an estimated 59 miles of new roads could be constructed in inventoried roadless areas over the next five years. Road construction or reconstruction in support of future mineral leasing could continue at this level or in greater amounts into the foreseeable future. The agency estimates more than 10 million acres of inventoried roadless area could be roaded for exploration and development of leasable minerals, although the agency believes it is unlikely that more than a small percentage of these acres would contain minerals sufficient for economic development (FEIS Vol. 1, 3–250 to 260 and 313 to 321). Mineral leasing activities not dependent on road construction, such as directional (slant) drilling and underground development, would not be affected by the prohibition.

The Department has decided not to adopt the exception for future discretionary mineral leasing as identified in the FEIS because of the potentially significant environmental impacts that road construction could cause to inventoried roadless areas. Existing leases are not subject to the prohibitions. The Department has decided to adopt a more limited exception at 36 CFR 294.12(b)(7) to allow road construction needed in conjunction with the continuation, extension, or renewal of a mineral lease, on lands that were under lease by the Secretary of the Interior as of the date of publication of this rule in the **Federal Register**. Additionally, road construction needed in conjunction with a new lease may be allowed on these same lands if the lease is issued immediately upon expiration of the existing lease. The lessee would be required to start the process for issuance of a new lease prior to the expiration of the existing lease. Such road construction or reconstruction must be conducted in a manner that minimizes effects on surface resources, prevents unnecessary or unreasonable surface disturbance, and complies with all applicable lease requirements, land and resource management plan direction, regulations, and laws. Roads constructed or reconstructed pursuant

to this paragraph must be obliterated when no longer needed for the purposes of the lease or upon termination or expiration of the lease, whichever is sooner.

This provision allows, but does not require, road construction and reconstruction. These decisions would be made through the regular NEPA process. For example, this paragraph does not supersede land management plan prescriptions that prohibit road construction. This exception only applies to lands in inventoried roadless areas that are currently under mineral lease. The agency has less than 1 million acres of high potential oil and gas currently under mineral lease. This provision maintains the status quo for entities that currently hold mineral leases, while at the same time limiting the potential impacts on roadless area characteristics within this identified set of lands.

*Comment on Potential Misuse of Exceptions.* Some respondents felt there should not be any exceptions to the prohibition on construction of roads in inventoried roadless areas, out of fear that the exceptions would be used in situations not intended. These respondents wanted to know who would review decisions granting the exceptions.

*Response.* The Department believes that exceptions to the prohibitions on road construction and reconstruction are warranted to address legal, social, economic, and environmental concerns. Projects proposed under any of the exceptions would still have to comply with all legal requirements and agency policy related to environmental analysis and public involvement. Depending on the specific circumstances of a particular exception, decisions would be subject to administrative appeal or internal review.

*Comment on Multiple-Use Exception.* Some respondents requested an additional exception to the road construction prohibition, whereby the Department would insert "A road is needed to carry out the multiple-uses provided for in the authorities cited for these regulations." in § 294.12(b) of the proposed rule.

*Response.* The addition of the proposed exception would allow road construction in inventoried roadless areas for any multiple-use purpose, which would be counter to the purpose of protecting roadless areas.

*Comment on Private Land and Utility Company Exceptions.* Some respondents stated that the construction of roads should be allowed to access State or private lands and water diversions and dams. Utility companies

expressed concern that they would be unable to access existing facilities in an emergency, such as a pipeline rupture or a transmission line toppled by a landslide, and that the exception at proposed paragraph (b)(1) should be expanded to accommodate access to utility facilities in order to ensure their safe operation.

*Response.* The proposed rule did not suspend or modify existing permits, contracts, or other legal instruments authorizing the use and occupancy of National Forest System lands. Existing roads or trails would not have been closed by the proposed rule, and existing rights of access were recognized. The final rule retains all of the provisions that recognize existing rights of access and use. Where access to these facilities is needed to ensure safe operation, a utility company may pursue necessary authorizations pursuant to the terms of the existing permit or contract. Additionally, the examples described by the utility companies could qualify for an emergency exception under paragraph (b)(1) of the final rule depending on local circumstances and risk to public health and safety.

*Comment on Federal and State Highway Exceptions.* Some respondents stated that the final rule should permit road construction, realignment, and reconstruction of Federal and State highways.

*Response.* In response to public comments, the agency has included an exception that would allow road projects funded under Title 23 of the United States Code (23 U.S.C. 317) to occur in inventoried roadless areas. The final rule at § 294.12(b)(6) allows for construction, reconstruction, or realignment of a Federal Aid Highway where the Secretary determines that the project is in the public interest or consistent with the purposes for which the land was reserved or acquired, is reasonable and prudent, and no other feasible alternative exists (FEIS Vol. 1, 2–9 to 2–14).

*Summary of Changes in section 294.12 of the Final Rule.* Paragraph (a) of the final rule has been revised consistent with the changes in the definitions of "inventoried roadless areas" and "road", to remove the phrases "the unroaded portions of" and "This prohibition covers classified and unclassified roads," respectively.

Paragraph (b) in the final rule sets out certain limited exceptions to the prohibition on road construction and road reconstruction. The first four exceptions were adopted essentially as proposed with minor editing for clarity and three more exceptions were added.

**Federal Register** / Vol. 66, No. 9 / Friday, January 12, 2001 / Rules and Regulations       **3257**

Paragraph (c) of the proposed rule, which described the rule's application to the Tongass National Forest, has been removed. This change immediately applies the prohibitions in the rule to the Tongass National Forest, except as provided in a new paragraph applicable to the Tongass National Forest, which is added at § 294.14(d).

Proposed paragraph (d) is redesignated as paragraph (c) in the final rule. This paragraph permits maintenance activities for classified roads included in an inventoried roadless area, and is adopted essentially as proposed but with minor editing for clarity.

*Final section 294.13. Prohibition on timber cutting, sale, or removal in inventoried roadless areas.* The final rule adds a new prohibition on timber harvesting (the cutting, sale, or removal of timber): except for clearly defined, limited purposes; when incidental to the implementation of an activity not otherwise prohibited by this rule; for personal and administrative uses; or where roadless characteristics have been substantially altered in a portion of an inventoried roadless area due to the construction of a classified road and subsequent timber harvest. Both the road construction and subsequent timber harvest must have occurred after an area was designated an inventoried area. Even though this provision was not in the proposed rule, the DEIS analyzed timber harvesting prohibition alternatives for public comment and the FEIS identified a preferred alternative that included both timber harvesting and road construction prohibitions. Therefore, the public had sufficient opportunity to comment on this provision and there is adequate information to make a reasoned and informed decision.

Alternative 3 in the FEIS would prohibit timber harvesting except for stewardship and other limited purposes. Concerns over potential confusion of the interpretation of "stewardship" have led the agency to clearly define at § 294.13(b)(1) through (b)(4) the limited circumstances where the cutting, sale, or removal of timber in inventoried roadless areas is permitted. The final rule embodies Alternative 3, but, in contrast to the FEIS, the term "stewardship" does not appear in the final rule.

The cutting, sale, or removal of trees must be clearly shown through project level analysis to contribute to the ecological objectives described in § 294.13(b)(1), or under the circumstances described in paragraphs (b)(2) through (b)(4). Such management activities are expected to be rare and to focus on small diameter trees. Thinning of small diameter trees, for example, that became established as the result of missed fire return intervals due to fire suppression and the condition of which greatly increases the likelihood of uncharacteristic wildfire effects would be permissible.

Because of the great variation in stand characteristics between vegetation types in different areas, a description of what constitutes "generally small diameter timber" is not specifically included in this rule. Such determinations are best made through project specific or land and resource management plan NEPA analyses, as guided by ecological considerations such as those described below.

The intent of the rule is to limit the cutting, sale, or removal of timber to those areas that have become overgrown with smaller diameter trees. As described in the FEIS (Vol. 1, 3–76), areas that have become overgrown with shrubs and smaller diameter trees creating a fuel profile that acts as a "fire ladder" to the crowns of the dominant overstory trees may benefit ecologically from thinning treatments that cut and remove such vegetation. The risk of uncharacteristic fire intensity and spread may thus be reduced, provided the excess ladder fuels and unutilized coarse and fine fuels created by logging are removed from the site (FEIS Vol. 1, 3–91). Also, in some situations, cutting or removal of small diameter timber may be needed for recovery or conservation of threatened, endangered, proposed or sensitive species to improve stand structure or reduce encroachment into meadows or other natural openings.

In any event, all such determinations of what constitutes "generally small diameter timber" will consider how the cutting or removal of various size classes of trees would affect the potential for future development of the stand, and the characteristics and inter-relationships of plant and animal communities associated with the site and the overall landscape. Site productivity due to factors such as moisture and elevational gradients, site aspect, and soil types will be considered, as well as how such cutting or removal of various size classes of standing or down timber would mimic the role and legacies of natural disturbance regimes in providing the habitat patches, connectivity, and structural diversity critical to maintaining biological diversity. In all cases, the cutting, sale, or removal of small diameter timber will be consistent with maintaining or improving one or more of the roadless area characteristics as defined in § 294.11.

*Comment on Scope of the Prohibitions.* Many respondents urged the agency to expand the prohibitions to prohibit timber harvesting, mining, and other activities that harm the undeveloped characteristics of inventoried roadless areas.

*Response.* In preparing the FEIS, the scope of prohibited actions considered in detail was limited to road construction, road reconstruction, and timber harvesting, because these activities pose disproportionately greater risks of altering and fragmenting natural landscapes at regional and national scales (FEIS Vol. 1, 1–15 to 1–16). In addition, the agency can analyze potential social and ecological effects based on the five-year timber sale program of each national forest. Other uses, although potentially as harmful to roadless area values and characteristics, are not scheduled in such a fashion and are more appropriately reviewed through land and resource management planning.

The agency has decided to prohibit timber harvesting because it provides additional protection for roadless area characteristics beyond that provided by a prohibition on road construction alone. However, the agency agrees with those respondents who asserted that science-based forest management might require some level of vegetative management in inventoried roadless areas. Thus, the agency has decided to allow some timber harvesting for clearly defined purposes in the final rule at 294.13(b)(1) through (b)(4).

*Comment on Wildlife Habitat Management.* Many respondents, including some State wildlife management agencies, were concerned that a timber harvest prohibition would preclude all wildlife habitat management opportunities.

*Response.* As provided by final 294.13(b)(1), tree cutting for wildlife habitat improvement could proceed if it is designed to maintain or help restore ecosystem composition or structure to conditions within the range of variability that would be expected to occur under natural disturbance regimes of the current climatic period. This will allow the agency to manage for the full range of habitat types needed to support the diversity of native and desired non-native species.

*Comments on Uncharacteristic Wildfire Effects.* Of particular interest to many respondents because of the severity of the 2000 fire season, was how the agency would manage inventoried roadless areas to reduce the risk of uncharacteristic wildfire effects.

TRSF_H_005601

*Response.* The effects of uncharacteristic wildfires often include unnatural increases in wildfire size, severity, and resistance to control and the associated impacts to people and property. These uncharacteristic effects have been caused primarily by past wildfire suppression, and past timber harvesting and grazing practices. These have contributed to often-dramatic changes in some areas in wildfire frequency, size, and severity (FEIS Vol. 1, 3–72 to 3–73). The vegetative structure, density, and composition of these areas have changed when compared to less altered ecosystems (FEIS Vol. 1, 3–144).

The use of timber harvesting, as permitted by this rule, and other fuel management techniques will help maintain ecosystem composition and structure within its historic range of variability at the landscape scale. Treatment priorities may be consistent with those identified in the report Protecting People and Sustaining Resources in Fire-Adapted Ecosystems: A Cohesive Strategy (November 9, 2000; 65 FR 67480). These include wildland-urban interface areas, readily accessible municipal watersheds, and threatened and endangered species habitat. Since wildland-urban interface areas and readily accessible municipal watersheds rarely occur in or adjacent to inventoried roadless areas, most fire hazard reduction work would not begin in inventoried roadless areas for at least 20 years, the estimated time it would take to address the extremely hazardous fuel situations outside inventoried roadless areas (FEIS Vol. 1, 3–78). However, hazardous fuels treatment in inventoried roadless areas is not prohibited by this rule, so long as road construction or reconstruction is not necessary. Vegetative management would focus on removing generally small diameter trees while leaving the overstory trees intact. The cutting, sale, or removal of trees pursuant to 294.13(b)(1) must be clearly shown through project level analysis to contribute to the ecological objectives described. Such management activities are expected to be rare and to focus on small diameter trees. Thinning of small diameter trees, for example, that became established as the result of missed fire return intervals due to fire suppression and the condition of which greatly increases the likelihood of uncharacteristic wildfire effects would be permissible.

*Summary of Changes in new section 294.13 of the Final Rule.* The final rule adds a new prohibition on timber harvesting except for clearly defined, limited purposes, when incidental to the implementation of a management activity not otherwise prohibited by this rule; for personal or administrative use; or where roadless characteristics have been substantially altered in a portion of an inventoried roadless area due to the construction of a classified road and subsequent timber harvest. Paragraph (a) establishes a prohibition on timber cutting, sale, or removal in inventoried roadless areas except as provided in paragraph (b). Paragraph (b) makes clear that the cutting, sale, or removal of timber in inventoried roadless areas is expected to be infrequent, but allows timber cutting, sale, or removal as identified in paragraphs (b)(1) through (b)(4).

Paragraph (b)(1) allows generally small diameter timber to be cut, sold, or removed in inventoried roadless areas where it maintains one or more of the roadless area characteristics as defined in § 294.11 and: (1) improves habitat for threatened, endangered, proposed or sensitive species or (2) maintains or restores the characteristics of ecosystem composition and structure, such as to reduce uncharacteristic wildfire effects, within the range of variability that would be expected to occur under natural disturbance regimes of the current climatic period.

Paragraph (b)(2) allows timber cutting, sale, or removal in inventoried roadless areas when incidental to implementation of a management activity not otherwise prohibited by this rule. Examples of these activities include, but are not limited to trail construction or maintenance; removal of hazard trees adjacent to classified roads for public health and safety reasons; fire line construction for wildland fire suppression or control of prescribed fire; survey and maintenance of property boundaries; other authorized activities such as ski runs and utility corridors; or for road construction and reconstruction where allowed by this rule.

Paragraph (b)(3) allows timber cutting, sale, or removal for personal or administrative use as provided for at 36 CFR part 223. Personal use includes activities such as Christmas tree and firewood cutting. Administrative use includes providing materials for activities such as construction of footbridges and fences.

Paragraph (b)(4) allows the cutting, sale, or removal of timber where roadless characteristics have been substantially altered in a portion of an inventoried roadless area due to the construction of a classified road and subsequent timber harvest. The road construction and subsequent timber harvest must have occurred after the area was designated an inventoried roadless area and prior to the date of publication of this rule in the **Federal Register**. Timber may be cut, sold, or removed only in the substantially altered portion of the inventoried roadless area. This exception recognizes that road construction and timber harvesting in inventoried roadless areas may have altered the roadless characteristics to the extent that the purpose of protecting those characteristics cannot be achieved. Timber harvest should not expand the area already substantially altered by past management. This exception is subject to applicable laws, regulations, and land and resource management planning direction. Refer to the previous discussion in ''Comment on Unroaded Portion of an Inventoried Roadless Area'' in the ''Proposed § 294.11 Definitions'' section of this preamble for more information on this subject.

*Proposed 294.13. Consideration of roadless area conservation during forest plan revision.* This section of the proposed rule would have required the responsible official to evaluate the quality and importance of roadless area characteristics and determine whether and how to protect these characteristics in the context of multiple-use objectives during forest plan revision.

*Comment on Integration with the Planning Rule.* Respondents from a cross section of timber industry and business interests, State, county and Federal representatives, professional associations, and the public expressed concern that this section did not provide adequate direction on how to consider and implement the criteria and procedures during forest plan revision, leading to confusion over integration of this section with the proposed planning and road management rulemaking initiatives.

*Response on Proposed Section 1294.13.* The Department has decided that the appropriate place for considering protections for inventoried roadless areas, in addition to those in this rule, and protections for uninventoried unroaded areas is during the planning process pursuant to the new planning regulations at 36 CFR part 219, Subpart A.

The framework for planning allows for the development of issues leading to the proposal of special designations, and also gives ample opportunity for the public and others to collaborate on the issue at all levels of planning. Based on public comment, specific requirements for evaluating inventoried roadless areas and unroaded areas are included in § 219.9(b)(8) of the final planning rule (65 FR 67571) to emphasize that the

**Federal Register** / Vol. 66, No. 9 / Friday, January 12, 2001 / Rules and Regulations     **3259**

responsible official must evaluate these areas during the plan revision process.

The new planning regulations provide for consideration of roadless areas in the forest planning process in a fashion similar to that set out in the proposed rule at § 294.13. Based on the comments received and reasons stated previously, the Department has determined that those requirements are better considered in the context of 36 CFR part 219. Elimination of proposed § 294.13 from the final rule will not have a significant effect on the purpose or scope of the final rule or on the protections provided to inventoried roadless areas because evaluation of inventoried roadless areas and unroaded areas are now integrated into the final planning rule.

*Proposed Section 294.14. Scope and applicability.* Proposed paragraph (a) of this section of the proposed rule provided that existing contracts, permits, or other legal instruments authorizing the occupancy and use of National Forest System land would not be suspended or modified by the rule.

*Comment on Existing Authorized Activities.* Some respondents were concerned about the impact of the rule on special uses and requested clarification regarding the ability to construct or maintain roads in inventoried roadless areas to access electric power or telephone lines, pipelines, hydropower facilities, and reservoirs. Some suggested that proposed § 294.12(b)(3) be revised to read, "A road is needed pursuant to reserved or outstanding rights or as permitted by statute, treaty or other authorities."

*Response.* Section 294.14(a) of the proposed rule stated that the rule would not suspend or modify any existing permit, contract, or other legal instrument authorizing the use and occupancy of National Forest System lands. Existing authorized uses would be allowed to maintain and operate within the parameters of their current authorization, including any provisions regarding access. Adding the wording "other authorities" to this paragraph is not necessary as the term "other legal instrument" adequately covers other existing authorizations.

Under paragraph (a), road construction or reconstruction associated with ongoing implementation of special use authorizations would not be prohibited. For example, all activities anticipated and described in an authorized ski area's master plan, such as construction or maintenance of ski trails and ski runs, the use of over snow vehicles or off-highway vehicles necessary for ski area operations, including associated road construction,

would not be prohibited even if a specific decision authorizing road construction has not been made as of the date of publication of this rule in the **Federal Register**. Likewise, activities necessary to a mineral lease authorization issued prior to the date of publication of this rule would not be prohibited even if a specific decision authorizing road construction has not been made as of the date of publication of this rule in the **Federal Register**. A phrase has been added to clarify that this paragraph only applies to permits, contracts, or other legal instruments issued before the date of publication of this rule in the **Federal Register**. The term "revoke" has been added to this provision to clarify that this final rule will not revoke existing permits, contracts, or other legal instruments.

Proposed § 294.14(b) made clear that the final rule would not require units to initiate land management plan amendments or revisions.

*Comment on Land Management Plan Amendments.* Some respondents commented that the proposed rule is a "massive change" in existing land management plan direction or land allocation, without amendment or revision of land management plans as required by the National Forest Management Act. Some respondents suggested that amendments were necessary in order to consider site-specific biological and socio-economic information.

*Response.* The Secretary has extensive rulemaking authority governing forest management and development of land management plans. Just as development and approval of land management plans must conform to existing laws and regulations, new laws or regulations can supersede land management plan management direction. Requiring "conforming amendments" to land management plans would be redundant of the rulemaking process.

Local responsible officials' discretion to initiate land and resource management plan amendments, as deemed necessary, would not be limited by this provision. There may be instances where a local responsible official elects to initiate amendment or revision of forest and grassland plans following final promulgation of this final rule. While the analysis undertaken at the national scale is sufficient for the prohibitions established pursuant to this rulemaking, the Department appreciates that additional management issues may need to be addressed, both within and outside of inventoried roadless areas. The local official is best positioned to assess whether any such adjustment is

necessary. For example, although the local official is not free to re-examine the prohibitions established by this rule, it may be appropriate to consider amendments to land and resource management plans regarding plan decisions that guide the use of inventoried roadless areas in light of the final rule.

Forest Service officials have several mechanisms that allow for evaluation of forest and grassland plan implementation, including plan-specific monitoring provisions, the amendment and revision process, and project-level decisionmaking. A determination to amend or revise a land and resource management plan is based on a variety of factors. Forest Supervisors and Regional Foresters have substantial discretion in determining whether or not to initiate plan amendments or revisions.

In the early stages of forest plan amendment or revision, or any decisionmaking process involving land management practices, Regional Foresters, Forest Supervisors, and District Rangers must actively seek input and participation by State, local, and Tribal officials and other affected or interested parties. Therefore, this provision is retained without change in the final rule.

Paragraph (c), as proposed, provided that the regulation, if adopted, would not suspend or modify any decision made prior to the effective date of the final rule.

*Comment on Effect on Project Planning.* Some respondents questioned whether implementation of the rule would prohibit projects where planning is already underway. Most of the comments on this paragraph were related to current and future ski area development, although other land uses would be treated in a similar manner. Some respondents asserted that exemptions from the rule should include all lands or activities described in existing ski area special use permits or master development plans. Specifically listed were White Pass, Arapahoe Basin, Sierra at Tahoe, Pallavicini, Alleys Trails, Mammoth Mountain, June Mountain, Tamarack Resort and Cross Country Skiing Center, and Mammoth Snowmobile Adventures. Respondents also stated that the proposed Pelican Butte Ski Area and expansion of the Sipapu Ski Area should be allowed to continue their current planning processes and that the agency should also allow expansion of commercial recreation activities to benefit local people. Others took an opposing view, stating that the agency should not exempt from the rule any

TRSF_H_005603

new ski areas or expansion of any existing ski areas at Pelican Butte, Mount Ashland, Copper Creek, Sherwin, Beaver Creek, Mammoth Mountain, June Mountain, and others.

*Response.* Road construction and timber harvest for expansion of ski areas, resorts, or other recreation developments in inventoried roadless areas would be allowed under paragraph (a) as previously discussed, subject to existing Forest Service procedures, if special use permits are in existence prior to the date of publication of this rule in the **Federal Register** and proposed activities take place within the boundaries established by the special use authorization (FEIS Vol. 1, 3–226). The requirement that a permit be in existence prior to the effective date of this rule has been changed in the final rule to require that the permit be in existence prior to the date of publication of this rule in the **Federal Register**. This change was necessary because the effective date of this rule is delayed 60 days from the date of publication.

Road construction and timber harvest would also be allowed for new ski areas, or expansions of existing ski areas outside the existing special use permit boundaries, in inventoried roadless areas provided that the expansion or construction was approved by a signed Record of Decision, Decision Notice, or Decision Memorandum before the date of publication of the rule in the **Federal Register** (FEIS Vol. 1, 3–226). Under paragraph (c), project decisions for any activity made prior to the date of publication of the final rule in the **Federal Register** would be altered.

*Summary of Changes in § 294.14 of the Final Rule.* Under paragraph (a) of the final rule, road construction, road reconstruction, and timber harvest associated with ongoing implementation of special use authorizations are not prohibited. The term ''revoke'' and the date of publication of this rule in the **Federal Register** were added to clarify agency intent.

Paragraph (b) makes clear that the final rule would not require units to initiate land management plan amendments or revisions and is adopted without change.

Paragraph (c) states that project decisions made prior to the date of publication of the final rule in the **Federal Register** would not be altered. The term revoke was added to clarify agency intent. The requirement in the proposed rule that a project decision be in existence prior to the effective date of this rule has been changed in the final rule to require that the project decision be in existence prior to the date of publication of this rule in the **Federal**

**Register**. This change was necessary because the effective date of this rule is delayed 60 days from the date of publication.

Proposed paragraph (d) was a ''severability'' or ''savings'' clause. This provision identifies the Department's intention that, in the event any provision is determined invalid, the remaining portions of the rule would remain in force. No comments were received on this provision; it has been redesignated as paragraph (f) in the final rule and retained without change.

A new paragraph (d) has been added to the final rule which provides that the prohibitions in the final rule do not apply to road construction, reconstruction, or the cutting, sale or removal of timber from inventoried roadless areas on the Tongass National Forest where a notice of availability for a draft environmental impact statement for such activities has been published in the **Federal Register** prior to the date of publication of this rule in the **Federal Register**. This mitigation measure allows an adjustment period for the timber program in Southeast Alaska, but will also assure the long-term protection of the Forest's unique ecological values and characteristics. Refer to the previous discussion in the section entitled, ''Comment on Application to the Tongass National Forest,'' in, ''Proposed § 294.12. Prohibition on road construction and reconstruction in inventoried roadless areas.''

To replace and serve the same purpose as proposed § 294.13(f), a new § 294.14(e) has been added to the final rule to address the recently adopted planning regulations at 36 CFR part 219, which require the responsible official to determine which inventoried roadless areas warrant additional protection. Consistent with the original proposal, this new paragraph (e) makes clear that, in determining whether additional protections are needed for any inventoried roadless area, the responsible official cannot reconsider or set aside the prohibitions established in § 294.12 or § 294.13.

*What Other Issues Were Considered in the Final Environmental Impact Statement?*

*Environmental Effects.* Another major issue among those who commented on the proposed rule and DEIS was the environmental effects of the alternatives on inventoried roadless area characteristics. It was also the most important consideration in selection of an alternative. The purpose and need for this proposed action is based on the premise that inventoried roadless areas have characteristics that should be

conserved and maintained. Road construction, reconstruction, and timber harvesting are the activities most likely to harm the characteristics that the agency is seeking to protect. The FEIS documents the contribution of inventoried roadless area characteristics to watershed health and water quality, to biological strongholds for terrestrial and aquatic species, and to habitat for threatened, endangered, and sensitive species. The effects of road construction, reconstruction, and timber harvesting on those characteristics are also documented.

Additionally, some respondents commented on the discussion of spiritual values of inventoried roadless areas in chapter 3 of the DEIS. Some thought it was inappropriate to discuss spiritual values in an environmental analysis produced by the Federal government. Others thought these values were important to consider in the rulemaking process because inventoried roadless areas provided an important setting for their personal spiritual renewal. Reconciling divergent viewpoints on spiritual values is beyond the scope of this proposal. The decision for this rulemaking was not based on the beliefs or principles of one religion or another, but based on the science, policies and laws that guide the decisionmaking process.

Alternative 1 in the FEIS is the no action alternative and, if selected, would not have restricted activities in inventoried roadless areas. While it would not fund, authorize, compel, or carry out any activity in an inventoried roadless area, this alternative does have the greatest potential for adverse impact on the characteristics the agency seeks to protect. It allows the most roads to be constructed and reconstructed and the most timber to be harvested.

Action Alternatives 2, 3, and 4 in the FEIS all provide ecological benefits from prohibiting road construction and reconstruction. The major difference among these alternatives is that Alternative 2 does not restrict timber harvesting; Alternative 3 prohibits timber harvesting for commodity purposes, but allows timber harvesting for clearly defined purposes and circumstances; and Alternative 4 prohibits all timber cutting (except that which may be needed for protection or recovery of threatened, endangered, or proposed species). In alternatives 2, 3, and 4, personal and administrative use harvest, including firewood and Christmas tree cutting, would be permitted. Limited tree cutting could occur incidental to other management activities, such as trail construction or

maintenance, hazard tree removal adjacent to classified roads for public health and safety reasons, fire line construction for wildland fire suppression or control of prescribed fire, or survey and maintenance of property boundaries.

The preferred alternative in the FEIS would prohibit all timber harvest activities in inventories roadless areas except for clearly defined purposes. The final rule provides for the cutting, sale or removal of timber in substantially altered portions of inventoried roadless areas for any purpose as long as the activities do not require additional road construction or reconstruction. By allowing some additional level of timber harvest activity compared to the FEIS preferred alternative, there is an increase in the likelihood of related environmental impacts and decrease in the environmental benefits accrued through the more stringent prohibition in the preferred alternative.

The DEIS estimated that approximately 2.8 million of the 58.5 million acres of inventoried roadless areas had been roaded since the areas were designated as inventoried roadless areas. Some portion of these roaded areas had also been impacted by subsequent management activities facilitated by the road access. It is unknown exactly what portion of these 2.8 million acres has sustained sufficient road construction and timber harvest to substantially alter their roadless characteristics. The determination of whether roadless characteristics have been substantially altered is to be made following a site-specific evaluation. Before any project is authorized that allows the cutting, sale, or removal of timber in an inventoried roadless area, it will subject to site-specific analysis following existing laws and regulations.

Current timber harvesting practices have less impact on the environment than they have had in the past. Increased knowledge, new equipment and techniques, and the application of best management practices have helped to reduce the adverse environmental impacts of timber harvest activities. However, timber-harvesting practices still impact roadless area characteristics, contributing to the fragmentation of habitat and threatening their ability to function as biological strongholds, reference areas, and provide other roadless values.

The final rule allows timber harvesting of generally small diameter timber for limited purposes when it maintains or improves one or more roadless area characteristics and: (1) Improves threatened, endangered,

proposed, and sensitive species habitat or (2) maintains or restores the characteristics of ecosystem composition and structure, such as to reduce the risks of uncharacteristic wildfire effects. The final rule also allows timber to be cut, sold, or removed where roadless characteristics have been substantially altered in a portion of an inventoried roadless area due to the construction of a classified road and subsequent timber harvest, and such road construction and subsequent timber harvest occurred after the area was designated an inventoried roadless area. Roadless area characteristics are identified in § 294.11 as: (1) High quality or undisturbed soil, water, and air; (2) sources of public drinking water; (3) diversity of plant and animal communities; (4) habitat for threatened, endangered, proposed, candidate, and sensitive species and for those species dependent on large, relatively undisturbed areas of land; (5) primitive, semi-primitive non-motorized, and semi-primitive motorized classes of dispersed recreation; (6) reference landscapes; (7) naturally appearing landscapes with high scenic quality; (8) traditional cultural properties and sacred sites; and (9) other locally identified unique characteristics (FEIS Vol. 1, 3–3 to 3–7).

*Forest Dependent Communities.* Impacts to forest dependent communities were a major issue among those who commented on the proposed rule and DEIS. Under Alternative 1 of the FEIS, the flow of goods and services would continue according to current policies and land management direction. Alternatives 2 through 4 could reduce future timber harvest, mineral exploration and development, and other activities such as ski area development in inventoried roadless areas. Communities with significant economic activities in these sectors could be adversely impacted. However, the effects on national social and economic systems are minor. For example, the total timber volume affected by this rule is less than 0.5 percent of total United States production, and the total oil and gas production from all National Forest System lands is currently about 0.4 percent of the current national production. None of the alternatives are likely to have measurable impacts compared to the broader social and economic conditions and trends observable at these scales, however the effects of the alternatives are not distributed evenly across the United States (FEIS Vol. 1, 3–326 to 3–350).

To reduce the economic impact of this decision, the Chief of the Forest Service

will seek to implement one or more of the following provisions of an economic transition program for communities most affected by application of the prohibitions in inventoried roadless areas (FEIS Vol. 1, 2–14):

(1) Provide financial assistance to stimulate community-led transition programs and projects in communities most affected by application of the prohibitions in inventoried roadless areas;

(2) Through financial support and action plans, attract public and private interests, both financial and technical, to aid in successfully implementing local transition projects and plans by coordinating with other Federal and State agencies and;

(3) Assist local, State, Tribal and Federal partners in working with those communities most affected by the final roadless area decision.

*Local Decisionmaking.* The potential effect of the proposed rule on local involvement in decisionmaking was a major issue identified by many respondents to the DEIS. As described in both the DEIS and FEIS, Alternative 1 would allow local land managers the discretion on whether to construct or reconstruct roads or harvest timber for commodity purposes in inventoried roadless areas. Alternatives 2, 3, and 4 would remove the local decisionmaking authority only for these specific activities. All other management decisions regarding inventoried roadless areas would be made through National Forest System planning procedures. Under all alternatives, management decisions for unroaded areas would be made under the provisions of the new planning regulations at 36 CFR part 219. As explained in the ''*National Direction v. Local Decisionmaking*'' discussion, the agency has determined that national direction is needed to address the issues regarding road construction, reconstruction, and timber harvesting in inventoried roadless areas.

**The Final Rule and Alternatives Considered**

*What Alternatives and Mitigation Measures Were Considered by the Agency?*

The agency identified two methods to conserve the remaining inventoried roadless areas in the notice of intent for the proposed rule. The first method evaluated whether road construction, reconstruction, and timber harvest should be prohibited in inventoried roadless areas. The second method examined the establishment of procedures to evaluate and conserve roadless area characteristics during land

TRSF_H_005605

**3262** **Federal Register** / Vol. 66, No. 9 / Friday, January 12, 2001 / Rules and Regulations

and resource management plan revisions. These methods were incorporated into the proposed rule and alternatives analyzed in the DEIS. Since publication of the proposed rule, the agency has published final Land and Resource Management Planning Regulations at 36 CFR part 219. The draft and subsequent final planning regulations also provided direction to integrate the consideration of roadless area characteristics into the amendment and revision procedures of land and resource management plans for National Forest System lands. This detailed direction in the final planning regulations eliminated the need for the procedures considered in the Roadless Area Conservation DEIS and proposed rule. Therefore, these procedures have been omitted from the FEIS and final rule.

Public comments on the notice of intent identified a variety of suggestions for alternatives, including different types and combinations of prohibitions, procedures, and exemptions (Summary of Public Comment for the Notice of Intent, Content Analysis Enterprise Team, 2000). Comments on the DEIS and proposed rule provided detailed ways in which to modify the alternatives (Summary of Public Comment for the DEIS, Content Analysis Enterprise Team, 2000).

Summaries of public comment on the notice of intent, proposed rule and the DEIS are part of the record for this rulemaking, and can be viewed at the agency's roadless website (*roadless.fs.fed.us*). The agency's response to comments on the DEIS and proposed rule can be found in Volume 3 of the FEIS. This information was used in forming the alternatives in the FEIS (Chapter 2), which frame the choices for this final rule.

With the removal of the procedures, the agency had two basic decisions to make, with four alternatives for each decision. The first decision was whether road construction, reconstruction, or timber harvesting should be prohibited in National Forest System inventoried roadless areas, or some combination of the three. The second decision was whether the proposed national prohibitions should be applied to the Tongass National Forest or modified to meet the unique situation on the Tongass.

Four alternatives, including a no action alternative, were developed to cover the range of possible prohibited activities in inventoried roadless areas consistent with the stated purpose and need. Four alternative ways of applying the prohibitions to the Tongass National Forest were developed as well (FEIS

Vol. 1, 2–3 to 2–12). Various other alternatives were considered but eliminated from detailed study (FEIS Vol. 1, 2–15 to 2–22).

*Prohibition Alternatives.* Alternative 1 allowed road construction and reconstruction to continue, subject to existing land management plan prescriptions. There was no national restriction on timber harvesting. This was the no action alternative.

Prohibition Alternative 2 prohibited road construction and reconstruction activities, including temporary road construction, in inventoried roadless areas. There was no national restriction on timber harvesting.

Prohibition Alternative 3 prohibited road construction and reconstruction activities, including temporary road construction, in inventoried roadless areas. Timber harvesting was allowed for clearly defined stewardship purposes only, where harvesting could only be used when it maintained or improved roadless characteristics and: (1) improved habitat for threatened, endangered, proposed or sensitive species, (2) reduced uncharacteristic wildfire effects, or (3) restored ecological structure, function, process or composition. Timber harvest for commodity purposes was prohibited.

The definition of timber harvesting for stewardship purposes was reviewed and refined between the proposed rule and the FEIS to more clearly state the agency's intent and to ensure effective protection of roadless characteristics. In the DEIS, timber harvesting for stewardship purposes could be interpreted to accommodate any non-timber production resource management objective that required removal of forest vegetation. Many respondents were concerned about the agency's broad use of timber harvest for stewardship purposes on National Forest System lands. They believed that stewardship purpose timber harvest in inventoried roadless areas needed to be more clearly defined.

The agency agreed that it needed to clearly state the intended purposes for stewardship harvest in inventoried roadless areas. The FEIS identified the range of allowable objectives that are consistent with timber harvesting for stewardship purposes in inventoried roadless areas. In doing so, local decisions about timber harvesting within inventoried roadless areas must maintain or improve one or more roadless characteristics, while focusing on improving threatened, endangered, proposed, or sensitive species habitat; reducing the risk of uncharacteristic wildfire effects; or restoring ecological processes.

Alternative 4 prohibited road construction and reconstruction activities, including temporary road construction, in inventoried roadless areas. No timber cutting was allowed for stewardship or commodity purposes, except where it was necessary for the protection of threatened or endangered species.

*Exceptions and Mitigation Measures.* The agency identified an initial set of exceptions to the prohibition alternatives, as set out in the DEIS and proposed rule. The exceptions addressed the following circumstances where the prohibitions did not apply and are set out in the final rule at § 294.12(b)(1) through (b)(4). These include circumstances where a road is needed to: (1) protect public health and safety; (2) to conduct an environmental response action; (3) pursuant to reserved or outstanding rights or as provided for by statute or treaty; or (4) road realignment is needed to prevent irreparable resource damage by a classified road.

Based on comments received on the proposed rule and the DEIS, the agency developed and considered additional optional exceptions that mitigated the effects of the prohibition alternatives (FEIS Vol. 1, 2–8 to 2–9). These exceptions were available for selection as part of the final rule to reduce or eliminate undesirable social and economic impacts. Any or none of these optional exceptions could have been selected as part of the final rule. If selected, these exceptions would state that the responsible official may authorize road construction or reconstruction in inventoried roadless areas where: (1) reconstruction is needed to implement road safety improvements; (2) the Secretary determines that a Federal Aid Highway project is in the public interest or consistent with the purposes for which the land was reserved or acquired; or (3) a road is needed for prospective mineral leasing activities in inventoried roadless areas.

*Tongass National Forest Alternatives.* The second decision was to select one of the four alternatives created specifically for the Tongass National Forest (FEIS Vol. 1, 2–9). Based on public comments and the agency's decision to integrate procedures for evaluating roadless area characteristics into the planning rule, some of the Tongass alternatives presented in the DEIS were modified accordingly.

The Tongass Not Exempt alternative applied the same prohibition alternative to the Tongass National Forest that applied to the rest of National Forest System lands. An optional social and

economic mitigation measure was developed for the Tongass Not Exempt alternative that delayed implementation of the selected prohibition alternative on the Tongass National Forest until April 2004 in order to provide a transition period for communities most affected by changes that may result if this alternative were enacted.

The Tongass Exempt alternative did not apply a national prohibition to the Tongass National Forest. It allowed road construction and reconstruction on the Tongass to continue subject to existing land management plan prescriptions. Future proposals for road activities in inventoried roadless areas would be considered on a case-by-case basis.

The Tongass Deferred alternative postponed the decision on whether to apply prohibitions to the Tongass National Forest until April 2004, when an evaluation to determine whether the prohibitions against road construction and reconstruction should apply to any or all inventoried roadless areas would be conducted as part of the scheduled 5-year review of the April 1999 Tongass Land and Resource Management Plan.

The Tongass Selected Areas alternative applied the prohibitions on road construction and reconstruction within inventoried roadless areas located in certain land use designations (LUDs) identified in the Tongass Land and Resource Management Plan, specifically those of Old Growth Habitat, Semi-Remote Recreation, Remote Recreation, and LUD II. See Appendix E of Volume 1 of the FEIS for a complete description of these land use designations.

*What is the Environmentally Preferred Alternative?*

Under the National Environmental Policy Act, the agency is required to identify the environmentally preferred alternative (40 CFR 1505.2(b)). This is interpreted to mean the alternative that would cause the least damage to the biological and physical components of the environment, and, which best protects, preserves, and enhances historic, cultural, and natural resources (Council on Environmental Quality, Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 FR 18026). Factors considered in identifying this alternative include: (1) fulfilling the responsibility of this generation as trustee of the environment for future generations, (2) providing for a productive and aesthetically pleasing environment, (3) attaining the widest range of beneficial uses of the environment without degradation, (4) preserving important natural

components of the environment, including biodiversity, (5) balancing population needs and resource use, and (6) enhancing the quality of renewable resources.

The agency believes the alternative that best meets these objectives is Alternative 3 combined with the Tongass Not Exempt alternative, without any social or economic mitigation. Alternative 3 protects inventoried roadless areas from adverse environmental impacts associated with road construction, reconstruction, and timber harvesting for commodity purposes, as identified in Chapter 3 of the FEIS.

Alternative 4, by prohibiting timber cutting of any kind (except for protection or recovery of threatened, endangered, and proposed species), does not allow for the array of vegetation management potentially necessary to maintain or improve roadless characteristics, reduce the risks of uncharacteristic wildfire effects, or restore ecological structure, function, processes, or composition. Timber harvesting for the limited purposes under Alternative 3 would allow needed biological treatments to promote a healthy forest for future generations. Alternative 2, although providing for protection from road construction and reconstruction, would still permit harvesting of trees for commodity purposes that could conflict with protecting the physical and biological environment.

Alternative 3, like the other alternatives, contains exceptions that allow road construction and reconstruction for important human and environmental protection measures, such as protection of public health and safety from imminent threats of flood and fire, treatment to clean up hazardous pollution sites, and road realignment to prevent irreparable resource damage. These are important exceptions needed to enhance the productivity and esthetics of the environment. Social and economic mitigation measures are not part of this environmentally preferred Alternative 3 because these measures, although important to reduce the social and economic effects of the action alternatives, do not contribute to the protection of the physical or biological environment.

The Tongass National Forest is part of the northern Pacific coast ecoregion, an ecoregion that contains one fourth of the world's coastal temperate rainforests. As stated in the FEIS, the forest's high degree of overall ecosystem health is largely due to its quantity and quality of inventoried roadless areas and other

special designated areas. The ''Tongass Not Exempt'' alternative would immediately apply prohibitions to all inventoried roadless areas and is the environmentally preferred alternative. The other Tongass alternatives either delay or limit the inventoried roadless area land base to which the prohibitions would apply, or defer the decision regarding prohibitions altogether. The adverse environmental impacts of these alternatives are disclosed in Chapter 3 of the FEIS.

*What Is in the Final Rule and What Are the Reasons for Selecting That Alternative?*

Selection of an alternative to be adopted in the final rule requires careful consideration of the environmental effects, including cumulative, social, and economic impacts, and the relative values of the various resources to arrive at a fair and reasoned decision to achieve the stated purpose and need for inventoried roadless area protection (FEIS Vol. 1, 3–392 to 3–403). As stated previously, courts have held that the agency has wide discretion in weighing and deciding the proper administration of National Forest System lands.

The Department's judgment regarding the appropriate administration of these lands is embodied in the policies described in this final rule. First and foremost, the Department wants to ensure that inventoried roadless areas sustain their values for this and future generations. By sustaining these values, a continuous flow of benefits associated with healthy watersheds and ecosystems is provided. These benefits include sources for clean drinking water, fish habitat, wildlife habitat, biological diversity, and dispersed outdoor recreational opportunities. Not only are short-term economic and environmental factors considered, but also the long-term productivity of these lands which are so critical to strong, productive economies.

Evaluation of these considerations for this decision is based primarily on these qualitative factors. Quantitative factors, such as volume of timber offered for sale, or roadless acres protected, were also considered and are helpful to distinguish and compare the alternatives (FEIS Vol. 1, 2–24 to 2–38), and their effects (FEIS Chapter 3).

*Prohibition Alternatives.* Alternative 1 in the FEIS has the greatest potential for adverse impact on watershed health and water quality by allowing increased sedimentation and disruption of hydrologic processes; the greatest potential for adverse impact on biodiversity by fragmenting habitat for threatened, endangered, and sensitive

TRSF_H_005607

**3264**    **Federal Register** / Vol. 66, No. 9 / Friday, January 12, 2001 / Rules and Regulations

species; the greatest potential for adverse impact on aquatic and terrestrial habitat; and the greatest potential for increase in competition from invasive non-native species. This alternative was not selected because it did not meet the specified purpose and need for this action.

Action Alternatives 2, 3, and 4 in the FEIS all provide ecological benefits from prohibiting road construction and reconstruction. The major difference among these alternatives is that Alternative 2 allows timber harvesting without restriction; Alternative 3 prohibits timber harvesting for commodity purposes, but allows timber harvesting for clearly defined purposes and limited circumstances; and Alternative 4 prohibits all timber cutting (except that which may be needed for protection or recovery of threatened, endangered, or proposed species). Personal and administrative use harvest, including firewood and Christmas tree cutting, would be permitted. Tree removal could occur when associated with management activities not otherwise prohibited by the final rule, such as trail construction or maintenance, hazard tree removal adjacent to classified roads for public health and safety reasons, fire line construction for wildland fire suppression or control of prescribed fire, or survey and maintenance of property boundaries.

Alternative 2 was not selected because it posed more risks to roadless characteristics than Alternatives 3 or 4. Timber harvesting for clearly defined, limited purposes can be a valuable tool for conserving and improving roadless area values and should be available as a management option for the local responsible official. Therefore, the Department did not select Alternative 4 and is selecting Alternative 3.

Reducing the risk of uncharacteristic wildfire effects is one way of restoring ecological processes. The final rule recognizes this by eliminating "reducing the risk of uncharacteristic wildfire effects" as a separate purpose and instead uses it as an example of restoring ecological processes. Also, to address concern about the meaning and implementation of stewardship purpose timber harvest that "restores ecological structure, function, processes, and composition" described in the FEIS, the final rule eliminates use of the term "stewardship". Instead, the rule relies on the purposes specifically listed and mirrors language from the new planning regulations at 36 CFR part 219 stating that timber harvest is allowed in order to maintain or restore the characteristics of ecosystem composition and structure

within the range of variability that would be expected to occur under natural disturbance regimes of the current climatic period.

Alternatives 2 through 4 could reduce future timber harvest, mineral exploration and development, and other activities such as ski area development in inventoried roadless areas. Communities with significant economic activities in these sectors could be adversely impacted. However, the effects on the social and economic situation nationally are minor. For example, the reduction in timber harvest from National Forest System lands is less than 3%, which is less than 0.5 percent of total United States timber production. The total oil and gas production from all National Forest System lands is about 0.4 percent of the current national production, and the oil and gas resources located inside inventoried roadless areas are an insignificant portion of total resources.

Rights of reasonable access to prospect and explore lands open to mineral entry and to develop valid claims, would be unaffected under these alternatives as provided by the General Mining Law. Reasonable rights of access may include, but are not limited to, road construction and reconstruction, helicopters, or other nonmotorized access (FEIS Vol. 1, 3–254). None of the alternatives are likely to have measurable impacts compared to the broader social and economic conditions and trends observable at these scales; however, the effects of the alternatives are not distributed evenly across the United States (FEIS Vol. 1, 3–329 to 3–350).

Comment was received concerning the cumulative relationship of the Roadless Area Conservation Rule with the Bureau of Land Management's proposed rule for Mining Claims Under the General Mining Laws; Surface Management, published on February 9, 1999 (64 FR 6422). Since that comment was received, the Mining Claims rule became final (65 FR 69998, November 21, 2000). Both the final Roadless Area Conservation Rule and the final Bureau of Land Management mining rule have comparable goals to prevent unnecessary or undue degradation of public lands. However, the Roadless Area Conservation Rule at 294.12(b)(3) does not affect rights of reasonable access to prospect and explore lands open to mineral entry and to develop valid claims. Reasonable access includes, road construction or reconstruction for mining activities covered under the General Mining Law, while the performance standards at proposed 3809.420(c) would require

that permitted roads and structures be designed, constructed, and maintained to control or prevent erosion, siltation, and air pollution and to minimize impacts to resources. Cumulative effects of these two rules are expected to be minimal because of the exception for locatable minerals under § 294.12(b)(3) in the final roadless rule.

*Exceptions.* The Department is adopting the exceptions for road safety projects and for Federal Aid Highway projects. The exception for road safety projects is a narrow exception that only allows road reconstruction where past experience or expert opinion has indicated that the road design would present a threat to public safety. The Department decided to adopt the Federal Aid Highway exception to allow road construction based on social considerations and Federal-State relationships. The Department believes that this exception will have a very limited application, and the Secretary of Agriculture retains the discretion to approve or deny authorization when warranted (23 U.S.C. 317). The analysis in the FEIS identified only one application of this exception in the next five years for a proposed 5.5-mile State highway relocation project on the Chugach National Forest in Alaska (FEIS Vol. 1, 3–33).

After publication of the FEIS for Roadless Area Conservation, the Department of Energy (DOE) and the Office of Management and Budget (OMB) received and shared with the Forest Service several letters from mining interests outlining their concerns with the preferred alternative. The Forest Service also received comments directly from the National Mining Association. DOE provided an analysis of potential impacts related to oil and gas resources, and compiled information on coal resources as well. Upon being informed of these concerns, the Forest Service evaluated the information provided by DOE and others. The Forest Service also met with and discussed these concerns with DOE.

The FEIS analysis focused on impacts to coal, phosphate, and oil and gas resources, based on input from the national forests and grasslands and from public comment on the draft environmental impact statement (DEIS) and proposed rule (May 10, 2000; 65 FR 30276). Comment received from DOE on the DEIS was focused only on transmission line corridors. Potential economic impacts related to existing coal and phosphate operations with known plans to expand into inventoried roadless areas were quantified in the FEIS (Vol. 1, pp. 3–308 to 3–324). Areas of known high potential for coal,

TRSF_H_005608

phosphate, and oil and gas were also discussed (Vol. 1. pp. 3–254 to 3–260). With respect to oil and gas, no attempt was made to estimate the proportion of these resources within inventoried roadless areas because of the high degree of uncertainty of these estimates.

After publication of the FEIS for Roadless Area Conservation, the Department of Energy (DOE) raised concerns about the potential impacts on leasable energy minerals, particularly for natural gas and coal, if the final Roadless Area Conservation Rule did not allow road building in support of exploration and development for leasable minerals.

Currently, the NFS lands play a minor role in providing natural gas resources, only about 0.4% of national production (76.4 billion cubic feet) in 1999. The resource estimates by DOE were made assuming that the resources are homogeneously distributed across play areas, which is generally not the case with oil and gas resources. It is reasonable to assume, under the current demand conditions, that there will be increased interest in development of natural gas resources on federal lands and elsewhere. Some of these areas are not currently available for leasing, as a result of leasing decisions or local forest and grassland plan decisions. Moreover, current access restrictions would make many of these resources unavailable in the near future. In addition, the steep terrain that is typical of many inventoried roadless areas often makes these areas difficult to access for environmental and/or economic reasons. The likelihood of resources being recovered from inventoried roadless areas even in the absence of a final roadless rule is small, except where leases already exist. Finally, where accessible, exploration and development of these resources would likely take about 5–10 years before production would begin.

The FEIS described the coal production from NFS lands as accounting for about 7% of national production in 1999. The analysis acknowledged the increasing national demand for coal, particularly the low-sulfur coal found primarily in the western U.S. About 2.5 million acres of coal-bearing rock were estimated to occur within inventoried roadless areas in the interior West.

A concern raised by DOE and others was the potential effect on users of this low sulfur coal, primarily electric utilities in the East. According to DOE, many utility and industrial boilers have been designed to blend the western coal with other higher sulfur coal to meet their Clean Air Act compliance goals.

The DOE analysis did not provide any information on the availability of substitute sources of coal if supply from existing mines is reduced.

Overall, the U.S. has abundant coal reserves. Also, alternative sources of low-sulfur coal do exist, concentrated in the western U.S., mostly in Colorado, Montana, and Wyoming. Additionally, the abundant sources of low cost-coal and available technology, such as scrubbers, will enable electric utilities to meet their Clean Air Act compliance goals.

Several commentators on the DEIS, including the Governor of the State of Utah, had questions about access to state-owned coal. As discussed in the FEIS, access based on existing rights would not be affected by the final rule, therefore, access is guaranteed to coal held under existing rights.

The FEIS identified potential impacts on future phosphate mining on the Caribou National Forest, the only area of active phosphate mining on NFS lands. The FEIS acknowledged that phosphate production from the Caribou accounts for about 12% of national production, and is used to supply regional producers of phosphate fertilizer products and elemental phosphorous. The analysis included an estimate of phosphate resources within inventoried roadless areas of 873.3 million tons, and a description that about 8,000 acres of the area of Known Phosphate Lease Areas are within inventoried roadless areas.

In a letter to OMB, the National Mining Association provided estimates of phosphate reserves in Idaho, Wyoming, Utah, and Montana potentially impacted by the final rule. The company currently mining on the Caribou made these estimates. No documentation was provided for the basis of the estimates. However, their open pit mining estimates for Idaho were less than the resources identified in the FEIS in inventoried roadless areas alone.

In conclusion, the information provided by DOE and others provides additional context to the analysis. However, for coal and phosphate, the impacts noted in these comments fall within the range of effects disclosed in the FEIS. For oil and gas, the Forest Service continues to believe there is a high degree of uncertainty in the available information. Moreover, it seems likely that even if resources do underlie inventoried roadless areas, they would be among the last areas entered for exploration and development for the reasons described above. After careful review of the information provided by DOE and

private parties, the agency has determined that the information does not materially alter the environmental analysis disclosed in the FEIS and does not constitute significant new circumstances or information relevant to environmental concerns bearing on the rulemaking effort.

The Department has decided not to adopt the exception for future discretionary mineral leasing because of the potentially significant environmental impacts that road construction could cause to inventoried roadless areas, but instead determined a more limited exception is appropriate. Existing mineral leases are not subject to the prohibitions, nor is the continuation, extension, or renewal of an existing mineral lease on lands under lease by the Secretary of the Interior as of the date of publication of this rule in the **Federal Register**. Additionally, road construction or reconstruction may be authorized for new leases on these same lands in the event that application for a new lease is made prior to termination or expiration of the existing lease.

The Department recognizes that this decision may have major adverse economic impacts on a few communities dependent on mineral leasing from inventoried roadless areas. However, if road construction and reconstruction were allowed for future mineral leasing on lands not under mineral lease as of the date of publication of this rule in the **Federal Register**, an estimated 59 miles of new roads would be constructed in inventoried roadless areas over the next five years. Road construction or reconstruction in support of future mineral leasing on lands not presently under mineral lease could continue at this level or in greater amounts into the foreseeable future. Over an estimated 10 million acres of inventoried roadless areas could be roaded for exploration and development of leasable minerals, although the agency believes it is unlikely that more than a small percentage of these acres would contain minerals sufficient for economic development.

The effects of road construction over time could substantially alter valuable roadless area characteristics by fragmenting habitat, increasing soil disturbance, decreasing water quality, and providing new avenues for the invasion of non-native invasive species. Mineral leasing activities not dependent on road construction, such as directional (slant) drilling and underground development, would not be affected by the prohibition.

The final rule extends indefinitely the timeframe for which roads can be

TRSF_H_005609

constructed on areas currently under lease, which are estimated to be less than 1 million acres in extent, or less than 2 percent of the total acreage of inventoried roadless areas. The environmental effects of this extension fall between those described in the FEIS for the preferred alternative, which would have allowed road construction or reconstruction only for the duration of an existing lease, and those described in the FEIS under the potential social and economic mitigation measures, which would have provided an exception for mineral leasing activities within all inventoried roadless areas, with no limitations.

Relative to the preferred alternative, the final rule will somewhat diminish the potential beneficial effects of the overall prohibition on road construction and reconstruction in the areas affected by the minerals leasing exception, due to the greater amount of area potentially disturbed and the effects of associated activities. However, by limiting the area potentially affected to only those areas currently under lease, the potential extent of these activities and their impacts are identified and limited.

*Tongass National Forest Alternatives.* The Tongass Exempt alternative described in the FEIS was not selected. Allowing road construction and reconstruction on the Tongass National Forest to continue unabated would risk the loss of important roadless area values.

The Tongass Deferred alternative was not selected because the agency presently has sufficient information to make this decision, and the decisionmaking processes used have identified the environmental, social, and economic issues that must be addressed. There is no need to postpone the decision.

The Tongass Selected Areas alternative did not meet the purpose and need as well as the selected alternative. Important roadless area values would be lost or diminished because of the road construction, reconstruction, and timber harvesting activities that this alternative allowed.

By applying the final rule to the Tongass National Forest immediately, but allowing road construction, reconstruction, and the cutting, sale, and removal of timber from inventoried roadless areas where a notice of availability for a draft environmental impact statement for such activities has been published in the **Federal Register** prior to the date of publication of this rule in the **Federal Register**, a period of transition is available to affected communities while providing certainty for long term protection of these lands.

The Tongass National Forest has 261 MMBF of timber under contract and 386 MMBF under a notice of availability of a DEIS, FEIS, or Record of Decision. In addition, the Tongass has 204 MMBF available in roaded areas that is sold, has a Record of Decision, or is currently in the planning process. This total of 852 MMBF is enough timber volume to satisfy about seven years of estimated market demand. During the period of transition, an estimated 114 direct timber jobs and 182 total jobs would be affected. In the longer-term, an additional 269 direct timber jobs and 431 total jobs could be lost in Southeast Alaska if current demand trends continue and no other adjustments are provided to allow for more harvest from other parts of the forest. The exception for projects with a notice of availability for a draft environmental impact statement on the Tongass National Forest is because of the unique social and economic conditions where a disproportionate share of the impacts are experienced throughout the entire Southeast Alaska region and most heavily in a few communities.

*Decision Summary.* It is the decision of the Secretary of Agriculture to select Prohibition Alternative 3 and the Tongass Not Exempt Alternative identified in the FEIS as the final rule, with modifications. These modifications include: (1) an exception to the prohibition on road construction and reconstruction for mineral leasing in areas under mineral lease as of the date of publication of this rule in the **Federal Register**; (2) an exception to the timber harvest prohibition for the cutting, sale, or removal of timber in portions of inventoried roadless areas where construction of a classified road and subsequent timber harvest have substantially altered the roadless characteristics, and the road construction and subsequent timber harvest occurred after the area was designated an inventoried roadless area and prior to the date of publication of this rule in the **Federal Register**; and (3) the immediate application of the prohibitions to the Tongass National Forest with a provision that exempts road construction, road reconstruction, and the cutting, sale, or removal of timber if a notice of availability for a DEIS for such activities has been published in the **Federal Register** prior to the date of publication of this rule in the **Federal Register**. The final rule best meets the agency's goal of maintaining the health and contributions of existing inventoried roadless areas by preserving the relatively undisturbed characteristics of those areas, thereby

protecting watershed health and ecosystem integrity. In evaluating the comments received from the public, the Department believes that there is adequate relevant information to assess reasonably foreseeable significant adverse impacts (40 CFR 1502.22). The FEIS for this final rule documents the adverse impacts road construction and timber harvesting can have in inventoried roadless areas. This final rule reduces potential impacts to a greater degree and with more certainty than Prohibition Alternatives 1 and 2 and the other Tongass National Forest alternatives.

The final rule retains the ability to use timber harvesting for clearly defined purposes where necessary to meet ecological needs, allowing accomplishment of ecological objectives that Alternative 4 would preclude. Allowing clearly defined, limited timber harvest of generally small diameter trees will maintain a valuable management option for the agency to help improve habitat for threatened, endangered, proposed, or sensitive species recovery and to help restore ecological composition and structure, such as reducing the risk of uncharacteristic wildfire effects. As habitat fragmentation, subdivision, and urbanization of lands continues nationally, this decision allows the agency to avoid most human-caused fragmentation of National Forest System inventoried roadless areas to preserve management options for future generations. Finally, these inventoried roadless areas will remain available to all Americans for a variety of dispersed recreation opportunities.

The final rule:

(1) Recognizes that the agency's first and highest priority is to ensure sustainability for resources under its jurisdiction. It protects inventoried roadless areas from the activities that most directly threaten their fundamental characteristics through the alteration of natural landscapes and fragmentation of forestlands.

(2) Protects public health by promoting watershed health and maintaining important sources of clean drinking water for current and future generations.

(3) Responds to the major issues identified in public comments.

(4) Is fiscally responsible, and does not increase the financial burden by adding expensive roads the agency cannot afford to maintain.

(5) Exemplifies the agency's responsibility as a world leader in natural resource conservation by setting an example for the global community.

**Federal Register** / Vol. 66, No. 9 / Friday, January 12, 2001 / Rules and Regulations    **3267**

(6) Recognizes that some communities, such as those in Southeast Alaska, bear a disproportionate share of the burden, and offers assistance to mitigate those impacts.

This decision is expected to cause additional adverse economic effects to forest dependent communities because of the potential reduction in future timber harvest, mineral leasing, and other activities (FEIS Vol. 1, 3–326 to 3–350). However, the Department believes that the long-term ecological benefits to the nation of conserving these inventoried roadless areas outweigh the potential economic loss to those local communities. To reduce the economic impacts of this decision, the Chief of the Forest Service will seek to implement one or more of the following provisions of an economic transition program for communities most affected by application of the prohibitions in inventoried roadless areas:

(1) Provide financial assistance to stimulate community-led transition programs and projects in communities most affected by application of the prohibitions in inventoried roadless areas;

(2) Through financial support and action plans, attract public and private interests, both financial and technical, to aid in successfully implementing local transition projects and plans by coordinating with other Federal and State agencies; and

(3) Assist local, State, Tribal and Federal partners in working with those communities most affected by the final roadless area decision.

### Regulatory Certifications

This final rule was reviewed under USDA procedures, Executive Order (E.O.) 12866 on Regulatory Planning and Review, and the major rule provisions of the Small Business Regulatory Enforcement and Fairness Act (5 U.S.C. 800). The Office of Management and Budget (OMB) has determined that this is a major rule, because this rule may have an annual effect of $100 million or more on the economy or, in some sectors, may affect productivity, competition, or jobs. Consequently, the rule is subject to OMB review under E.O. 12866 and a regulatory impact analysis has been prepared for this final rule. This rule is not expected to interfere with an action taken or planned by another agency nor raise new legal or policy issues. This action will not alter the budgetary impact of entitlements, grants, user fees, or loan programs or the rights and obligations of recipients of such programs.

### Regulatory Impacts

*Summary of the Results of the Regulatory Impact Analysis.* Many of the benefits and costs associated with the final rule were not quantifiable. Therefore, many of the costs and benefits are described qualitatively. Although the analysis does not provide a quantitative measure of net benefits, the Department believes the benefits of the rule outweigh the costs.

Local-level analysis cannot easily incorporate the economic effects associated with nationally significant issues. Therefore, the Department believes the aggregate transactions costs (costs associated with the time and effort needed to make decisions) of local level decisions would be much higher than the transactions costs of a national policy, because of the controversy surrounding roadless area management.

National Forest System lands provide a variety of goods and services to the American public. Use of the national forests and grasslands for both commodities and amenity services varies over time, in response to changing market conditions, consumer preferences, and other factors. For the purpose of this analysis, the baseline describes the likely mix of goods and services from the national forests and grasslands in the near future in the absence of the final rule, which is likely to affect some goods and services, while having no effect on others. Details on the environmental effects of the final rule can be found in the Forest Service Roadless Area Conservation Final Environmental Impact Statement (FEIS).

Most of the benefits of the rule result from maintaining roadless areas in their current state, and, therefore, maintaining the current stream of benefits from these areas. The costs are primarily associated with lost opportunities, since the final rule would limit some types of development activities that might have occurred in the future without this rule. Table 1 summarizes the potential benefits and costs of the rule.

*Potential Benefits Of The Roadless Rule.* Undisturbed landscapes provide a variety of monetary and non-monetary benefits to the public. Many of these benefits are associated with the protection of ecological, social, and economic values in inventoried roadless areas.

Air and water quality would be maintained at a higher level than under the baseline. Higher water quality provides a higher level of protection for drinking water sources, reduces treatment costs for irrigation, reservoirs, and other downstream facilities and maintains the value of water-based recreation activities. Higher air quality protects not only values associated with human health, but also improves visibility and benefits recreation and adjacent private property values.

A greater degree of protection of biological diversity and threatened and endangered species would occur if roads and commodity timber harvest were prohibited in inventoried roadless areas as opposed to the baseline. As a result, ecological values would be maintained. Passive use values related to the existence of biological diversity and threatened and endangered species would be maintained, as well as values associated with protecting these areas for future generations.

A number of other benefits are associated with maintaining healthy wildlife and fish populations at a level higher than under the baseline. Some game species are likely to benefit from this protection, which would maintain quality hunting and fishing experiences both within inventoried roadless areas and beyond. Other types of recreation experiences, such as wildlife viewing, also would benefit.

Inventoried roadless areas are important in providing remote recreation opportunities. A greater number of acres in these recreation settings would be maintained than under the baseline. Remote areas are also important settings for many outfitter and guide services. Maintaining these areas increases the ability of the agency to accommodate additional demand for these types of recreation special use authorizations.

Inventoried roadless areas provide a remote recreation experience without the activity restrictions of Wilderness (for example, off-highway vehicle use and mountain biking). Maintaining roadless areas would likely lessen visitation pressure on Wilderness compared to the baseline.

The risk of introducing non-native invasive species would be reduced if road access were not available. This is beneficial to grazing permittees with allotments in inventoried roadless areas, and to collectors of non-timber forest products by maintaining forage quality and quantity, and forest products that cannot compete with invasive species. The reduced probability of introduction would also benefit forest health in inventoried roadless areas and would contribute to the maintenance of biological diversity.

Some planned timber sales in inventoried roadless areas are likely to cost more to prepare and sell than they realize in revenues received. To the extent that these sales will not take

TRSF_H_005611

place, a financial efficiency savings would be realized. Implementing the rule could result in agency cost savings. First, local appeals and litigation about some management activities in roadless areas could be reduced, which would avoid future costs. Secondly, the reduction in new miles of roads constructed would reduce the number of miles the agency is responsible for maintaining in the future, resulting in avoiding up to an additional $219,000 per year of costs.

*Potential Costs Of The Roadless Rule.* The prohibition on road construction, reconstruction, and timber harvest except for clearly defined, limited purposes would reduce development of roaded access to resources within inventoried roadless areas compared to the baseline. Roads are required for most timber sales to be economically feasible. For those sales that are financially profitable, the rule would reduce net revenues. In addition to lost revenue, there would be an estimated immediate impact of 461 fewer timber jobs and 841 total jobs, with an associated annual loss of $20.7 million in direct income and $36.2 million in total income. In the longer term, an additional 269 timber jobs and 431 total jobs could be affected from harvest reductions on the Tongass National Forest. The longer-term income effect was estimated at $12.4 million in direct income and $20.2 million in total income. A reduction in the timber program could also affect about 160 Forest Service jobs, with an additional 100 jobs affected on the Tongass in the longer term.

Jobs associated with road construction and reconstruction for timber harvest and other activities would also be fewer than under the baseline. Initially, between 43 and 51 direct jobs and between 88 and 104 total jobs could be affected by reduced road construction and reconstruction. An additional 39 direct jobs and 78 total jobs could be affected by harvest reductions on the Tongass National Forest in the longer term.

The impact on mineral resources will vary, depending on factors such as prices, technology change, and substitutes. Reasonable access to conduct exploration and development of valid claims for locatable minerals (metallic and nonmetallic minerals subject to appropriation under the General Mining Law of 1872) would continue. Such access may involve some level of road construction that, depending on the stage of exploration or development, could range from helicopters, temporary or unimproved

roads, more permanent, improved roads, or nonmotorized transport.

Exploration for and development of leasable minerals (such as oil, gas, coal, and geothermal) on areas not already under lease would likely be limited because roads are often needed for these activities. In the short-term, up to 546 direct and 3,095 total jobs could be affected, with direct annual income effects of $36 million and total income effects of $128 million. Payments to states could be reduced by about $3.2 million per year. Between 308 and 1,371 million tons of coal resources on the Grand Mesa, Uncompahgre, and Gunnison and Manti-LaSal National Forests could be unavailable for development as a result of this rule. About 873 million tons of phosphate resources on the Caribou National Forest may also be unavailable. Other inventoried roadless areas may contain additional coal and phosphate resources. An estimated mean of 11.3 trillion cubic feet of undiscovered natural gas and 550 million barrels of undiscovered oil resources could also be affected. Effects on saleable minerals (such as sand, gravel, stone, and pumice) are expected to be negligible.

New roads have the potential to reduce current operating costs for other users, for example grazing permittees and collectors of non-timber forest products, by allowing faster and easier access. These potential cost reductions would not be realized if road construction is prohibited. The agency, however, builds few roads for recreation, grazing, or collection of non-timber forest products, and this pattern is unlikely to change. New roads built for other purposes may provide additional access for recreationists, including hunters and anglers. Prohibiting construction of new roads would have minimal impacts on these groups, since all temporary roads and many of the other planned roads would be closed once the intended activity is concluded. Therefore, the number of additional road miles that would be available for recreational or other uses would be small.

Opportunities for some types of recreation special uses may be limited in the future. Developed recreation use and road-based recreation uses in general are more likely to occur at higher densities outside of inventoried roadless areas than under the baseline, since expansion into inventoried roadless areas would not occur. However, roads are rarely constructed into inventoried roadless areas for recreation purposes. The development of new ski areas within inventoried roadless areas would be unlikely. Other,

new non-recreation special uses may be limited in the future as well. Such special uses include communication sites and energy-related transmission uses (such as ditches and pipelines, and electric transmission lines).

There could be a slight increase in the risk from uncharacteristic wildland fire or insect and disease as a result of reduced opportunities for forest health treatments. However, the Forest Service would likely treat few acres of inventoried roadless areas regardless of the issuance of the Roadless Rule, since moderate and high risk forests in inventoried roadless areas would be given a low priority for treatment, unless there was an imminent threat to public safety, private property, water quality, or threatened and endangered species. While overall fire hazard can still be reduced without roads, restricted road access would likely increase the cost of treatments, which would result in fewer acres treated. Some fuel treatment techniques available under the baseline would not be economically or logistically feasible. Of the 14 million acres in inventoried roadless areas identified as potentially requiring fuel treatment, 6.5 million could still be treated with prescribed fire without mechanical pretreatment. The use of timber harvest for fuel management would be limited to those activities that reduce uncharacteristic wildfire effects through the cutting, sale, or removal of small diameter timber that maintains or improves one or more of the roadless characteristics. For the next five years, about 22,000 acres could be treated by the limited timber harvest allowed under the final rule. Although this is a significant decline in treatment acres compared to acres that would have been harvested under the baseline, the total acreage affected is less than 1 percent of all inventoried roadless area that potentially require mechanical pretreatment.

Agency costs could increase compared to the baseline for some types of activities. Fuel treatment and other ecological restoration treatment costs in inventoried roadless areas would likely increase, but the impact on agency costs is likely to be negligible since treatment in most inventoried roadless areas is a lower priority.

The goods and services that could not be produced from inventoried roadless areas without road construction are likely to be produced either on other parts of National Forest System land or on other lands. Substitute production could result in adverse environmental effects on these other lands. The following Table 1 summarizes the costs and benefits of the final rule.

TRSF_H_005612

TABLE 1.—SUMMARY OF COSTS AND BENEFITS OF THE ROADLESS AREA CONSERVATION RULE COMPARED TO THE BASELINE

| Category | Baseline | Final rule |
|---|---|---|
| Air quality [1] | Potential increase in dust, vehicle emissions associated with road use and management activities in inventoried roadless areas. | Air quality is maintained in inventoried roadless areas. |
| Water quality [1] | Potential increase in sediment associated with roads and management activities in inventoried roadless areas. | Water quality is maintained in inventoried roadless areas. |
| Land base available for dispersed recreation activities [1]. | Decrease in remote settings, increase in developed settings on National Forest System lands. | Current land base for remote and developed settings is maintained on National Forest System lands. |
| Quality of fishing and hunting for recreation, commercial, and subsistence users [1].. | Potential habitat degradation, increase in roaded access, and decrease in remote hunting and fishing opportunities. | Existing hunting and fishing quality and access in inventoried roadless areas maintained. Opportunities for remote experiences are maintained. |
| Forage quality for livestock grazing [1] | Increased risk of non-palatable invasive species. | Existing forage quality is maintained. |
| Non-timber forest products [1] | Increased risk of invasive species displacing desired products. | Non-timber forest products maintained at current levels. |
| Existence and bequest values [1] | Potential decrease due to loss of biological diversity and increased risks to threatened and endangered species habitat in inventoried roadless areas. | Values maintained at existing levels due to conservation of biological diversity and habitat for threatened and endangered species in inventoried roadless areas. |
| Agency costs associated with planning activities [1]. | No change in current costs associated with appeals and litigation on roadless area management. | Savings in costs associated with appeals and litigation on roadless area management. |
| Agency cost associated with road maintenance [2]. | Increase up to $219,000 per year in maintenance cost associated with new roads in inventoried roadless areas. | No increase in road maintenance costs in inventoried roadless areas. |
| Projected timber harvest (average annual) from inventoried roadless areas [3]. | 146.7 million board feet | 74.3 million board feet. |
| Timber related jobs [4] | No change to current estimates of future timber associated direct and total jobs. | Estimated job loss of 461 direct jobs and 841 total jobs. An additional 269 direct and 431 total jobs could be affected in Alaska in the longer term. |
| Timber related income [4] | No change to current estimates of future timber associated direct and total income. | Estimated annual income loss of about $20.7 million direct income and $36.2 million total income. An additional $12.4 million direct and $20.2 million total income could be affected in Alaska in the longer term. |
| Road construction jobs [5] | No change to current estimates of future road construction direct jobs. | Projected annual job loss ranging from 43 to 51 direct jobs and between 88 and 104 total jobs. An additional 39 direct and 78 total jobs could be affected in Alaska in the longer term. |
| Exploration and development for locatable minerals (gold, silver, lead, etc.) [1]. | Existing mineral availability continues subject to General Mining Law of 1872. | Access continues subject to General Mining Law of 1872. |
| Exploration and development for leasable minerals (oil, gas, coal, etc.) [1]. | Existing mineral availability continues along with current exploration and development costs. | Exploration and development in areas not under lease as of the date of publication of this rule and requiring roads would be precluded. |
| Leasable minerals related jobs [6] | No change to current estimates of future mineral associated direct and indirect jobs. | Potential effect on mining related employment is a decrease of 546 direct and 3,095 total jobs. |
| Leasable minerals related income [6] | No change to current estimates of future minerals associated direct and total income. | Potential effect on mining related annual income is $36.2 million less direct and $127.8 million less total income. |
| Payments to states for leasable minerals | Payments will continue to vary as extraction varies over time. | Payments associated with coal and phosphate could be reduced by $3.2 million per year. |
| Leasable mineral resources | No change to current estimates of available leasable resources. | About 873 million tons of phosphate and 308 to 1,371 million tons of coal would likely be unavailable for development. About 11.3 trillion cubic feet of undiscovered gas and 550 million barrels of undiscovered oil resources may be unavailable. |
| Exploration and development for salable minerals (sand, stone, gravel, pumice, etc.) [1]. | Existing mineral availability continues along with current exploration and development costs. | In a few isolated cases, development requiring roads may be precluded or costs may increase. |
| Operating costs for grazing permittees [1] | Increased access can potentially decrease cost. | No change in operating costs. |

TRSF_H_005613

Table 1.—Summary of Costs and Benefits of the Roadless Area Conservation Rule Compared to the Baseline—Continued

| Category | Baseline | Final rule |
|---|---|---|
| Operating costs for collectors of non-timber products [1]. | Increased access can potentially decrease cost. | No change in operating costs. |
| Special-use authorizations (such as communications sites, electric transmission lines, pipelines) [1]. | Current use and occupancies ......................... | Current use and occupancies not affected, future developments requiring roads excluded in inventoried roadless areas unless one of the exceptions applies. |
| Forest health [1] ................................. | Potential lower cost of treatment due to increased access. | Slightly increased risk because of fewer treatment opportunities. Cost of current treatments remains unchanged. |

[1] Analysis based on qualitative discussion.
[2] Analysis based on historic Agency data on expenditures.
[3] Analysis based on forest-level data on projected timber volumes in inventoried roadless areas.
[4] Analysis based on Agency data from Timber Sales Program Information System Reporting System (TSPIRS) and IMPLAN model multipliers.
[5] Analysis based on Agency estimates of historic expenditures and IMPLAN model multipliers.
[6] Analysis based on Agency production estimates and IMPLAN model multipliers.

*Summary of the Results of the Final Regulatory Flexibility Analysis.* The Department is promulgating a final rule for roadless area conservation that does not impose regulations on small entities. The rule would not suspend or modify any existing permit, contract, or other legal instrument authorizing the occupancy and use of National Forest System land.[1] The rule could affect future opportunities for small entities, but the agency cannot predict at any given time what authorized uses a small entity might want to pursue on National Forest System lands.

Data are limited for linking the proposed rule to effects on small businesses. The agency does not typically collect information about the size of businesses that seek permission to operate on National Forest System lands. The agency sought information to the extent possible by specifically requesting additional information in the initial regulatory flexibility analysis.

The rulemaking has the potential to affect a subset of small businesses that may seek opportunities on National Forest System lands in the future. The primary effect of the rule on small businesses is the potential to affect the future supply of commodity outputs or commercial opportunities for businesses. The change in resource availability is expected to be small across most regions in the country. Therefore, future business opportunities are not likely to be reduced to any great extent in comparison to continuation of current management policies. However, the effects may be more pronounced in the Intermountain and Alaska Regions, with the effects in Alaska increasing in the longer term.

Small businesses in the wood products sector most likely to be affected are logging and sawmill operations. Reductions in the harvest of softwood sawtimber, particularly in the western U.S., are most likely to affect small businesses, since these sectors are dominated by small business. With the exception of the Intermountain (Utah, Nevada, western Wyoming, and southern Idaho) and Alaska Regions, reductions in harvest are estimated to range from less than one percent to four percent. The reduction in the Intermountain Region is estimated to be nine percent. Harvest effects on the Tongass National Forest will be reduced about 18 percent in the short-term, but in the longer-term, harvest could be reduced by about 60 percent absent further adjustments to the Tongass Land and Resource Management Plan.

In the mining sector, small businesses most likely to be affected are businesses involved in the exploration and development of leasable minerals. The final Roadless Area Conservation rule will affect exploration and development for leasable minerals in inventoried roadless areas in the future where road construction is required, except in areas presently under lease.

The potential effects on small businesses involved in livestock grazing and the collection of non-timber forest products are expected to be negligible. There will be fewer roads available for use in the future under the final rule, but the number of miles that would have been built in the next five years and that would have remained open for use is minor compared to the entire National Forest System road system.

Special use authorizations on National Forest System land could be affected by the final rule, if road access is required. Most of the special uses potentially affected are dominated by large businesses, such as businesses in communication, electric services, gas production and distribution, and resort development. Small businesses with outfitter and guide permits are expected to benefit from the final rule, since these businesses are often dependent on providing services to recreationists interested in remote recreation activities that are often found in inventoried roadless areas.

The effect of the final rulemaking on small governmental jurisdictions is tied to possible reductions in commodity outputs in cases where some portion of federal receipts is returned to the states for distribution to counties, and to changes in the jurisdiction's economic base from changes in employment and business opportunities related to National Forest System outputs and management. Payments to states from timber receipts will be unaffected by the final Roadless Rule through 2006 because the "Secure Rural Schools and Community Self-Determination Act of 2000" was signed into law on October 30 (Pub. L. 106–393). This legislation allows counties to select a payment based on historic payment levels rather than payments based on current receipts. However, this legislation does not affect revenue sharing of federal receipts from mineral leasing on national grasslands and from public domain lands of the national forests. Therefore, the final rule may result in a reduction in those receipts in the future, which would affect revenues shared with states and counties. The agency has also chosen to pursue funds to assist communities undergoing economic transition resulting from implementation of the final Roadless Rule. Such assistance could include financial assistance to stimulate community-led transition programs and projects, support to attract public and

---

[1] Because the roadless rule does not directly regulate small entities, the Department does not believe the Regulatory Flexibility Act applies to this rule.

private interests in implementing local transition projects, coordination with other Federal and State agencies, and assisting local, State, Tribal, and Federal partners to work with the most affected communities. The Forest Service will pursue a six-year economic transition program. The Economic Adjustment Program will be used to fund or support projects that will be specific to the needs of individual communities and important to the national forest or grassland. The Forest Service anticipates requesting $72.5 million in support of these activities between fiscal years 2001 and 2006.

**Environmental Impact**

*The Endangered Species Act of 1973, As Amended.* A biological evaluation was prepared which analyzed the potential effects of the action alternatives on threatened, endangered, and proposed species. This evaluation, along with other supporting documentation for the rule, was provided to the U.S. Fish and Wildlife Service and the National Marine Fisheries Service as part of consultation and conferencing under the Endangered Species Act. Both agencies concurred with the determination in the biological evaluation that all of the action alternatives analyzed in the biological evaluation may affect, but are not likely to adversely affect threatened or endangered species or adversely modify designated critical habitat; are not likely to jeopardize proposed species or adversely modify proposed critical habitat; and may beneficially affect threatened, endangered, and proposed species and critical habitat. Copies of these letters of concurrence are in the project record and can be viewed at the Roadless Area Conservation project website.

*Other Required Disclosures.* The agency has prepared a final environmental impact statement in concert with this rule. In it, the direct, indirect, and cumulative effects of the final rule and alternatives are disclosed. None of the prohibition alternatives are an action that requires consultation under the Fish and Wildlife Coordination Act because they do not require water to be impounded or diverted. The FEIS may be obtained from various sources as indicated in the **ADDRESSES** section of this document.

The Indiana Department of Natural Resources (IDNR) questioned whether the agency had adequately taken into account effects on historic properties and expressed concern that the rule would cause "neglect of historic properties." The IDNR urged the Forest Service to consult with the Indiana State Historic Preservation Officer pursuant to Section 106 of the National Historic Preservation Act (NHPA). First, the FEIS does evaluate and display the effects of the final rule regarding cultural resources (FEIS Vol. 1, 3–232 to 3–237). The FEIS also makes clear that the prohibitions will not inhibit existing access to historic sites. As for the Section 106 NHPA process, this rulemaking does not constitute an "undertaking" as defined in 36 CFR 800.16. The regulations established by the Advisory Council for Historic Preservation make clear that once an agency determines that it has no undertaking, or that its undertaking has no potential to affect historic properties, the agency has no further Section 106 obligations.

**Controlling Paperwork Burdens on the Public**

This rule does not contain any record keeping or reporting requirements or other information collection requirements as defined in 5 CFR part 1320 and, therefore, imposes no paperwork burden on the public. Accordingly, the review provisions of the Paperwork Reduction Act of 1995 (44 U.S.C. 3501, *et seq.*) and implementing regulations at 5 CFR part 1320 do not apply.

**Unfunded Mandates Reform**

Pursuant to Title II of the Unfunded Mandates Reform Act of 1995 (2 U.S.C. 1531–1538), the Department has assessed the effects of this proposed rule on State, local, and Tribal governments, and on the private sector. This proposed rule does not compel the expenditure of $100 million or more by any State, local, or Tribal government, or anyone in the private sector. Therefore, a statement under Section 202 of the Act is not required.

**No Takings Implications**

This rule has been reviewed for its impact on private property rights under Executive Order 12630. The Department determined that this proposed rule does not pose a risk of taking Constitutionally protected private property; in fact, the proposed rule honors access to private property pursuant to statute and to outstanding or reserved rights.

**Civil Justice Reform Act**

This rule has been reviewed under Executive Order 12988, Civil Justice Reform. The proposed revision: (1) preempts all State and local laws and regulations that are found to be in conflict with or that would impede its full implementation; (2) does not retroactively affect existing permits, contracts, or other instruments authorizing the occupancy and use of National Forest System lands; and (3) does not require administrative proceedings before parties may file suit in court challenging these provisions.

**Federalism and Consultation with Tribal Governments**

The agency considered this rule under the requirements of Executive Order 12612 and found the rule will not have substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, the agency determined that no further assessment on federalism implications is necessary at this time. In addition, the consultation requirements under Executive Order 13132, effective November 2, 1999 were reviewed. This new Order calls for enhanced consultation with State and local government officials and emphasizes increased sensitivity to their concerns.

Forest Service line officers in the field were asked to make contact with Tribes to ensure awareness of the initiative and of the rulemaking process. Outreach to Tribes has been conducted at the national forest and grassland level, which is how Forest Service government-to-government dialog with Tribes is typically conducted.

Outreach to State and local governments has taken place both in the field and Washington offices. Forest Service officials have contacted State and local governmental officials and staffs to explain the notice of intent and the rulemaking process. The agency met with and responded to a variety of information requests from local officials and State organizations, such as the National Governors Association and the Western Governors Association.

In the development of this rule comments received from States, Tribes, and local governments in response to the notice of intent to prepare an environmental impact statement published October 19, 1999 (64 FR 56306) were carefully considered. Following publication of the proposed rule, the agency met with State, Tribal, and local government officials to explain and clarify the proposed rule and the accompanying environmental impact statement. The extent to which additional consultation was appropriate under Executive Order 13132 was considered. In addition, the Forest Service responsible official will seek input and participation by State, local, and Tribal officials in the early stages of forest and project planning regarding

TRSF_H_005615

subsequent decisions for inventoried roadless areas.

**List of Subjects in 36 CFR Part 294**

Forests and forest products, Highways and roads, Land and resource management planning, National forests, Navigation (air), Recreation and recreation areas, and Wilderness areas.

For the reasons set forth in this preamble, part 294 of Title 36 of the Code of Federal Regulations is amended as follows:

**PART 294—SPECIAL AREAS**

1. Add and reserve §§ 294.3–294.9, designate §§ 294.1 through 294.9 as subpart A, and add a subpart heading to read as follows:

**Subpart A—Miscellaneous Provisions**

2. Remove the authority citations that follow §§ 294.1 and 294.2 and add an authority citation for the newly designated Subpart A to read as follows:

**Authority:** 16 U.S.C. 472, 551, and 1131.

3. Add a new Subpart B to read as follows:

**Subpart B—Protection of Inventoried Roadless Areas**

Sec.
294.10   Purpose.
294.11   Definitions.
294.12   Prohibition on road construction and road reconstruction in inventoried roadless areas.
294.13   Prohibition on timber cutting, sale, or removal in inventoried roadless areas.
294.14   Scope and applicability.

**Authority:** 16 U.S.C. 472, 529, 551, 1608, 1613; 23 U.S.C. 201, 205.

**Subpart B—Protection of Inventoried Roadless Areas**

**§ 294.10   Purpose.**

The purpose of this subpart is to provide, within the context of multiple-use management, lasting protection for inventoried roadless areas within the National Forest System.

**§ 294.11   Definitions.**

The following terms and definitions apply to this subpart:

*Inventoried roadless areas.* Areas identified in a set of inventoried roadless area maps, contained in Forest Service Roadless Area Conservation, Final Environmental Impact Statement, Volume 2, dated November 2000, which are held at the National headquarters office of the Forest Service, or any subsequent update or revision of those maps.

*Responsible official.* The Forest Service line officer with the authority

and responsibility to make decisions regarding protection and management of inventoried roadless areas pursuant to this subpart.

*Road.* A motor vehicle travelway over 50 inches wide, unless designated and managed as a trail. A road may be classified, unclassified, or temporary.

(1) *Classified road.* A road wholly or partially within or adjacent to National Forest System lands that is determined to be needed for long-term motor vehicle access, including State roads, county roads, privately owned roads, National Forest System roads, and other roads authorized by the Forest Service.

(2) *Unclassified road.* A road on National Forest System lands that is not managed as part of the forest transportation system, such as unplanned roads, abandoned travelways, and off-road vehicle tracks that have not been designated and managed as a trail; and those roads that were once under permit or other authorization and were not decommissioned upon the termination of the authorization.

(3) *Temporary road.* A road authorized by contract, permit, lease, other written authorization, or emergency operation, not intended to be part of the forest transportation system and not necessary for long-term resource management.

*Road construction.* Activity that results in the addition of forest classified or temporary road miles.

*Road maintenance.* The ongoing upkeep of a road necessary to retain or restore the road to the approved road management objective.

*Road reconstruction.* Activity that results in improvement or realignment of an existing classified road defined as follows:

(1) *Road improvement.* Activity that results in an increase of an existing road's traffic service level, expansion of its capacity, or a change in its original design function.

(2) *Road realignment.* Activity that results in a new location of an existing road or portions of an existing road, and treatment of the old roadway.

*Roadless area characteristics.* Resources or features that are often present in and characterize inventoried roadless areas, including:

(1) High quality or undisturbed soil, water, and air;

(2) Sources of public drinking water;

(3) Diversity of plant and animal communities;

(4) Habitat for threatened, endangered, proposed, candidate, and sensitive species and for those species dependent on large, undisturbed areas of land;

(5) Primitive, semi-primitive non-motorized and semi-primitive motorized classes of dispersed recreation;

(6) Reference landscapes;

(7) Natural appearing landscapes with high scenic quality;

(8) Traditional cultural properties and sacred sites; and

(9) Other locally identified unique characteristics.

**§ 294.12   Prohibition on road construction and road reconstruction in inventoried roadless areas.**

(a) A road may not be constructed or reconstructed in inventoried roadless areas of the National Forest System, except as provided in paragraph (b) of this section.

(b) Notwithstanding the prohibition in paragraph (a) of this section, a road may be constructed or reconstructed in an inventoried roadless area if the Responsible Official determines that one of the following circumstances exists:

(1) A road is needed to protect public health and safety in cases of an imminent threat of flood, fire, or other catastrophic event that, without intervention, would cause the loss of life or property;

(2) A road is needed to conduct a response action under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) or to conduct a natural resource restoration action under CERCLA, Section 311 of the Clean Water Act, or the Oil Pollution Act;

(3) A road is needed pursuant to reserved or outstanding rights, or as provided for by statute or treaty;

(4) Road realignment is needed to prevent irreparable resource damage that arises from the design, location, use, or deterioration of a classified road and that cannot be mitigated by road maintenance. Road realignment may occur under this paragraph only if the road is deemed essential for public or private access, natural resource management, or public health and safety;

(5) Road reconstruction is needed to implement a road safety improvement project on a classified road determined to be hazardous on the basis of accident experience or accident potential on that road;

(6) The Secretary of Agriculture determines that a Federal Aid Highway project, authorized pursuant to Title 23 of the United States Code, is in the public interest or is consistent with the purposes for which the land was reserved or acquired and no other reasonable and prudent alternative exists; or

(7) A road is needed in conjunction with the continuation, extension, or

TRSF_H_005616

renewal of a mineral lease on lands that are under lease by the Secretary of the Interior as of January 12, 2001 or for a new lease issued immediately upon expiration of an existing lease. Such road construction or reconstruction must be conducted in a manner that minimizes effects on surface resources, prevents unnecessary or unreasonable surface disturbance, and complies with all applicable lease requirements, land and resource management plan direction, regulations, and laws. Roads constructed or reconstructed pursuant to this paragraph must be obliterated when no longer needed for the purposes of the lease or upon termination or expiration of the lease, whichever is sooner.

(c) Maintenance of classified roads is permissible in inventoried roadless areas.

### § 294.13  Prohibition on timber cutting, sale, or removal in inventoried roadless areas.

(a) Timber may not be cut, sold, or removed in inventoried roadless areas of the National Forest System, except as provided in paragraph (b) of this section.

(b) Notwithstanding the prohibition in paragraph (a) of this section, timber may be cut, sold, or removed in inventoried roadless areas if the Responsible Official determines that one of the following circumstances exists. The cutting, sale, or removal of timber in these areas is expected to be infrequent.

(1) The cutting, sale, or removal of generally small diameter timber is needed for one of the following purposes and will maintain or improve one or more of the roadless area characteristics as defined in § 294.11.

(i) To improve threatened, endangered, proposed, or sensitive species habitat; or

(ii) To maintain or restore the characteristics of ecosystem composition and structure, such as to reduce the risk of uncharacteristic wildfire effects, within the range of variability that would be expected to occur under natural disturbance regimes of the current climatic period;

(2) The cutting, sale, or removal of timber is incidental to the implementation of a management activity not otherwise prohibited by this subpart;

(3) The cutting, sale, or removal of timber is needed and appropriate for personal or administrative use, as provided for in 36 CFR part 223; or

(4) Roadless characteristics have been substantially altered in a portion of an inventoried roadless area due to the construction of a classified road and subsequent timber harvest. Both the road construction and subsequent timber harvest must have occurred after the area was designated an inventoried roadless area and prior to January 12, 2001. Timber may be cut, sold, or removed only in the substantially altered portion of the inventoried roadless area.

### § 294.14  Scope and applicability.

(a) This subpart does not revoke, suspend, or modify any permit, contract, or other legal instrument authorizing the occupancy and use of National Forest System land issued prior to January 12, 2001.

(b) This subpart does not compel the amendment or revision of any land and resource management plan.

(c) This subpart does not revoke, suspend, or modify any project or activity decision made prior to January 12, 2001.

(d) This subpart does not apply to road construction, reconstruction, or the cutting, sale, or removal of timber in inventoried roadless areas on the Tongass National Forest if a notice of availability of a draft environmental impact statement for such activities has been published in the **Federal Register** prior to January 12, 2001.

(e) The prohibitions and restrictions established in this subpart are not subject to reconsideration, revision, or rescission in subsequent project decisions or land and resource management plan amendments or revisions undertaken pursuant to 36 CFR part 219.

(f) If any provision of the rules in this subpart or its application to any person or to certain circumstances is held invalid, the remainder of the regulations in this subpart and their application remain in force.

Dated: January 5, 2001.

**Dan Glickman,**

*Secretary.*

[FR Doc. 01–726 Filed 1–5–01; 3:45 pm]

**BILLING CODE 3410–11–P**

TRSF_H_005617

Justin Augustine (CA Bar No. 235561)
Center for Biological Diversity
1212 Broadway, Suite 800
Oakland, CA 94612
(916) 597-6189
jaugustine@biologicaldiversity.org

Brian Segee (CA Bar No. 200795)
Center for Biological Diversity
660 S. Figueroa Street, Suite 1000
Los Angeles, CA  90017
(805) 750-8852
bsegee@biologicaldiversity.org

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **LOS PADRES FORESTWATCH, et al.** | Case No. 2:19-cv-05925-VAP-KS |
| Plaintiffs, | |
| v. | **DECLARATION OF BRYANT BAKER** |
| **UNITED STATES FOREST SERVICE, et al.** | |
| Federal Defendants, | Hearing date: November 7, 2022 |
| and | Hearing time: 11:00 AM |
| | Before: Hon. Virginia A. Phillips |
| **AMERICAN FOREST RESOURCE COUNCIL, et al.** | |
| Defendant-Intervenors. | |

1  I, Bryant Baker, declare as follows:

2  1.  I submit this declaration in support of Plaintiffs' Motion for Summary

3  Judgment in this case regarding the Forest Service's plans to implement the

4  Tecuya Project in the Antimony Inventoried Roadless Area in Los Padres National

5  Forest. I have personal knowledge of the matters stated herein and, if called as a

6  witness, would and could competently testify thereto.

7  2.  I am a resident of Goleta, California and have been involved in

8  monitoring forest management on Los Padres National Forest for over nearly six

9  years. I am the Director of Conservation and Research of Los Padres ForestWatch

10  (LPFW) and I am also a member of the organization. I have a bachelor's and a

11  master's degree in Environmental Science from the University of Arkansas. Before

12  working at LPFW, I spent five years conducting aquatic biogeochemical research

13  and also worked at a watershed conservation organization. I am a published

14  scientist, authoring and co-authoring six scientific papers in peer-reviewed

15  journals, three of which involve fire ecology and management in California.

16  3.  LPFW's mission is to protect and restore public lands throughout the

17  Central Coast region through policy and legal advocacy, scientific collaboration,

18  and community outreach. ForestWatch focuses its work throughout Los Padres

19  National Forest and nearby public lands. To further its mission and protect the

20  interests of its members and supporters in preserving public lands, ForestWatch

21  monitors forest conditions and activities in Los Padres National Forest and reviews

22  and comments on proposed Forest Service projects. ForestWatch also organizes

23  habitat restoration and forest stewardship projects using crews of volunteers,

24  making the forest a better place for all to enjoy and visit. In addition, ForestWatch

25  programs seek to engage underserved youth by providing them with opportunities

26  to explore nature and foster an appreciation of the outdoors.

27

28

4.      LPFW and its members, including myself, will be harmed by the Forest Service's implementation of the Tecuya Project due to the impacts of the logging in the Project area on the forest itself, the Antimony IRA, and various wildlife species, which we monitor and are trying to protect. LPFW and its members, including me, will be harmed by the loss of intact forest structure and our ability to observe wildlife due to the proposed Tecuya Project logging.

5.      I have visited the Antimony IRA part of the Tecuya Project area, including on March 28, July 26, October 22, and November 11 in 2018, on October 25, 2019, on September 23 and November 6, 2021, and on May 25, 2022. On all occasions I went to the area to enjoy forest scenery, observe wildlife, take nature photographs, and hike. I intend to return in October 2022 for recreation and to observe the forest and wildlife, and I intend to visit yet again in Spring 2023. I also expect to continue monitoring and visiting this area for many years to ensure that the old-growth forest and its wildlife habitat are properly cared for.

6.      While hiking through the Tecuya Project area in the Antimony IRA, I have observed mature stands of forest. The Tecuya Project proposes to allow logging of this forest. Logging projects have historically caused a disruption of my activities in the logged areas because the forest is no longer reflective of natural forest characteristics. The Tecuya Project will harm my interests in observing and enjoying intact forests and associated wildlife.

7.      The Forest Service proposes to allow logging in the Tecuya Project area as early as November of 2022, which will harm my future ability to view the forest and wildlife species that I am trying to protect in the Project area.

8.      I believe that a favorable court decision finding that the Forest Service failed to comply with the Roadless Rule, and halting implementation of the Tecuya Project until the agency revises its analysis, would redress the injuries I have described.

I declare, under penalty of perjury, that the foregoing is true and correct to the best of my knowledge and recollection.

Executed on September 22, 2022 in Santa Barbara, California.

_____
BRYANT BAKER

Justin Augustine (CA Bar No. 235561)
Center for Biological Diversity
1212 Broadway, Suite 800
Oakland, CA 94612
(916) 597-6189
jaugustine@biologicaldiversity.org

Brian Segee (CA Bar No. 200795)
Center for Biological Diversity
226 W. Ojai Ave., Ste. 101-442
Ojai, CA 93023-3278
(805) 750-8852
bsegee@biologicaldiversity.org

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **LOS PADRES FORESTWATCH, et al.** ) | |
| ) | Case No. 2:19-cv-05925-VAP-KS |
| Plaintiffs, ) | |
| ) | **PLAINTIFFS' NOTICE OF** |
| v. ) | **APPEAL** |
| ) | |
| **UNITED STATES FOREST SERVICE,** ) | |
| **et al.** ) | |
| ) | |
| Defendants, ) | |
| ) | |
| and ) | |
| ) | |
| **AMERICAN FOREST RESOURCE** ) | |
| **COUNCIL, et al.** ) | |
| ) | |
| Defendant-Intervenors. ) | |
| _____ ) | |

# NOTICE OF APPEAL

Notice is hereby given that Los Padres ForestWatch, the Center for Biological Diversity, and Earth Island Institute, Plaintiffs in the above-named case, appeal to the United States Court of Appeals for the Ninth Circuit from the district court's Order (ECF No. 118) denying Plaintiffs' Motion for Summary Judgment and granting Defendants' Motion for Summary Judgment, which was entered in this action on December 5, 2022. Judgment was entered on January 3, 2023 (ECF No. 119).

Pursuant to Ninth Circuit Court of Appeals Rule 3-2(b), a Representation Statement is attached.

Respectfully submitted this 13th day of January, 2023,

/s/ Justin Augustine
Justin Augustine
Brian Segee
CENTER FOR BIOLOGICAL DIVERSITY

Attorneys for Plaintiffs

ACCO,NORTHERN,(KSx),APPEAL,CLOSED,DISCOVERY,REOPENED

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA (Western Division - Los Angeles)
## CIVIL DOCKET FOR CASE #: 2:19-cv-05925-VAP-KS

| | |
|---|---|
| Los Padres Forestwatch et al v. United States Forest Service et al | Date Filed: 07/10/2019 |
| Assigned to: Judge Virginia A. Phillips | Date Terminated: 01/03/2023 |
| Referred to: Magistrate Judge Karen L. Stevenson | Jury Demand: None |
| Case in other court: 9th CCA, 20-55859 | Nature of Suit: 893 Environmental Matters |
|                Ninth Circuit, 23-55054 | Jurisdiction: U.S. Government Defendant |
| Cause: 28:2201 Declaratory Judgment | |

**Plaintiff**

**Los Padres Forestwatch**
        represented by  **Brian P. Segee**
Center for Biological Diversity
226 West Ojai Avenue Suite 101-442
Ojai, CA 93023-3278
805-750-8852
Email: bsegee@biologicaldiversity.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Justin Augustine**
Center for Biological Diversity
1212 Broadway Suite 800
Oakland, CA 94612
415-436-9682
Email: jaugustine@biologicaldiversity.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Earth Island Institute**
        represented by  **Brian P. Segee**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Justin Augustine**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Center For Biological Diversity**
        represented by  **Brian P. Segee**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Justin Augustine**
(See above for address)

**ER-123**

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

| | | |
|---|---|---|
| **United States Forest Service** | represented by | **Nicole Marie Smith** |

US Department of Justice
Environment and Natural Resources
Division
150 M Street NE
Washington, DC 20002
202-305-0368
Fax: 202-305-0275
Email: nicole.m.smith@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sean Christian Duffy**
US Department of Justice
Environment and Natural Resources
Divison
Natural Resources Section
150 M Street NE
Washington, DC 20002
202-305-0445
Fax: 202-305-0506
Email: sean.c.duffy@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Bridget Kennedy McNeil**
US Department of Justice
Environment and Natural Resources
Division
999 18th Street South Terrace Suite 370
Denver, CO 80202
303-844-1484
Fax: 303-844-1350
Email: bridget.mcneil@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

| | | |
|---|---|---|
| **Christopher Stubbs** | represented by | **Nicole Marie Smith** |

*Supervisor, Los Padres National Forest*
*Substituted for*
Kevin B. Elliott

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sean Christian Duffy**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**ER-124**

**Bridget Kennedy McNeil**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**United States Fish and Wildlife Service**    represented by    **Nicole Marie Smith**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sean Christian Duffy**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Bridget Kennedy McNeil**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Intervenor Defendant**

**American Forest Resource Council**    represented by    **Lawson E. Fite**
American Forest Resource Council
700 NE Multnomah Street Suite 320
Portland, OR 97232
503-222-9505
Fax: 503-222-3255
Email: lfite@martenlaw.com
*TERMINATED: 08/23/2022*
*PRO HAC VICE*

**Matthew M. Gurvitz**
Venable LLP
2049 Century Park East No 2300
Los Angeles, CA 90067
310-229-9900
Fax: 310-229-9901
Email: mgurvitz@willkie.com
*TERMINATED: 07/27/2022*

**Nicole Norma King**
Venable LLP
2049 Century Park Park East Suite 2300
Los Angeles, CA 90067
310-229-9900
Fax: 310-229-9901
Email: nnking@venable.com
*ATTORNEY TO BE NOTICED*

**Sara Ghafouri**
American Forest Resource Council
700 NE Multnomah Street Suite 320

**ER-125**

Portland, OR 97232
503-222-9505
Fax: 505-222-3255
Email: sghafouri@amforest.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**California Forestry Association**          represented by     **Lawson E. Fite**
(See above for address)
*TERMINATED: 08/23/2022*
*PRO HAC VICE*

**Matthew M. Gurvitz**
(See above for address)
*TERMINATED: 07/27/2022*

**Nicole Norma King**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sara Ghafouri**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**Associated California Loggers**          represented by     **Lawson E. Fite**
(See above for address)
*TERMINATED: 08/23/2022*
*PRO HAC VICE*

**Matthew M. Gurvitz**
(See above for address)
*TERMINATED: 07/27/2022*

**Nicole Norma King**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sara Ghafouri**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mediator (ADR Panel)**

**David E Cranston**          represented by     **David Edward Cranston**
Greenberg Glusker Fields Claman and
Machtinger LLP
2049 Century Park East Suite 2600
Los Angeles, CA 90067
310-553-3610
Fax: 310-553-0687

**ER-126**

Email: dcranston@ggfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 07/10/2019 | 1 | COMPLAINT with filing fee previously paid (400.00 paid on 07/10/2019, receipt number 0973-24056833), filed by Plaintiff Los Padres Forestwatch, Center For Biological Diversity, Earth Island Institute. (Attorney Justin Augustine added to party Center For Biological Diversity(pty:pla), Attorney Justin Augustine added to party Earth Island Institute(pty:pla), Attorney Justin Augustine added to party Los Padres Forestwatch(pty:pla))(Augustine, Justin) (Entered: 07/10/2019) |
| 07/10/2019 | 2 | CIVIL COVER SHEET filed by Plaintiffs Center For Biological Diversity, Earth Island Institute, Los Padres Forestwatch. (Augustine, Justin) (Entered: 07/10/2019) |
| 07/10/2019 | 3 | NOTICE of Interested Parties filed by Plaintiff Center For Biological Diversity, Earth Island Institute, Los Padres Forestwatch, (Augustine, Justin) (Entered: 07/10/2019) |
| 07/10/2019 | 4 | Request for Clerk to Issue Summons on Complaint (Attorney Civil Case Opening), 1 filed by Plaintiff Center For Biological Diversity, Earth Island Institute, Los Padres Forestwatch. (Augustine, Justin) (Entered: 07/10/2019) |
| 07/10/2019 | 5 | NOTICE OF ASSIGNMENT to District Judge Fernando M. Olguin and Magistrate Judge Suzanne H. Segal. (car) (Entered: 07/10/2019) |
| 07/10/2019 | 6 | NOTICE TO PARTIES OF COURT-DIRECTED ADR PROGRAM filed. (car) (Entered: 07/10/2019) |
| 07/10/2019 | 7 | 60 DAY Summons Issued re Complaint (Attorney Civil Case Opening), 1 as to Defendants Kevin B. Elliott, United States Fish and Wildlife Service, United States Forest Service. (car) (Entered: 07/10/2019) |
| 07/26/2019 | 8 | TEXT ONLY ENTRY by Chambers of Judge Fernando M. Olguin. This matter has been assigned to District Judge Fernando M. Olguin. The Court refers counsel to the Court's Initial Standing Order found on the Court's Website under Judge Olguin's Procedures and Schedules. Please read this Order carefully.THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (vdr) TEXT ONLY ENTRY (Entered: 07/26/2019) |
| 07/29/2019 | 9 | NOTICE of Related Case(s) filed by plaintiff Earth Island Institute, Los Padres Forestwatch, Mountain Communities for Fire Safety. Related Case(s): 2:19-cv-6539-CAS-AFM (Voss, Rene) (Entered: 07/29/2019) |
| 08/14/2019 | 10 | NOTICE of Appearance filed by attorney Sean Christian Duffy on behalf of Defendants Kevin B. Elliott, United States Fish and Wildlife Service, United States Forest Service (Attorney Sean Christian Duffy added to party Kevin B. Elliott (pty:dft), Attorney Sean Christian Duffy added to party United States Fish and Wildlife Service(pty:dft), Attorney Sean Christian Duffy added to party United States Forest Service(pty:dft))(Duffy, Sean) (Entered: 08/14/2019) |
| 08/21/2019 | 11 | PROOF OF SERVICE Executed by Plaintiff Los Padres Forestwatch, Center For Biological Diversity, Earth Island Institute, upon Defendant All Defendants. Service of the Summons and Complaint were executed upon the United States Attorneys Office by delivering a copy to Civil Process Clerk. Executed upon the Attorney Generals Office of the United States by delivering a copy to William Barr. Executed upon the officer agency or corporation by delivering a copy to United States Forest Service; Kevin B. Elliott; United States Fish and Wildlife Service. Service was executed in compliance with |

**ER-127**

| | | Federal Rules of Civil Procedure. Due diligence declaration NOT attached. Registered or certified mail return receipt attached. Original Summons returned. (Augustine, Justin) (Entered: 08/21/2019) |
|---|---|---|
| 09/09/2019 | 12 | ANSWER to Complaint (Attorney Civil Case Opening), 1 filed by Defendant Kevin B. Elliott, United States Fish and Wildlife Service, United States Forest Service.(Duffy, Sean) (Entered: 09/09/2019) |
| 09/10/2019 | 13 | ORDER SETTING SCHEDULING CONFERENCE by Judge Fernando M. Olguin. Scheduling Conference set for 11/14/2019 at 10:00 AM before Judge Fernando M. Olguin. (cw) (Entered: 09/10/2019) |
| 09/12/2019 | 14 | NOTICE of Appearance filed by attorney Nicole Marie Smith on behalf of Defendants Kevin B. Elliott, United States Fish and Wildlife Service, United States Forest Service (Attorney Nicole Marie Smith added to party Kevin B. Elliott (pty:dft), Attorney Nicole Marie Smith added to party United States Fish and Wildlife Service(pty:dft), Attorney Nicole Marie Smith added to party United States Forest Service(pty:dft))(Smith, Nicole) (Entered: 09/12/2019) |
| 09/30/2019 | 15 | FIRST AMENDED COMPLAINT against Defendants All Defendants amending Complaint (Attorney Civil Case Opening), 1 , filed by Plaintiffs Los Padres Forestwatch, Center For Biological Diversity, Earth Island Institute(Augustine, Justin) (Entered: 09/30/2019) |
| 10/09/2019 | 16 | Joint STIPULATION for Relief from THE SEPTEMBER 10, 2019, ORDER SETTING SCHEDULING CONFERENCE filed by Plaintiffs Center For Biological Diversity, Earth Island Institute, Los Padres Forestwatch. (Attachments: # 1 Proposed Order)(Augustine, Justin) (Entered: 10/09/2019) |
| 10/10/2019 | 17 | ORDER 16 by Judge Fernando M. Olguin. The Parties do not need to meet in person to comply with paragraph 2 of the Order Setting Scheduling Conference and instead can meet by phone. (iv) (Entered: 10/10/2019) |
| 10/15/2019 | 18 | ANSWER to Amended Complaint/Petition 15 filed by Defendant Kevin B. Elliott, United States Fish and Wildlife Service, United States Forest Service.(Smith, Nicole) (Entered: 10/15/2019) |
| 10/17/2019 | 19 | NOTICE OF MOTION AND MOTION to Intervene filed by Proposed Defendant-Intervenors American Forest Resource Council, California Forestry Association, Associated California Loggers. Motion set for hearing on 11/14/2019 at 10:00 AM before Judge Fernando M. Olguin. (Attachments: # 1 Memorandum in Support of Motion to Intervene, # 2 Declaration of Travis Joseph, # 3 Declaration of Steven A. Brink, # 4 Declaration of Michael H. Albrecht, # 5 [Proposed] Defendant-Intervenors' Answer, # 6 Proposed Order) (Attorney Matthew Marshall Gurvitz added to party American Forest Resource Council(pty:intvd), Attorney Matthew Marshall Gurvitz added to party California Forestry Association(pty:intvd), Attorney Matthew Marshall Gurvitz added to party Associated California Loggers(pty:intvd)) (Gurvitz, Matthew) (Entered: 10/17/2019) |
| 10/17/2019 | 20 | CORPORATE DISCLOSURE STATEMENT filed by Intervenor Defendants American Forest Resource Council, Associated California Loggers, California Forestry Association (Gurvitz, Matthew) (Entered: 10/17/2019) |
| 10/21/2019 | 21 | APPLICATION of Non-Resident Attorney Lawson E. Fite to Appear Pro Hac Vice on behalf of Intervenor Defendants American Forest Resource Council, Associated California Loggers, California Forestry Association (Pro Hac Vice Fee - $400 Fee Paid, Receipt No. 0973-24642676) filed by Defendant-Intervenors American Forest Resource Council, Associated California Loggers, California Forestry Association. (Attachments: # |

**ER-128**

| | | |
|---|---|---|
| | | **1** Proposed Order on Application of Non-Resident Attorney to Appear In a Specific Case Pro Hac Vice) (Gurvitz, Matthew) (Entered: 10/21/2019) |
| 10/21/2019 | 22 | APPLICATION of Non-Resident Attorney Sara Ghafouri to Appear Pro Hac Vice on behalf of Intervenor Defendants American Forest Resource Council, Associated California Loggers, California Forestry Association (Pro Hac Vice Fee - $400 Fee Paid, Receipt No. 0973-24643010) filed by Defendant-Intervenors American Forest Resource Council, Associated California Loggers, California Forestry Association. (Attachments: # 1 Proposed Order on Application of Non-Resident Attorney to Appear In a Specific Case Pro Hac Vice) (Gurvitz, Matthew) (Entered: 10/21/2019) |
| 10/24/2019 | 23 | PLAINTIFFS' RESPONSE TO MOTION TO INTERVENE re NOTICE OF MOTION AND MOTION to Intervene 19 filed by Plaintiffs Center For Biological Diversity, Earth Island Institute, Los Padres Forestwatch. (Augustine, Justin) (Entered: 10/24/2019) |
| 10/25/2019 | 24 | ORDER by Judge Fernando M. Olguin: Granting 22 Non-Resident Attorney Sara Ghafouri APPLICATION to Appear Pro Hac Vice on behalf of American Forest Resource Council, California Forestry Association and Associated California Loggers, Defendant Intervenors, designating Matthew M. Gurvitz as local counsel. (twdb) (Entered: 10/25/2019) |
| 10/25/2019 | 25 | ORDER by Judge Fernando M. Olguin: Granting 21 Non-Resident Attorney Lawson E. Fite APPLICATION to Appear Pro Hac Vice on behalf of American Forest Resource Council, California Forestry Association and Associated California Loggers, Defendant Intervenors, designating Matthew M. Gurvitz as local counsel. (twdb) (Entered: 10/25/2019) |
| 10/31/2019 | 26 | Joint STIPULATION to Vacate scheduling conference and enter case management plan Initial Order Setting R26 Scheduling Conference - form only 13 filed by Federal Defendants Kevin B. Elliott, United States Fish and Wildlife Service, United States Forest Service. (Attachments: # 1 Proposed Order, # 2 Statment of Consent to Proceed Before a United States Magistrate Judge)(Smith, Nicole) (Entered: 10/31/2019) |
| 11/06/2019 | 27 | TEXT ONLY ENTRY by Chambers of Judge Fernando M. Olguin. In light of the pending Consent to Proceed Before a United States Magistrate Judge, the hearing on Motion to Intervene 19 , and the Scheduling Conference set for 11/14/2019 are vacated by order of the court. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (cw) TEXT ONLY ENTRY (Entered: 11/06/2019) |
| 11/08/2019 | 28 | CONSENT TO PROCEED before United States Magistrate Judge by all parties pursuant to GO 18-11 is approved by District Judge Fernando M. Olguin and Magistrate Judge Patrick J. Walsh. This case is hereby reassigned to Magistrate Judge Patrick J. Walsh for all further proceedings. Case number will now read 2:19-cv-05925 PJW. (rn) (Entered: 11/08/2019) |
| 11/20/2019 | 29 | SCHEDULING NOTICE by Magistrate Judge Patrick J. Walsh - Telephonic Scheduling Conference set for 12/17/2019 at 2:00 PM. Call-in information will be emailed to counsel. Counsel shall call in at 1:55 PM. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (im) TEXT ONLY ENTRY (Entered: 11/20/2019) |
| 12/17/2019 | 30 | MINUTES OF TELEPHONIC SCHEDULING CONFERENCE held before Magistrate Judge Patrick J. Walsh. The case is called and appearances are made. The federal Defendants will file the administrative record by January 8, 2020. The Court has adopted the Parties' schedule for further proceedings. Parties are ordered to file a Joint Status Report by January 8, 2020. All other dates/contingencies are contained in the attached memorandum from counsel. Court Recorder: CS 12/17/19. (Attachments: # 1 Attachment) (sbou) (Entered: 12/19/2019) |

**ER-129**

| 01/06/2020 | [31](#) | ORDER GRANTING MOTION TO INTERVENE by Magistrate Judge Patrick J. Walsh: granting [19](#) MOTION to Intervene. Having considered the Motion to Intervene by American Forest Resource Council, California Forestry Association, and Associated California Loggers, and being fully advised, the Court hereby GRANTS the Motion to Intervene. (sbou) (Entered: 01/07/2020) |
|---|---|---|
| 01/08/2020 | [32](#) | STATUS REPORT *Joint* filed by Plaintiffs Center For Biological Diversity, Earth Island Institute, Los Padres Forestwatch. (Attachments: # [1](#) Proposed Order)(Augustine, Justin) (Entered: 01/08/2020) |
| 01/08/2020 | [33](#) | NOTICE of Lodging Administrative Record filed by defendants Kevin B. Elliott, United States Fish and Wildlife Service, United States Forest Service. (Attachments: # [1](#) Exhibit, # [2](#) Exhibit)(Duffy, Sean) (Entered: 01/08/2020) |
| 01/09/2020 | [34](#) | ORDER by Magistrate Judge Patrick J. Walsh. Pursuant to the parties' request to allow more time to resolve outstanding issues, and for good cause shown, the Court sets the deadline for filing a joint status report for February 5, 2020. re [32](#) (sbou) (Entered: 01/10/2020) |
| 02/04/2020 | [35](#) | STATUS REPORT *Joint* filed by Plaintiffs Center For Biological Diversity, Earth Island Institute, Los Padres Forestwatch. (Attachments: # [1](#) Proposed Order)(Augustine, Justin) (Entered: 02/04/2020) |
| 02/11/2020 | [36](#) | ORDER SETTING BRIEFING SCHEDULE AND PROVIDING RELIEF FROM LOCAL CIVIL RULE 56 by Magistrate Judge Patrick J. Walsh. IT IS ORDERED that the Parties are exempt from the requirements of Local Civil Rule 56-1 and 56-2. IT IS FURTHER ORDERED that a hearing will be held on June 9, 2020 at 1:30 p.m. (See document for details.) (sbou) (Entered: 02/13/2020) |
| 02/21/2020 | [37](#) | NOTICE OF MOTION AND MOTION for Summary Judgment filed by Plaintiffs Center For Biological Diversity, Earth Island Institute, Los Padres Forestwatch. Motion set for hearing on 6/9/2020 at 01:30 PM before Magistrate Judge Patrick J. Walsh. (Attachments: # [1](#) Declaration of Bryant Baker, # [2](#) Declaration of Jeff Miller, # [3](#) Declaration of Justin Augustine, # [4](#) Proposed Judgment) (Augustine, Justin) (Entered: 02/21/2020) |
| 02/21/2020 | [38](#) | NOTICE OF MOTION AND MOTION to Supplement the Administrative Record with Extra-Record Evidence filed by Plaintiffs Center For Biological Diversity, Earth Island Institute, Los Padres Forestwatch. Motion set for hearing on 6/9/2020 at 01:30 PM before Magistrate Judge Patrick J. Walsh. (Attachments: # [1](#) Declaration of Justin Augustine, # [2](#) Proposed Order) (Augustine, Justin) (Entered: 02/21/2020) |
| 03/09/2020 | [39](#) | First APPLICATION for Extension of Time to File Response to Motion for Summary Judgment and Response to Motion to Supplement Administrative Record filed by defendant Kevin B. Elliott, United States Fish and Wildlife Service, United States Forest Service. (Attachments: # [1](#) Proposed Order) (Duffy, Sean) (Entered: 03/09/2020) |
| 03/10/2020 | [40](#) | ORDER AMENDING BRIEFING SCHEDULE AND HEARING DATE [39](#) by Magistrate Judge Patrick J. Walsh: the Court grants Federal Defendants' unopposed application to amend the briefing schedule and hearing date, and amends the briefing schedule and hearing date as follows: *see document for details.* IT IS FURTHER ORDERED that a hearing will be held on August 17, 2020 at 1:30 p.m. (es) (Entered: 03/12/2020) |
| 04/06/2020 | [41](#) | NOTICE of Appearance filed by attorney Bridget Kennedy McNeil on behalf of Defendants Kevin B. Elliott, United States Fish and Wildlife Service, United States Forest Service (Attorney Bridget Kennedy McNeil added to party Kevin B. Elliott (pty:dft), Attorney Bridget Kennedy McNeil added to party United States Fish and |

**ER-130**

| | | Wildlife Service(pty:dft), Attorney Bridget Kennedy McNeil added to party United States Forest Service(pty:dft))(McNeil, Bridget) (Entered: 04/06/2020) |
|---|---|---|
| 04/24/2020 | 42 | MEMORANDUM in Opposition to NOTICE OF MOTION AND MOTION to Supplement the Administrative Record with Extra-Record Evidence 38 filed by Defendants Kevin B. Elliott, United States Fish and Wildlife Service, United States Forest Service. (Attachments: # 1 Declaration (Patrick Lieske), # 2 Declaration (Joseph Brandt))(McNeil, Bridget) (Entered: 04/24/2020) |
| 04/24/2020 | 43 | NOTICE OF MOTION AND MOTION for Summary Judgment *and in Opposition to Plaintiffs' Motion for Summary Judgment* filed by Defendant-Intervenors American Forest Resource Council, Associated California Loggers, California Forestry Association. Motion set for hearing on 8/17/2020 at 01:30 PM before Magistrate Judge Patrick J. Walsh. (Fite, Lawson) (Entered: 04/24/2020) |
| 04/24/2020 | 44 | MEMORANDUM in Opposition to NOTICE OF MOTION AND MOTION to Supplement the Administrative Record with Extra-Record Evidence 38 filed by Intervenor Defendants American Forest Resource Council, Associated California Loggers, California Forestry Association. (Fite, Lawson) (Entered: 04/24/2020) |
| 04/24/2020 | 45 | REQUEST FOR JUDICIAL NOTICE re NOTICE OF MOTION AND MOTION for Summary Judgment *and in Opposition to Plaintiffs' Motion for Summary Judgment* 43 filed by Intervenor Defendants American Forest Resource Council, Associated California Loggers, California Forestry Association. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Fite, Lawson) (Entered: 04/24/2020) |
| 04/24/2020 | 46 | NOTICE OF MOTION re NOTICE OF MOTION AND MOTION for Summary Judgment 37 , NOTICE OF MOTION AND MOTION for Summary Judgment *and in Opposition to Plaintiffs' Motion for Summary Judgment* 43 filed by Defendants Kevin B. Elliott, United States Fish and Wildlife Service, United States Forest Service. Motion set for hearing on 8/17/2020 at 01:30 PM before Magistrate Judge Patrick J. Walsh. (Duffy, Sean) (Entered: 04/24/2020) |
| 05/29/2020 | 47 | MEMORANDUM in Opposition to NOTICE OF MOTION AND MOTION for Summary Judgment *and in Opposition to Plaintiffs' Motion for Summary Judgment* 43 *and Reply in Support of Plaintiffs' Motion for Summary Judgment[* filed by Plaintiffs Center For Biological Diversity, Earth Island Institute, Los Padres Forestwatch. (Augustine, Justin) (Entered: 05/29/2020) |
| 05/29/2020 | 48 | REPLY in support of NOTICE OF MOTION AND MOTION to Supplement the Administrative Record with Extra-Record Evidence 38 filed by Plaintiffs Center For Biological Diversity, Los Padres Forestwatch. (Augustine, Justin) (Entered: 05/29/2020) |
| 05/29/2020 | 49 | REQUEST FOR JUDICIAL NOTICE filed by Plaintiffs Center For Biological Diversity, Earth Island Institute, Los Padres Forestwatch. (Augustine, Justin) (Entered: 05/29/2020) |
| 05/29/2020 | 50 | NOTICE OF NON-OPPOSITION *to Motion for Judicial Notice* filed by Plaintiffs Center For Biological Diversity, Earth Island Institute, Los Padres Forestwatch. (Augustine, Justin) (Entered: 05/29/2020) |
| 06/26/2020 | 51 | NOTICE of Supplemental Authority filed by Plaintiffs Center For Biological Diversity, Earth Island Institute, Los Padres Forestwatch. (Augustine, Justin) (Entered: 06/26/2020) |
| 06/26/2020 | 52 | EX PARTE APPLICATION for Extension of Time to File Reply in Support of Cross-Motion for Summary Judgment filed by Defendant Kevin B. Elliott, United States Fish and Wildlife Service, United States Forest Service. (Attachments: # 1 Proposed Order) (Duffy, Sean) (Entered: 06/26/2020) |

**ER-131**

| 06/30/2020 | 53 | ORDER AMENDING BRIEFING SCHEDULE 52 by Magistrate Judge Patrick J. Walsh: the Court grants Federal Defendants' unopposed application to amend the briefing schedule and amends the briefing schedule as follows: July 7, 2020 Federal Defendants' reply in support of their cross-motion for summary judgment (limited to 13,500 words). July 7, 2020 Defendant-Intervenors' reply in support of their cross-motion for summary judgment (limited to 13,500 words). IT IS FURTHER ORDERED that a hearing will be held on August 17, 2020 at 1:30 p.m. (es) (Entered: 06/30/2020) |
|---|---|---|
| 07/07/2020 | 54 | REPLY in Support of NOTICE OF MOTION AND MOTION for Summary Judgment *and in Opposition to Plaintiffs' Motion for Summary Judgment* 43 filed by Intervenor Defendants American Forest Resource Council, Associated California Loggers, California Forestry Association. (Ghafouri, Sara) (Entered: 07/07/2020) |
| 07/07/2020 | 55 | REPLY *in Support of Notice of Motion and Motion for Summary Judgment* filed by Defendants Kevin B. Elliott, United States Fish and Wildlife Service, United States Forest Service. (Duffy, Sean) (Entered: 07/07/2020) |
| 08/05/2020 | 56 | Text Only Entry The parties are directed to file a brief of five pages or less explaining what impact, if any, the 9th Circuits August 3, 2020 decision in EPIC v. Carlson, 19-17479, has on their pending motions. The briefs are due one week from today, August 11, 2020. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (ev) TEXT ONLY ENTRY (Entered: 08/05/2020) |
| 08/11/2020 | 57 | SUPPLEMENT to NOTICE OF MOTION AND MOTION for Summary Judgment 37 filed by Plaintiffs Center For Biological Diversity, Earth Island Institute, Los Padres Forestwatch. (Augustine, Justin) (Entered: 08/11/2020) |
| 08/11/2020 | 58 | SUPPLEMENT to NOTICE OF MOTION AND MOTION for Summary Judgment *and in Opposition to Plaintiffs' Motion for Summary Judgment* 43 filed by Intervenor Defendants American Forest Resource Council, Associated California Loggers, California Forestry Association. (Ghafouri, Sara) (Entered: 08/11/2020) |
| 08/11/2020 | 59 | SUPPLEMENT to NOTICE OF MOTION AND MOTION for Summary Judgment 37 , NOTICE OF MOTION AND MOTION for Summary Judgment *and in Opposition to Plaintiffs' Motion for Summary Judgment* 43 filed by Defendants Kevin B. Elliott, United States Fish and Wildlife Service, United States Forest Service. (Duffy, Sean) (Entered: 08/11/2020) |
| 08/17/2020 | 60 | MINUTES OF Plaintiffs' Motion for Summary Judgment and Motion to Supplement the Administrative Record (Docs. 37-38); Intervenors' Motion for Summary Judgment (Doc. 43); Defendants' Motion for Summary Judgment (Doc. 46) Hearing held before Magistrate Judge Patrick J. Walsh: The case is called and appearances are made. Before the Court are cross motions for summary judgment and Plaintiffs' Motion to Supplement the Administrative Record. (Docs. 37-38, 43, 46.) Following the issuance of a tentative decision, the Court heard argument from counsel and will issue a final decision this week. Court Reporter: AT&T 8/17/20. (es) (Entered: 08/18/2020) |
| 08/20/2020 | 61 | ORDER GRANTING PLAINTIFFS' MOTION TO SUPPLEMENT THE RECORD; GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT by Magistrate Judge Patrick J. Walsh. (See document for details.) (es) (Entered: 08/20/2020) |
| 08/20/2020 | 62 | JUDGMENT by Magistrate Judge Patrick J. Walsh. Pursuant to the Order Granting Defendants' Motion for Summary Judgment, IT IS ADJUDGED that the entire action is dismissed with prejudice. 61 (MD JS-6, Case Terminated). (es) (Entered: 08/20/2020) |
| 08/20/2020 | 63 | NOTICE OF APPEAL to the 9th Circuit Court of Appeals filed by Plaintiffs Center For Biological Diversity, Earth Island Institute, Los Padres Forestwatch. Appeal of Judgment |

**ER-132**

| | | |
|---|---|---|
| | | **62** , Order on Motion for Summary Judgment, Order on Motion to Supplement, **61** . (Appeal Fee - $505 Fee Paid, Receipt No. ACACDC-27718307.) (Attachments: # **1** Representation Statement)(Augustine, Justin) (Entered: 08/20/2020) |
| 08/21/2020 | **64** | NOTIFICATION from Ninth Circuit Court of Appeals of case number assigned and briefing schedule. Appeal Docket No. 20-55859 assigned to Notice of Appeal to 9th Circuit Court of Appeals **63** as to Plaintiffs Earth Island Institute, Los Padres Forestwatch. (et) (Entered: 08/24/2020) |
| 08/25/2020 | **65** | TRANSCRIPT ORDER re: Court of Appeals case number 20-55859, as to Plaintiffs Center For Biological Diversity, Earth Island Institute, Los Padres Forestwatch for Court Smart (CS). Court will contact Justin Augustine at jaugustine@biologicaldiversity.org with further instructions regarding this order. Transcript preparation will not begin until payment has been satisfied with the transcription company. (Augustine, Justin) (Entered: 08/25/2020) |
| 09/01/2020 | **66** | APPLICATION to the Clerk to Tax Costs against Plaintiffs All Plaintiffs filed by Defendants Kevin B. Elliott, United States Forest Service, United States Fish and Wildlife Service. (Attachments: # **1** Declaration) (McNeil, Bridget) (Entered: 09/01/2020) |
| 09/02/2020 | **67** | NOTICE OF REASSIGNMENT OF CASE due to Unavailability of Judicial Officer filed. The previously assigned Magistrate Judge is no longer available. Pursuant to directive of the Chief Magistrate Judge and in accordance with the rules of this Court, the case has been returned to the Clerk for reassignment. This case has been reassigned to Judge Virginia A. Phillips for all further proceedings and Magistrate Judge Karen L. Stevenson for any discovery and/or post-judgment matters that may be referred. Case number will now read as 2:19-cv-05925 VAP(KSx). (rn) (Entered: 09/02/2020) |
| 09/15/2020 | **68** | Objection re: APPLICATION to the Clerk to Tax Costs against Plaintiffs All Plaintiffs **66** filed by Plaintiffs Center For Biological Diversity, Earth Island Institute, Los Padres Forestwatch. (Attachments: # **1** Declaration of Kieran Suckling, # **2** Declaration of Jeff Kuyper, # **3** Declaration of Chad Hanson)(Augustine, Justin) (Entered: 09/15/2020) |
| 09/18/2020 | **69** | RESPONSE IN SUPPORT of APPLICATION to the Clerk to Tax Costs against Plaintiffs All Plaintiffs **66** filed by Defendants Kevin B. Elliott, United States Fish and Wildlife Service, United States Forest Service. (Attachments: # **1** Declaration, # **2** Declaration) (Duffy, Sean) (Entered: 09/18/2020) |
| 09/24/2020 | **70** | TRANSCRIPT for proceedings held on 8/17/2020, 1:30 p.m. Court Reporter/Electronic Court Recorder: JAMS CERTIFIED TRANSCRIPTION, phone number (661) 609-4528. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Electronic Court Recorder before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Notice of Intent to Redact due within 7 days of this date. Redaction Request due 10/15/2020. Redacted Transcript Deadline set for 10/26/2020. Release of Transcript Restriction set for 12/23/2020. (ls) (Entered: 09/28/2020) |
| 09/24/2020 | 71 | NOTICE OF FILING TRANSCRIPT filed for proceedings 8/17/2020, 1:30 p.m. re Transcript **70** THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (ls) TEXT ONLY ENTRY (Entered: 09/28/2020) |
| 09/28/2020 | **72** | DESIGNATION of Record on Appeal by Plaintiffs Center For Biological Diversity, Earth Island Institute, Los Padres Forestwatch re **63** (Augustine, Justin) (Entered: 09/28/2020) |
| 11/09/2020 | **73** | BILL OF COSTS. Costs Taxed in amount of $10,900 in favor of DEFENDANT and against PLAINTIFF. RE: APPLICATION to the Clerk to Tax Costs against Plaintiffs All Plaintiffs **66** (kr) (Entered: 11/09/2020) |

| 11/16/2020 | 74 | NOTICE OF MOTION AND MOTION to Re-Tax Costs against Kevin B. Elliott, United States Fish and Wildlife Service, United States Forest Service filed by Plaintiffs Center For Biological Diversity, Earth Island Institute, Los Padres Forestwatch. Motion set for hearing on 2/8/2021 at 02:00 PM before Judge Virginia A. Phillips. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Declaration of Kieran Suckling, # 4 Declaration of Jeff Kuyper, # 5 Declaration of Chad Hanson, # 6 Proposed Order) (Augustine, Justin) (Entered: 11/16/2020) |
| --- | --- | --- |
| 01/15/2021 | 75 | OPPOSITION to NOTICE OF MOTION AND MOTION to Re-Tax Costs against Kevin B. Elliott, United States Fish and Wildlife Service, United States Forest Service 74 filed by Defendants Kevin B. Elliott, United States Fish and Wildlife Service, United States Forest Service. (Attachments: # 1 Declaration)(McNeil, Bridget) (Entered: 01/15/2021) |
| 01/22/2021 | 76 | REPLY in support of NOTICE OF MOTION AND MOTION to Re-Tax Costs against Kevin B. Elliott, United States Fish and Wildlife Service, United States Forest Service 74 filed by Plaintiffs Center For Biological Diversity, Earth Island Institute, Los Padres Forestwatch. (Augustine, Justin) (Entered: 01/22/2021) |
| 01/28/2021 | 77 | STIPULATION for Hearing re NOTICE OF MOTION AND MOTION to Re-Tax Costs against Kevin B. Elliott, United States Fish and Wildlife Service, United States Forest Service 74 filed by Federal Defendants Kevin B. Elliott, United States Fish and Wildlife Service, United States Forest Service. (Attachments: # 1 Proposed Order)(McNeil, Bridget) (Entered: 01/28/2021) |
| 01/29/2021 | 78 | ORDER ON STIPULATION TO SUBMIT PLAINTIFFS' MOTION TO RETAX COSTS ON THE PAPERS by Judge Virginia A. Phillips 77 Plaintiffs and Federal Defendants have stipulated to submit the Plaintiffs' Motion to Retax Costs, ECF No. 74, currently set for hearing on February 8, 2021, on the papers. Therefore, FOR GOOD CAUSE, the February 8, 2021 hearing is vacated and the motion is now submitted for consideration. (yl) (Entered: 02/01/2021) |
| 02/25/2021 | 79 | ORDER GRANTING Motion to Re-Tax Costs IN PART (Dkt. 74) by Judge Virginia A. Phillips: The Court therefore GRANTS Plaintiffs' Motion IN PART. For the reasons stated above, the Court deducts Defendants' Bill by 6 hours (or $600) for time billed to "Los Padres Admin Record." The Court DENIES the remainder of Plaintiffs' Motion. (see document for further details) (bm) (Entered: 02/26/2021) |
| 02/04/2022 | 80 | OPINION from Ninth Circuit Court of Appeals filed re: Notice of Appeal to 9th Circuit Court of Appeals, 63 filed by Los Padres Forestwatch, Earth Island Institute, and Center For Biological Diversity. CCA # 20-55859. The district court's order is VACATED and REMANDED. (yl) (Entered: 02/07/2022) |
| 07/05/2022 | 81 | MANDATE of Ninth Circuit Court of Appeals filed re: Notice of Appeal to 9th Circuit Court of Appeals, 63 , CCA # 20-55859. The judgment of this Court, entered February 04, 2022, takes effect this date. This constitutes the formal mandate of this Court issued pursuant to Rule 41(a) of the Federal Rules of Appellate Procedure. [See USCA Opinion 80 VACATE AND REMAND.](mat) (Entered: 07/06/2022) |
| 07/22/2022 | 82 | ORDER from Ninth Circuit Court of Appeals filed re: Notice of Appeal to 9th Circuit Court of Appeals, 63 filed by Los Padres Forestwatch, Earth Island Institute, Center For Biological Diversity. CCA # 20-55859. Appellants' motion to transfer consideration of attorney fees on appeal to the district court (Docket Entry No. 61) is GRANTED. (car) (Entered: 07/25/2022) |
| 07/25/2022 | 83 | NOTICE OF MOTION AND MOTION to Reopen Case , NOTICE OF MOTION AND MOTION for Leave to file Supplemental Complaint filed by Plaintiffs Center For Biological Diversity, Earth Island Institute, Los Padres Forestwatch. Motion set for |

**ER-134**

| | | hearing on 8/29/2022 at 02:00 PM before Judge Virginia A. Phillips. (Attachments: # 1 Proposed Order) (Augustine, Justin) (Entered: 07/25/2022) |
|---|---|---|
| 07/27/2022 | 84 | Notice of Appearance or Withdrawal of Counsel: for attorney Nicole Norma King counsel for Intervenor Defendant American Forest Resource Council. Adding Nicole N King as counsel of record for American Forest Resource Council for the reason indicated in the G-123 Notice. Filed by Defendant-Intervenors American Forest Resource Council. (Attorney Nicole Norma King added to party American Forest Resource Council(pty:intvd))(King, Nicole) (Entered: 07/27/2022) |
| 07/27/2022 | 85 | Notice of Appearance or Withdrawal of Counsel: for attorney Matthew M. Gurvitz counsel for Intervenor Defendant American Forest Resource Council. Filed by Defendant-Intervenors AMERICAN FOREST RESOURCE COUNCIL. (Gurvitz, Matthew) (Entered: 07/27/2022) |
| 08/05/2022 | 86 | RESPONSE IN SUPPORT of NOTICE OF MOTION AND MOTION to Reopen Case NOTICE OF MOTION AND MOTION for Leave to file Supplemental Complaint 83 filed by Defendants Kevin B. Elliott, United States Fish and Wildlife Service, United States Forest Service. (Duffy, Sean) (Entered: 08/05/2022) |
| 08/08/2022 | 87 | RESPONSE filed by Intervenor Defendant American Forest Resource Council (King, Nicole) (Entered: 08/08/2022) |
| 08/08/2022 | 88 | RESPONSE IN SUPPORT of NOTICE OF MOTION AND MOTION to Reopen Case NOTICE OF MOTION AND MOTION for Leave to file Supplemental Complaint 83 *Response To Plaintiffs Unopposed Motion* filed by Intervenor Defendant American Forest Resource Council. (King, Nicole) (Entered: 08/08/2022) |
| 08/11/2022 | 89 | NOTICE OF MOTION AND MOTION to Withdraw LAWSON E. FITE AS COUNSEL filed by Defendant-Intervenors American Forest Resource Council. Motion set for hearing on 9/12/2022 at 02:00 PM before Judge Virginia A. Phillips. (Attachments: # 1 Memorandum, # 2 Proposed Order) (King, Nicole) (Entered: 08/11/2022) |
| 08/11/2022 | 90 | [WITHDRAWN ON 08/23/22] NOTICE OF MOTION AND MOTION to Withdraw LAWSON E. FITE AS COUNSEL filed by Defendant-Intervenors American Forest Resource Council, Associated California Loggers, California Forestry Association. Motion set for hearing on 9/12/2022 at 02:00 PM before Judge Virginia A. Phillips. (Attachments: # 1 Memorandum, # 2 Proposed Order) (Attorney Nicole Norma King added to party Associated California Loggers(pty:intvd), Attorney Nicole Norma King added to party California Forestry Association(pty:intvd)) (King, Nicole) Modified on 8/24/2022 (wm). (Entered: 08/11/2022) |
| 08/23/2022 | 91 | Notice of Withdrawal of Motion to Withdraw,, 90 filed by DEFENDANT-INTERVENORS American Forest Resource Council, Associated California Loggers, California Forestry Association. (King, Nicole) (Entered: 08/23/2022) |
| 08/23/2022 | 92 | Notice of Appearance or Withdrawal of Counsel: for attorney Lawson E. Fite counsel for Intervenor Defendants American Forest Resource Council, Associated California Loggers, California Forestry Association. Lawson E. Fite is no longer counsel of record for the aforementioned party in this case for the reason indicated in the G-123 Notice. Filed by Intervenor-Defendants AFRC et al.. (Fite, Lawson) (Entered: 08/23/2022) |
| 08/26/2022 | 93 | TEXT ONLY ENTRY by Judge Virginia A. Phillips: Please be advised a telephonic Conference Re: Motion to Reopen Case and Motion for Leave to file Supplemental Complaint 83 is set for 08/31/22 at 10am. Clerk to provide call-in information by email. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (wm) TEXT ONLY ENTRY (Entered: 08/26/2022) |

**ER-135**

| 08/26/2022 | 94 | TEXT ONLY ENTRY by Judge Virginia A. Phillips: Please be advised the motion hearing presently set for 08/29/22 is vacated. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (wm) TEXT ONLY ENTRY (Entered: 08/26/2022) |
| --- | --- | --- |
| 08/31/2022 | 95 | ORDER GRANTING MOTION TO REOPEN CASE AND LEAVE TO FILE SUPPLEMENTAL COMPLAINT 83 by Judge Virginia A. Phillips: Plaintiffs' motion is GRANTED. Plaintiffs shall file their First Supplemental Complaint as a separate docket entry. (MD-JS5 Case Reopened). (lc) (Entered: 09/01/2022) |
| 08/31/2022 | 96 | MINUTES OF TELEPHONIC CONFERENCE RE: PLAINTIFFS' UNOPPOSED MOTION TO REOPEN CASE AND FOR LEAVE TO FILE SUPPLEMENTAL COMPLAINT 83 Motion Hearing held before Judge Virginia A. Phillips: The Court advises that the motion to reopen will be granted by a separate order. The Court also continues the telephonic hearing to September 19, 2022 at 1:00 p.m., and instructs counsel to review the Voluntary Consent to Magistrate Judges' list and advise before September 19th if the parties consent to a magistrate judge. The Court directs the clerk to provide the following call-in information to counsel. Conference Line: 877-336-1829 Access Code: 6814471 Further, the Court advises that the hearing date shall be vacated upon the filing of a consent form (CV-11D form). Court Reporter: Myra Ponce. (lc) (Entered: 09/01/2022) |
| 09/01/2022 | 97 | (STRICKEN PER 9/6/2022 ORDER DOCKET NO. 99 and No. 100). FIRST SUPPLEMENTAL AMENDED COMPLAINT against Defendants Kevin B. Elliott, United States Forest Service amending Amended Complaint/Petition 15 , filed by Plaintiffs Center For Biological Diversity, Earth Island Institute, Los Padres Forestwatch(Augustine, Justin) Modified on 9/6/2022 (lc). Modified on 9/6/2022 (lc). (Entered: 09/01/2022) |
| 09/02/2022 | 98 | NOTICE TO FILER OF DEFICIENCIES in Electronically Filed Document RE: FIRST SUPPLEMENTAL COMPLAINT 97 . The following error(s) was/were found: FRCP 10...Caption of initiating pleading is incomplete...has "et al", thus clerk unable identify parties as required. Upon review of body text... it appears a newly named defendant found on page 4, line 17 as "Defendant CHRISTOPHER STUBBS is sued in his official capacity as the Supervisor of Los Padres National Forest". Since not on caption, clerk is not authorized to add party to case. Also, there has been no No Formal notice of substitution of federal defendant on record as to "Kevin B. Elliott Supervisor, Los Padres National Forest" to date. In response to this notice, the Court may: (1) order an amended or correct document to be filed; (2) order the document stricken; or (3) take other action as the Court deems appropriate. You need not take any action in response to this notice unless and until the Court directs you to do so. (lc) (Entered: 09/02/2022) |
| 09/06/2022 | 99 | ORDER by Judge Virginia A. Phillips: the following document(s) be STRICKEN for failure to comply with the Local Rules, General Order and/or the Courts Case Management Order: First Supplemental Amended Complaint 97 , for the following reasons: Pursuant to FRCP 10, caption of initiating pleading is incomplete. Defendant referenced in the body of the document is not listed on the caption as required. (lc) (Entered: 09/06/2022) |
| 09/06/2022 | 100 | ORDER by Judge Virginia A. Phillips: the following document(s) be STRICKEN for failure to comply with the Local Rules, General Order and/or the Courts Case Management Order: First Supplemental Amended Complaint 97 , for the following reasons: Pursuant to FRCP 10, caption of initiating pleading is incomplete. Defendant Christopher Stubbs referenced in the body of the document is not listed on the caption as required. (lc) (Entered: 09/06/2022) |

**ER-136**

| 09/07/2022 | [101](#) | Notice Substitution of Party filed by defendant Kevin B. Elliott, United States Fish and Wildlife Service, United States Forest Service. (Duffy, Sean) (Entered: 09/07/2022) |
|---|---|---|
| 09/07/2022 | [102](#) | FIRST SUPPLEMENTAL AMENDED COMPLAINT against Defendants United States Forest Service, Christopher Stubbs amending Amended Complaint/Petition [15](#) , filed by Plaintiffs Center For Biological Diversity, Earth Island Institute, Los Padres Forestwatch(Augustine, Justin) (Entered: 09/07/2022) |
| 09/15/2022 | [103](#) | Joint Proposed Case Management Plan filed by Defendants Christopher Stubbs, United States Fish and Wildlife Service, United States Forest Service (Duffy, Sean) (Entered: 09/15/2022) |
| 09/19/2022 | [109](#) | MINUTES OF TELEPHONIC CONFERENCE RE: CONSENT TO PROCEED BEFORE A MAGISTRATE JUDGE held before Judge Virginia A. Phillips. The Court conferred with parties regarding their participation in the Courts Panel Mediation. The Court orders the parties to complete mediation on or before October 31, 2022. The Court has reviewed the parties' Joint Stipulated Case Management Plan. (Dkt. 103). The Court adopts following schedule. [See minutes for deadlines.] The Court continues the hearing to November 7, 2022, at 11:00 a.m. The hearing will be in person at the First Street Courthouse, Courtroom 6A. The parties are directed to inform the court if they plan to appear telephonically. Court Reporter: Myra Ponce. (lom) (Entered: 09/23/2022) |
| 09/21/2022 | [104](#) | NOTICE OF LODGING filed *Supplemental Administrative Record* re Miscellaneous Document [103](#) (Attachments: # [1](#) Declaration, # [2](#) Exhibit, # [3](#) Exhibit, # [4](#) Exhibit, # [5](#) Exhibit, # [6](#) Exhibit, # [7](#) Exhibit, # [8](#) Exhibit, # [9](#) Exhibit, # [10](#) Exhibit, # [11](#) Exhibit, # [12](#) Exhibit, # [13](#) Exhibit, # [14](#) Exhibit)(Duffy, Sean) (Entered: 09/21/2022) |
| 09/23/2022 | [105](#) | Notice of Lead Counsel for Defendant-Intervenors filed by Defendant-Intervenors American Forest Resource Council, Associated California Loggers, California Forestry Association. (King, Nicole) (Entered: 09/23/2022) |
| 09/23/2022 | [106](#) | ANSWER to Amended Complaint/Petition, [102](#) *(DEFENDANT-INTERVENORS' ANSWER TO FIRST SUPPLEMENTAL COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF (ECF NO. 102))* filed by Defendant-Intervenors American Forest Resource Council, Associated California Loggers, California Forestry Association.(King, Nicole) (Entered: 09/23/2022) |
| 09/23/2022 | [107](#) | ANSWER to Amended Complaint/Petition, [102](#) *Federal Defendants' Answer to First Supplemental Complaint for Declaratory and Injunctive Relief (ECF No. 102)* filed by Defendant Christopher Stubbs, United States Fish and Wildlife Service, United States Forest Service.(Duffy, Sean) (Entered: 09/23/2022) |
| 09/23/2022 | [108](#) | NOTICE OF MOTION AND MOTION for Summary Judgment filed by Plaintiffs Center For Biological Diversity, Earth Island Institute, Los Padres Forestwatch. Motion set for hearing on 11/7/2022 at 11:00 AM before Judge Virginia A. Phillips. (Attachments: # [1](#) Declaration of Bryant Baker, # [2](#) Proposed Judgment) (Augustine, Justin) (Entered: 09/23/2022) |
| 10/07/2022 | [110](#) | NOTICE OF MOTION AND MOTION for Summary Judgment *AND IN OPPOSITION TO PLAINTIFFS MOTION [ECF NO. 108]* filed by Defendant-Intervenors American Forest Resource Council, Associated California Loggers, California Forestry Association. Motion set for hearing on 11/7/2022 at 11:00 AM before Judge Virginia A. Phillips. (Ghafouri, Sara) (Entered: 10/07/2022) |
| 10/07/2022 | [111](#) | NOTICE OF MOTION re NOTICE OF MOTION AND MOTION for Summary Judgment [108](#) , NOTICE OF MOTION AND MOTION for Summary Judgment *AND IN OPPOSITION TO PLAINTIFFS MOTION [ECF NO. 108]* [110](#) filed by Defendants Christopher Stubbs, United States Fish and Wildlife Service, United States Forest |

**ER-137**

| | | Service. Motion set for hearing on 11/7/2022 at 11:00 AM before Judge Virginia A. Phillips. (Duffy, Sean) (Entered: 10/07/2022) |
|---|---|---|
| 10/17/2022 | 112 | MEMORANDUM in Opposition to NOTICE OF MOTION AND MOTION for Summary Judgment *AND IN OPPOSITION TO PLAINTIFFS MOTION [ECF NO. 108]* 110 *and in Opposition to NOTICE OF MOTION re NOTICE OF MOTION AND MOTION for Summary Judgment* 111 *, and Reply in Support of Plaintiffs' Motion for Summary Judgment* 108 filed by Plaintiffs Center for Biological Diversity, Earth Island Institute, Los Padres Forestwatch. (Augustine, Justin) (Entered: 10/17/2022) |
| 10/21/2022 | 113 | STIPULATION REGARDING SELECTION of Panel Mediator filed. Parties stipulate that David Cranston may serve as Panel Mediator. Plaintiff obtained the Panel Mediators consent to serve. All parties and the Panel Mediator have agreed that the mediation will be held on 10/25/2022 and counsel will submit mediation statements seven (7) calendar days before the session. Filed by Plaintiffs Center For Biological Diversity, Earth Island Institute, Los Padres Forestwatch(Augustine, Justin) (Entered: 10/21/2022) |
| 10/24/2022 | 114 | NOTICE OF ASSIGNMENT of Panel Mediator. Mediator (ADR Panel) David E Cranston has been assigned to serve as Panel Mediator. (lst) (Entered: 10/24/2022) |
| 10/24/2022 | 115 | REPLY in Support of NOTICE OF MOTION AND MOTION for Summary Judgment *AND IN OPPOSITION TO PLAINTIFFS MOTION [ECF NO. 108]* 110 filed by Intervenor Defendants American Forest Resource Council, Associated California Loggers, California Forestry Association. (Ghafouri, Sara) (Entered: 10/24/2022) |
| 10/24/2022 | 116 | *REPLY in Support of Federal Defendants Cross-Motion for Summary Judgment (ECF No. 111)* filed by Defendants Christopher Stubbs, United States Fish and Wildlife Service, United States Forest Service. (Duffy, Sean) (Entered: 10/24/2022) |
| 11/07/2022 | 117 | MINUTES OF IN-PERSON STATUS CONFERENCE RE: MEDIATION PLAINTIFFFS' MOTION FOR SUMMARY JUDGMENT 108 DEFENDANT-INTERVENORS' CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION (ECF NO. 108) 110 FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT 111 held before Judge Virginia A. Phillips. The Court, having heard the oral argument presented today, takes the motions under submission. A ruling will be issued after full consideration of the submitted pleadings. Court Reporter: Myra Ponce. (rolm) (Entered: 11/10/2022) |
| 12/05/2022 | 118 | ORDER DENYING Plaintiffs' Motion for Summary Judgment 108 by Judge Virginia A. Phillips: The Court GRANTS Federal Defendants' and Defendant-Intervenor's Motions for Summary Judgment 110 and DENIES Plaintiffs' Motion for Summary Judgment. (lc) (Entered: 12/05/2022) |
| 01/03/2023 | 119 | JUDGMENT by Judge Virginia A. Phillips: Pursuant to the Order Granting Defendant-Intervenors'and Federal Defendants' Cross-Motions for Summary Judgment 118 . Judgment is entered in favor of Defendant-Intervenors and Federal Defendants, and the action is DISMISSED WITH PREJUDICE. (MD JS-6, Case Terminated). (lc) (Entered: 01/04/2023) |
| 01/13/2023 | 120 | NOTICE OF APPEAL to the 9th Circuit Court of Appeals filed by Plaintiffs Center For Biological Diversity, Earth Island Institute, Los Padres Forestwatch. Appeal of Order on Motion for Summary Judgment,,, 118 , Judgment, 119 . (Appeal Fee - $505 Fee Paid, Receipt No. ACACDC-34619294.) (Attachments: # 1 Representation Statement) (Augustine, Justin) (Entered: 01/13/2023) |
| 01/17/2023 | 121 | NOTIFICATION from Ninth Circuit Court of Appeals of case number assigned and briefing schedule. Appeal Docket No. 23-55054 assigned to Notice of Appeal to 9th |

|  |  | Circuit Court of Appeals, 120 as to plaintiffs Center For Biological Diversity, Earth Island Institute, Los Padres Forestwatch. (lc) (Entered: 01/18/2023) |
| 01/31/2023 | 122 | DESIGNATION of Record on Appeal by Plaintiffs Center For Biological Diversity, Earth Island Institute, Los Padres Forestwatch re 120 (Augustine, Justin) (Entered: 01/31/2023) |

| PACER Service Center | | |
| Transaction Receipt | | |
| 04/11/2023 10:26:41 | | |
| PACER Login: | jaugustine0412 | Client Code: | |
| Description: | Docket Report | Search Criteria: | 2:19-cv-05925-VAP-KS End date: 4/11/2023 |
| Billable Pages: | 18 | Cost: | 1.80 |

**ER-139**

## CERTIFICATE OF SERVICE

I hereby certify that on April 24, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Justin Augustine*
_____
Justin Augustine
Brian Segee

*Attorneys for Plaintiffs-Appellants*